**LAW OFFICE OF JOSEPH M. KAR, PC**
Joseph M. Kar (SBN 207414)
jkar@civillegal.com
15250 Ventura Blvd., Suite PH-1220
Sherman Oaks, CA 91403
Telephone: (818) 501-6930
Facsimile: (818) 501-6935

**BLANK ROME LLP**
Gregory M. Bordo (SBN 156147)
Greg.Bordo@BlankRome.com
Craig N. Haring (SBN 314100)
Craig.Haring@BlankRome.com
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone: (424) 239-3400
Facsimile: (424) 239-3434

Attorneys for Plaintiff
GRIDIRON PRODUCTIONS, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| GRIDIRON PRODUCTIONS LLC, a Georgia Limited Liability Company,<br><br>      Plaintiff,<br><br>   vs.<br><br>BRET MERRITT SAXON, an individual; JEFF BOWLER aka JEFFREY BOWLER, an individual; AMY SAXON, an individual; NINA PODOLSKA, an individual; RICHARD DAVIS, an individual; RICHARD SALVATORE, an  individual; WONDERFILM LLC aka WONDERFILM aka THE WONDERFILM MEDIA CORPORATION, a California Limited Liability Company, WONDER CAPITAL LLC, a Delaware Limited Liability Company;  WF HARD MATTER, LLC, a Louisiana Limited Liability Company; WF GROUP, LLC, a Delaware Limited Liability | Case No.<br><br>**ORIGINAL COMPLAINT FOR:**<br><br>1) **DECEIT/FRAUD;**<br>2) **SUPPRESSION OF FACTS;**<br>3) **VIOLATION OF PENAL CODE § 496;**<br>4) **BREACH OF CONTRACT;**<br>5) **CONVERSION (5); AND**<br>6) **RESTITUTION, MONEY LENT OR RECEIVED.**<br><br>[TRIAL BY JURY DEMANDED] |

Company; LUCKY OWL FILMS INC., a
California Corporation; EPIC JOURNEY
PRODUCTIONS, LLC aka EPIC JOURNEY
FILMS, LLC, a California Limited Liability
Company; PICKLE WAGON HOLDINGS
INC., a California Corporation; MARCH ON
PRODUCTIONS INC., a California
Corporation; and BOS ENTERTAINMENT
INC. dba THE EXCHANGE, a California
Corporation,

Defendants.

COMES NOW, PLAINTIFF GRIDIRON PRODUCTIONS, LLC ("Plaintiff"
or "Gridiron") and hereby alleges and avers as follows:

## NATURE OF THE ACTION

1.     This action arises from certain misrepresentations made by Defendants,
seasoned con-artists "in the movie business," who unbeknownst to Plaintiff at the
time, through their concerted acts, aiding and abetting, conspiracy, deceit, fraud,
conversion and other misconduct, stole investments from Plaintiff after fraudulently
inducing Plaintiff to invest and contribute $5,050,000, of an estimated total budget of
$7,300,000, to make the film "Hard Matter" (the "Film" or "Hard Matter") with Mel
Gibson as a lead, as well as used Plaintiff's investment to secure an estimated
$2,000,000 in state tax rebates for the making of the Film which, upon information
and belief, Defendants, and each of them, secreted, diverted, misused, and converted
for their own purposes.

## JURISDICTION AND VENUE

2.     This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C.
§ 1332(a), as, upon information and belief, no Defendant is a citizen or domiciliary
of the same state as Plaintiff and the amount in controversy exceeds $75,000.00,
exclusive of interest and costs.

3.     Venue is proper in this judicial district and this Court has personal
jurisdiction over all the Defendants by virtue of their transacting, doing, and soliciting
business in this District, and because a substantial part of the relevant events occurred

1

in this District.

## **PARTIES**

4.     Plaintiff Gridiron Production LLC is a Georgia limited liability company and did and does business as an independent film producer.  Latavius Powell ("Powell") is the sole officer, member, and/or manager of Gridiron.  Gridiron is the successor in interest and assignee of all rights, interests and entitlements of Powell, Powell's partner Justin Price ("Price"), and Price Productions, LLC (Powell, Price, and Price Productions, LLC collectively referred to herein as "Price Productions") with respect to the Hard Matter Short Form Finance Agreement dated September 23, 2021, and all claims arising from or related to the agreement.  Attached hereto as **Exhibit 1** is a true and correct copy of the Hard Matter Short Form Finance Agreement dated September 23, 2021.

5.     Defendant Bret Merrick Saxon ("Bret Saxon") is an adult that resides and is a citizen of, did and does business in, and is, upon information and belief, domiciled in the State of California.  On May 26, 2021, Bret Saxon was disgracefully removed from the California bar and stripped of his license to practice law after a California Bar trial court found him guilty of stealing.  The final ruling on his discipline in In re discipline of BRET MERRICK SAXON was entered by the California Supreme Court en banc, at Docket No. S270015, with State Bar Court Case No. 17-O-01259-YDR, entitled, In re matter of Accusation of Defendant BRET MERRICK SAXON on September 22, 2021 ("Moral Turpitude Disbarment").  Attached hereto as **Exhibits 2 and 3** are true and correct copies of (**2**) the California Supreme Court Decision In Re BRET MERRICK SAXON on discipline en banc, Docket No. S270015, and (**3**) the trial court decision in State Bar Court Case No. 17-O-01259-YDR, In re matter of accusation against BRET MERRICK SAXON.  Wherein the Moral Turpitude Disbarment found that Bret Saxon "misappropriation of $1.5 million of entrusted funds from an investor in a movie Respondent was going to produce. The court f[ou]nd[], by clear and convincing evidence, that Respondent is culpable for the

intentional and dishonest misappropriation of the investor's funds, an act of moral turpitude." See **Exhibit 3**, pg. 1 thereto. As part of those decisions, Bret Saxon was liable for over $1.5 million plus interest since 2009 in restitution.

6. Defendant Jeffrey Bowler ("Bowler") is an adult that resides and is a citizen of, did and does business in, and is, upon information and belief, domiciled in the State of California. Upon information and belief, Bowler participated, aided and abetted, conspired with and engaged in misconduct resulting in the theft of money found in the Moral Turpitude Disbarment.

7. Bret Saxon and Bowler are partners, and are the principals in, owners, controllers, or otherwise direct (directly or indirectly) Defendants Wonderfilm LLC, aka The Wonderfilm Media Corporation ("Wonderfilm"), a California limited liability company; Wonder Capital LLC ("WC"), a Delaware limited liability company; WF Hard Matter, LLC ("WFHM"), a Louisiana limited liability company; WF Group, LLC ("WF Group"), a Delaware limited liability company; Luck Owl Films, Inc. ("Lucky Owl"), a California corporation; Epic Journey Productions, LLC, aka Epic Journey Films, LLC ("Epic Journey"), a California limited liability company; Pickle Wagon Holdings, Inc. ("Pickle Wagon"), a California corporation; March on Productions, Inc. ("March on Productions"), a California corporation; and BOS Entertainment, Inc. dba The Exchange ("The Exchange"), a California corporation. Upon information and belief, Bowler has and is the head of acquisitions for The Exchange and, upon information belief and unbeknownst to Price Productions and Plaintiff, closed secret business arrangements or dealings with that entity, including with respect to the Film.

8. Upon information and belief, Defendant Amy Saxon ("Amy Saxon") is the wife of Bret Saxon and is an adult that resides and is a citizen of, did and does business in, and is, upon information and belief, domiciled in the State of California. Amy Saxon is a principal in, owns, controls, or otherwise directs (directly or indirectly) Defendants WF and WF Group for, on behalf of, and at the direction and

control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.

9.     Defendant Nina Podolska ("Podolska"), upon information and belief, is the girlfriend of Bowler, and is an adult that resides and is a citizen of, did and does business in, and is, upon information and belief, domiciled in the State of California. Podolska is a principal in, owns, controls, or otherwise directs (directly or indirectly) Defendant Lucky Owl, for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.

10.     Defendant Richard Davis ("Davis"), upon information and belief, is a cohort of Bowler, and is a resident of the State of Illinois.  Davis is a principal in, owns, controls, or otherwise directs (directly or indirectly) Defendant Epic Journey, and works for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.

11.     Defendant Richard Salvatore ("Salvatore"), upon information and belief, is a cohort of Bret Saxon and Bowler, and is a resident of the State of California. Salvatore is a principal in, owns, controls, or otherwise directs (directly or indirectly) Defendant March on Productions, Inc., and works for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.

12.     Defendant Wonderfilm LLC is a California limited liability company that did and does business in California, and is, upon information and belief, a resident, citizen of, and with all its members, upon information and belief, domiciled in California with its nerve center in that state.  Wonderfilm was formed on December 6, 2021, upon information and belief, is a shell entity owned, controlled, or otherwise directed and instructed by and operates for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.  Upon further information and belief, Wonderfilm is entirely owned and/or controlled by, with a unity of interest in Bret Saxon and Bowler, and operates as their main puppet entity.

13.     Defendant Wonder Capital LLC is a Delaware limited liability company that did and does business in California.  Upon information and belief, none of its members are citizens of the State of Georgia.  WC was formed in October 12, 2017, and is, upon information and belief, a suspended shell entity owned, controlled, or otherwise directed and instructed by and operates, for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.

14.     Defendant WF Hard Matter LLC is a Louisiana limited liability company.  Upon information and belief, all its members are residents, citizens of, and domiciled in the State of California.  WFHM was formed on October 14, 2021 and is, upon information and belief, a suspended shell entity owned, controlled, or otherwise directed and instructed by and operates, for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments,

benefits, and other consideration from investors seeking legitimate services of a production company.

15.   Defendant WF Group LLC is a Louisiana limited liability company. Upon information and belief, all of its members are residents, citizens of, and domiciled in the State of California.  WF Group was formed on October 14, 2021 and is, upon information and belief, a suspended shell entity owned, controlled, or otherwise directed and instructed by and operates, for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.

16.   Defendant Lucky Owl Films Inc. is a California corporation that did and does business in California, and is, upon information and belief, a resident, citizen of, and domiciled in California with its nerve center in that state.  Lucky Owl is, upon information and belief, a shell entity owned, controlled, or otherwise directed and instructed by and operates at the behest, of Defendant Podolska for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.

17.   Defendant Epic Journey Productions, LLC is a California limited liability company, suspended in 2017, that did and does business in California, and is, upon information and belief, a resident, citizen of, and domiciled in California with its nerve center in that state.  Epic Journey, upon information and belief, operates as a movie production company and aided and abetted, or otherwise was directed and instructed by, for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration

from investors seeking legitimate services of a production company.

18.   Defendant Pickle Wagon Holdings Inc. is a California corporation that did and does business in California, and is, upon information and belief, a resident, citizen of, and domiciled in California with its nerve center in that state.  Pickle Wagon, upon information and belief, operates as a movie production company, and aided and abetted, or otherwise was directed and instructed by, for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.

19.   Defendant March on Productions Inc. is a California corporation that did and does business in California, and is, upon information and belief, a resident, citizen of, and domiciled in California with its nerve center in that state.  March on Productions, upon information and belief, operates as a movie production company, and aided and abetted, or otherwise was directed and instructed by, for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.

20.   Defendant Bos Entertainment Inc., dba The Exchange, is a California corporation that did and does business in California, and is, upon information and belief, a resident, citizen of, and domiciled in California with its nerve center in that state.  The Exchange, upon information and belief, operates as a movie production company, and aided and abetted, or otherwise was directed and instructed by, for, on behalf of, and at the direction and control of Defendants Bret Saxon, Bowler, Wonderfilm, WC, WFHM, and/or WF Group to deceive, defraud, and embezzle, steal and/or take money, investments, benefits, and other consideration from investors seeking legitimate services of a production company.

21.   Plaintiff is informed and believes, and thereon alleges, that each Defendant, was and is the agent, employee, servant, subsidiary, partner, member, co-conspirator, aider and abettor, associate or representative of each other Defendant, and all of the things alleged to have been done by the Defendants, and each of them, were done in the course and scope of the agency, employment, service, or representative relationship and with the knowledge and consent of their respective principals, employers, masters, parent corporations, partners, members, associates, or representatives.

## **GENERAL ALLEGATIONS**

### Defendants Induce Price Productions Into Financing The Film

22.   In or around early September 2021, the representative and predecessor of Gridiron, Price Productions, entered into contract negotiations with Bret Saxon and Bowler of Wonderfilm for the financing and production of the Film.  During these negotiations, Powell travelled to Los Angeles and met with Bret Saxon at the Saxon family home, in pursuit of the Film and completion of the Film before knowing of the fraud or any wrongdoing by the Defendants; and Powell communicated terms, conditions, plans, and ideas, and other things about the Film through email and phone or text messages directly with Bret Saxon and Bowler from the Los Angeles area. IMDB[1] describes "Hard Matter" as: "In a crime plagued future, a power-hungry corporation has issued deadly watches to criminals, forcing them to eliminate each other for freedom, and only one of their own can topple the entire system from within."

23.   At all relevant times, upon information and belief, Defendants and each of them, knew or should have known or became aware of the fact that on May 26, 2021, Bret Saxon was disgracefully removed from the California bar pursuant to the Moral Turpitude Disbarment.  However, Defendants concealed that information and

---

[1]      http://www.imdb.com is a film, tv, and media industry resource website.  It is self-described as "IMDb is the world's most popular and authoritative source for movie, TV and celebrity content. Find ratings and reviews for the newest movie and TV shows."

did not disclose those facts to Price Productions or Plaintiff. Furthermore, despite Defendants quietly removing Bret Saxon's name and information from public view on Wonderfilm's website, Bret Saxon remained and continued to engage as a principal, owner, controller, or otherwise directed (directly or indirectly) the entity Defendants.

24.    In the course of the negotiations over the financing and production of Hard Matter, and after execution of a written agreement, Bret Saxon and Bowler made certain untrue and false representations and promises to entice Price Productions and Plaintiff to invest $5,050,000 and transfer intellectual property rights for the Film based on representations that superstar celebrity Mel Gibson would star in the Film.

25.    For example, knowing that Price Productions would be lured to finance Hard Matter if a big star was signed on for the Film, Bret Saxon and Bowler informed Price Productions in early September 2021 that Mel Gibson "loved the script" and that he was "onboard" for $3,000,000.

26.    Based on Bret Saxon and Bowler's representations, Price Productions expressed a strong interest in having Mel Gibson in the lead starring role and requested that Bret Saxon and Bowler provide them a written agreement for Price Productions to finance the Film, subject to a provision that Price Productions could later assign the agreement to a different entity (Gridiron). Bret Saxon informed Powell that, as an attorney, he believed that a name change or assigning the agreement to a different entity for the financing would not be a problem if needed in the future.

27.    However, unbeknownst to Price Productions and Plaintiff, Mel Gibson was not available to star in Hard Matter because he already committed to another film entitled "Hot Seat" set to start production on November 1, 2021 in New Mexico; and, upon information and belief, Mel Gibson had either declined to star in Hard Matter or Bret Saxon and Bowler had fabricated their purported discussions with Mel Gibson to deceive Price Productions into entering into an agreement to produce Hard Matter with Bret Saxon, Bowler, Wonderfilm, WC, WFHM, WF Group, and The Exchange

(the "Wonderfilm Defendants") .

28.     On September 21, 2021, Bret Saxon and Bowler continued to deceive Price Productions by representing that Mel Gibson would star in Hard Matter. Specifically, Bret Saxon and Bowler sent Price Productions The Exchange's sales projection report reflecting that with Mel Gibson starring in Hard Matter, the Film was estimated to earn over $8,000,000 in world-wide revenue, including between $2,600,000 to $3,750,000 in the USA alone.

29.     That same day, on September 21, 2021, the California Supreme Court denied review and any relief to Bret Saxon in connection with the Moral Turpitude Disbarment, including the restitution order requiring Bret Saxon to pay approximately $3,000,000 in restitution (including interest in principle sum stolen).  Defendants never disclosed the Moral Turpitude Disbarment or the California Supreme Court's denial of review of the disbarment to Price Productions or Plaintiff.

30.     On September 23, 2021, based on the representations from the Wonderfilm Defendants that Mel Gibson would star in Hard Matter, Price for Price Productions signed the Hard Matter Short Form Contingent Finance Agreement with WC dated September 23, 2021 (the "First Contingent Agreement"), which in pertinent part and as a material part of the agreement contained the following provisions, among others,

> 2. Financier shall be entitled to have its certified
> public accountant examine, audit and copy, at Financier's
> sole cost and expense, those parts of the Company's books
> and records which relate to the Picture during reasonable
> business hours at such place where said books and records
> are regularly maintained. Such examinations shall be made
> upon not less than ten (10) days prior notice and shall
> not be held more frequently than once each calendar year.
> Additionally, Financier shall be provided with an ongoing

10

**COMPLAINT**

1    cost report during the production of the Picture.

2

3    3. Parties agree that for a transaction of this nature

4    more formal documents may be required to affect the

5    ultimate purpose of this Agreement and do hereby agree to

6    incorporate the terms and conditions of this letter

7    Agreement into said documents, if any. Parties agree to

8    negotiate in good faith terms and conditions not contained

9    herein using the standards and customs of the theatrical

10   motion picture industry for such negotiations. Unless and

11   until such further documents are executed, if ever, this

12   Agreement shall bind and inure to the benefit of the

13   Parties, their successors and assigns.

14

15   4. <u>Parties shall mutually agree</u> to all key creative,

16   artistic and business decisions relating to the

17   development, production (final key cast and crew)

18   distribution and other exploitation of the Picture.

19   **Exhibit 1**, ¶¶ 2-4 (emphasis added).

20   <u>Defendants Continue to Entice Price Productions to Invest More Money In Hard</u>

21   <u>Matter Based on Mel Gibson Starring in the Film</u>

22   31. After the First Contingent Agreement was executed, on or about

23   September 28, 2021, the Wonderfilm Defendants continued to deceive Price

24   Productions about Mel Gibson's involvement in the Film by transmitting a budget for

25   Hard Matter reflecting the $3,000,000 talent charge for Mel Gibson, among other

26   expenses, that appeared consistent with producing Hard Matter with the superstar

27   actor.  Other charges included: (1) special effects of $22,106; (2) wardrobe $69,698;

28   (3) art department of $78,552; (4) producer fees for Bret Saxon, Bowler, Wonderfilm,

11

WC, WFHM, and WF Group of $720,075; (5) sound of $35,417, and (6) "POST ALL IN DEAL" for $195,000.

32.   By October 9, 2021, Bret Saxon and Bowler continued to falsely entice and mispresent to Price Productions that Mel Gibson "[was] in" and that Mel Gibson's people needed a $2,500,000 guarantee to "lock him in."  Bowler further taunted Powell, telling him not to get "cold feet" and that the delay in depositing the funds would risk losing Mel Gibson as the lead actor and delay the expected November 15, 2021 start date for filming.

33.   Feeling justified in relying on Bowler's statements and not aware that the Wonderfilm Defendants and each of their statements or actions or inactions made were false and/or intended to deceive, approximately three days later, on October 12, 2021, Powell transferred $2,050,000 to WC for the strict purpose of guaranteeing Mel Gibson's role in Hard Matter.

34.   The next day, on or about October 13, 2021, Bowler texted Powell indicating that he had submitted the offer to Mel Gibson that morning.  Believing, as indicated by the Wonderfilm Defendants, that Mel Gibson was committed to Hard Matter as the lead actor, Price contacted Bowler to request a physical address for delivering wardrobe for the main characters, including Mel Gibson, for the expected November 15, 2021 start date of filming.

35.   That same day, continuing to deceive and mislead Powell and Price, Bowler told Bret Saxon, who then told Price Productions, that he had a "great" call with Mel Gibson's team earlier that morning.  During this time, Bret Saxon and Bowler repeatedly told Powell and Price that the deal with Mel Gibson was secured and encouraged them to proceed as if that were true while the Wonderfilm Defendants knew that Mel Gibson had no interest in the Film, and upon information and belief, Mel Gibson's "people" were not in contact with any of the Wonderfilm Defendants.

36.   By November 2, 2021, still believing that Mel Gibson was signed on to star in Hard Matter, Price Productions submitted sample Hard Matter graphics with

Mel Gibson to the Wonderfilm Defendants. However, as Wonderfilm Defendants well knew and had never disclosed to Price Productions at that time, Mel Gibson never agreed to star in Hard Matter, and had already started production of the film "Hot Seat" on November 1, 2021 in New Mexico; and, upon information and belief, on November 15, 2021, Mel Gibson also confirmed that he would be directing the fifth "Lethal Weapon" film.

37.   By the second week of November 2021, after duping Price Productions to invest $5,050,000 in Hard Matter based on the representation that Mel Gibson would star in the Film, and mere days before filming was to start on November 15, 2021, Wonderfilm Defendants admitted to Price Productions that Mel Gibson had not agreed to star in the Film. They further stated that production would not start until the first quarter of 2022.

Defendants Siphon Money Away from the Film

38.   Knowing that Price Productions was at risk of pulling its investment out of Hard Matter after learning that Mel Gibson would not be starring in the Film, Defendants siphoned money out of the Film's production to enrich themselves while diminishing the value and quality of the Film. Among other things, the Wondefilm Defendants adjusted the expense items in Hard Matter's budget so that they would keep the differences for themselves or to their benefit, by, and among other things, hiring unapproved and unnecessary producers and distributing the $2,500,000 Plaintiff invested to secure Mel Gibson to themselves through certain false and fraudulent "Loan Out Deal Memos" including the following:

a.   on or before November 10, 2021, WFHM and Pickle Wagon entered into a "Loan Out Agreement" in the amount of $450,000 to loan out Bret Saxon as an executive producer for Hard Matter;

b.   on or before November 10, 2021, WFHM and WC entered into a "Loan Out Agreement" in the amount of $500,000 to loan out Bowler as an executive producer for Hard Matter;

13
**COMPLAINT**

c.    on or before November 10, 2021, WFHM and Lucky Owl entered into a "Loan Out Agreement" in the amount of $450,000 to loan out Podolska as a producer for Hard Matter;

d.    on or before November 10, 2021, WFHM and Epic Journey entered into a "Loan Out Agreement" in the amount of $450,000 to loan out Davis for Hard Matter;

e.    on or before November 10, 2021, WFHM and March on Productions entered into a "Loan Out Agreement" in the amount of $200,000 to loan out Salvatore for Hard Matter; and

f.    on or before November 10, 2021, WFHM and WF Group, entered into a "Loan Out Agreement" in the amount of $500,000 to loan out Powell as an executive producer for Hard Matter, but which said sum was paid to and credited to the Film and not to Powell.

39.    While Defendants were looting the production funds, the Wonderfilm Defendants further began offering new high-profile actors to Price Productions to replace Mel Gibson in order to string Price Productions along.  For example, on or about November 21, 2021, Bret Saxon texted Powell that he was very close to "closing" John Travolta to star in the Film but he had passed and was now talking to Nicholas Cage.  In December 2021, the Wonderfilm Defendants sent another text to Powell stating that they were 80% certain that Gary Oldman would be on board.

40.    Between October 9, 2021 to January 2022, at no time did any of the Defendants account for the $2,500,000 that Price Productions had previously transferred to WC for the Film, nor did any of the Defendants notify or obtain from Price Productions  any approval to alter or to effect any changes to the talent, budget, or any other material aspect of the First Contingent Agreement for the Film's production, including the previously provided sales projections for the Film generated by The Exchange.

41.    On October 13, 2021, WC, by Bowler and The Exchange,  entered into a

14

**COMPLAINT**

binding Sales Term Sheet with respect to Hard Matter, which provided for further inflated compensation and favorable conditions and terms to The Exchange that, at no time, were approved or authorized by Price Productions, including an unheard of 20 year term with a five year option and exclusive rights for any future sequel, priority in payment of residuals over Price Productions and Plaintiff (hereinafter, "Sales Term Sheet.").

42.  However, the Sales Term Sheet expired by its own terms and conditions on November 5, 2021 without renewal or modification and had express condition precedent that provided for only Mel Gibson to play the leading starring role in the Film.  Attached hereto as **Exhibit 4** is a true and correct copy of the expired Sales Term Sheet of October 13, 2021.

43.  Upon information and belief, the Wonderfilm Defendants had tacit and secret agreements, encouraged and worked together to deceive and defraud Price Productions and Plaintiff by continuing to portray that the Sales Term Sheet was executory in respect to the Film at all times, despite the failure of the condition precedent requiring Mel Gibson in the lead starring role and the express expiration of that agreement on November 5, 2021.  **Exhibit 4**, pgs. 2 and 3.

44.  On January 9, 2022, despite not having obtained an executed assignment or rights thereto, Bowler executed an "Assignment" of all of WC's rights, title, and interest in the Film to WFHM.

45.  By January 2022, when the second production start date arrived, the Wonderfilm Defendants told Price Productions that they were closing a deal with Harvey Keitel, Peter Storemare and Frank Grillo to star in the Film.

46.  At that point, the balance of the $5.05M to finance Hard Matter called for in the First Contingent Agreement was not paid back to Price Productions, and Powell began to question things and ask Defendants to provide updated budgets and forecasting of sales for the Film in respect to the "switch" to Harvey Keitel and Frank Brillo as lead actors in the Film, as was its right under the First Contingent Agreement.

47.   Bowler continued to deceive Price Productions, telling Powell that the switch to Harvey Keitel was a close equivalent to Mel Gibson and orally stated, at that time, that Harvey Keitel was only being paid $1,750,000, Tyrese Gibson would be paid $1,000,000, Ray Stevenson would be paid $350,000, and Frank Grillo would be paid $250,000.

48.   On or about January 24, 2022, Bret Saxon and Bowler transmitted another sales forecast for the Film to continue to deceive Price Productions, reflecting that Harvey Keitel and Frank Grillo's involvement in the Film had an estimated initial revenue of over $9,000,000 worldwide, including between $2,150,000 to $3,500,000 in the USA alone.

49.   On February 5 and 6, 2022, without Price Productions' knowledge, WC, by and through Bowler, each respectively signed into a "Script Option/Purchase Agreement" dated January 8, 2022 regarding an original screen play entitled "Hard Matter" written by Price.

50.   On February 7, 2022, without Price Productions' knowledge, WFHM applied for a copyright for the "Hard Matter" as claimant thereof, and upon information and belief, that application was granted to that claimant.

51.   Unbeknownst to Price Productions and Plaintiff, by, on or about, February 11, 2022, Defendants Brett Saxon and Bowler, for Defendants, and each of them, had created but conceal the new budget for the Film, and did not obtain prior approval of or consulting with Price Productions and/or Plaintiff at any time.

Filming Starts and Defendants' Secretly Modify the First Contingent Agreement

52.   Production of Hard Matter finally began on March 25, 2022.  Defendants agreed that post-production would take place in April 2022, the Film would be sold by July 1, 2022, and there would be an initial producer's cut sent to Powell by June 2, 2022.

53.   On or around March 28, 2022, Price Productions assigned all its rights and claims arising from and related to the First Contingent Agreement to Gridiron.

54.   That day, the Wonderfilm Defendants sent a "Revised Contingent Agreement" to Powell, which they falsely claimed only changed the name on the First Contingent Agreement for the financer from Powell and Price Productions to Gridiron, as was requested by Price Productions.  Attached hereto as **Exhibit 5** is a true and correct copy of the Revised Contingent Agreement of March 28, 2022.

55.   However, the Wonderfilm Defendants conspired to deceive Price Productions and Gridiron by falsely and without authority making unauthorized changes to the Revised Contingent Agreement without prior authority, approval, or other consideration.  The Wonderfilm Defendants surreptitiously and without notice changed ¶ 4 of the First Contingent Agreement so that Price Productions and Gridiron were striped of "all creative, artistic and business decisions relating to the development, production, distribution and other exploitation of the Film." **Exhibit 5**, ¶ 4 thereto.  In other words, the Wonderfilm Defendants modified the First Contingent Agreement, without notice to Price Productions or Gridiron, to purportedly give themselves complete control over the production and sale of Hard Matter.

<u>Defendants Delay Post-Production Work on the Film and</u>
<u>Misrepresent the Costs to Finish the Film</u>

56.   By April, Gridiron had heard nothing of the status of the Film, and asked Bret Saxon and Bowler whether the Film would still be sold by July 1, 2022.  They reassured Gridiron that it would.

57.   When June 2, 2022 arrived and Bret Saxon had not provided a first producer's cut of the Film, Bret Saxon and Bowler explained that the original timeline was aggressive and that edits would take an additional four to six weeks, which Powell accepted as true at the time.

58.   By July 15, 2022, Defendants had still not provided any updates about the completion of the Film and Powell wrote to express his discontent that there appeared to be no visual post-production work done on Hard Matter.

59.   Bret Saxon responded with an email on Friday, July 15, 2022, at 2:42

17

pm from the email address bret@thewonderfilm.com, writing:

```
Sound done 8/15

VFX done 9/1

Conform 9/8

Color 9/22

At this point we can screen film

Once we sell and get notes from domestic distributor

2 weeks to make edits/QC

1 week to prep delivery

If you want to create a sizzle to trim the timeline, I

think you need to wait until after VFX is done, but you

could do it before Conform and Color

bret
```

60.   Yet, by August 15 and September 1, 2022, sound and visual effects were not done.  Gridiron later learned that neither were completed because the vendors stopped work due to outstanding invoices.

61.   Unbeknownst to Gridiron, by September 1, 2022, WFHM had signed a Collection Account Management Agreement ("CAMA") in connection with the Film, providing for a different distribution of proceeds than previously agreed to in the First Contingency Agreement or the Revised Contingency Agreement, including without limit, wrongfully and without approval or consent subordinating Gridiron's right to receive proceeds for the Film and recapture the initial investment.

62.   After September 1, 2022, Powell learned from the VFX vendor that the total post-production budget for the Film provide to that vendor was $85,000 and that a heavy visual effects film alone should be $85,000, thus Defendants, and each of them, falsely and untruthfully mispresented the budget for the Film by, and in part, portraying the budget for all post-production work to be $195,000 while in truth, Defendants, and each of them, actually allotted only $85,000 for post-production

work, and expected to keep the rest for themselves, or aided and abetted, conspired, encouraged, and/or was a link in the chain in the wrongful conduct and fraud perpetrated by Defendants.

63.    At all times relevant, Defendants, and each of them, knew, should have known, but planned, conspired to, disregarded or just didn't care after secretly taking so much money out of the Film on November 10, 2021, that their failing and refusing to timely attend to and sufficiently fund post-production of the Film as agreed in the original budget would undermine the quality and salability of the Film and dissuade or undervalue any potential future profitable exploitation and distribution of the Film, especially after Mel Gibson was "switched" by surprise to Harvey Keitel for the lead starring role.

<u>Defendants Fail to Finish the Film</u>

64.    Around September 1, 2022, Bowler, for Defendants, and each of them, again unilaterally changed the VFX completion deadline for the Film, this time, to October 1, 2022, and the VFX vendor started working on the Film by that time.  By that time, as well, Bowler told Powell that the Film can be ready for screening at the American Film Festival ("AFM") in November 1, 2022 and that sales would be impacted if the Film was not ready, since AFM is a major industry forum for film sales and transactions.

65.    As Powell started to investigate the original budget and looked for evidence of the expenses for the production and post-production vendors for the Film, he discovered that several of the originally budgeted line-items were unilaterally reduced in price and scope of work or replaced or left unpaid or incomplete, including without limit, VFX, sound, conforming and color.

66.    As well as, during production the original budget provided for assistant directors, production assistants, wardrobe, makeup and complex stunts, for the Film, among other things, that Defendants, and each of them, instead eliminated, reduced in scope and price, or provided sub-standard or non-conforming alternatives without

prior consent or approval of Price Productions and Gridiron, and which was, upon information and belief, Defendants, and each of them, as part of their intent and/or plan all along in order to avoid detection and conceal or obfuscate their intent to take, syphon and/or capture money or benefits for themselves and each other and deceive and defraud Price Productions and Gridiron out of as much of the $5,050,000 provided to make the Film, even though Defendants knew or should have known their acts to material depreciate the quality and salability of the Film irreversibly.

67.    By this time, in or about after October 1, 2022, Powell had repeatedly requested copies of expenses, bank statements, receipts, invoices, actor and producer contracts, a locked budget, and all documents related to the Film including without limit all information related to the tax rebate credit of approximately $2,000,000 applied for from the State of Louisiana which was also a material term of the transaction to funds and produce the Film, which Defendants would not comply with despite the express condition permitting an audit and document review rights in the First Contingent Agreement and Revised Contingent Agreement.

68.    In response to Powell's requests, Defendants would direct him to a "dropbox", even though Defendants, and each of them, knew and/or should have known, conspired to or intended to misdirect and frustrate Powell and his requests for an audit and review of records, since the "dropbox" only had very limited set, if any, of the documents requested or required for a proper audit or review.

69.    After production of the Film was completed, and despite its many previous requests and demands, Gridiron was shocked and surprised to discover that Defendants, and each of them, modified the original budget for the Film to benefit themselves without authority or prior approval in violation of the First Contingent Agreement and Revised Contingent Agreement, including without limit, adding or making changings to the following producers or actors:

a.    Bret Saxon, WC, WF Group, and/or WFHM, was credited $450,000;

b.    Bowler, WC, WF Group, and/or WFHM, was credited $450,000;

c.    Wonderfilm's expense line item was reduced to $50,000;

d.    Podalska and/or Lucky Owl was credited $425,000 as "executive producer" but confusingly labeled as "production staff;"

e.    Salvatore and/or March on Productions was credited $200,000, upon information and belief, as a "line producer" but confusingly labeled as "production staff;"

f.    Harvey Keitel was paid $500,000 instead of $1,750,000 as Bowler previously represented;

g.    Frank Grillo was paid $100,000 instead of $250,000 as Bowler previously represented;

h.    Tyrese Gibson was paid $500,000 instead of $1,000,000 as Bowler previously represented;

i.    Ray Stephenson was credited $350,000, but, upon information and belief did not show up to the set and was replaced with Brett Cullen who was only paid $50,000; and

j.    Davis was credited $0.00 despite the producer agreement of November 10, 2021 providing for Epic Journey or he to receive $450,000.

70.    Upon information and belief, the differences between the budgeted expenses and the actual expenses were pocketed by Defendants.

71.    By mid-October 2022, Defendants told Powell that VFX were completed and everything was sent to The Exchange for preparation for screening at AFM.

72.    On October 19, 2022, Bowler, for Defendants, and each of them, continued to deceive and intended to defraud Gridiron, and wrote Powell confirming that The Exchange's sales team would be cutting a promotional trailer of the Film for AFM to show buyers for the sale of the Film.

73.    Powell attempted to phone Bowler the day before AFM started, but Bowler did not answer. Anxious to learn about the circumstances, meetings, interests,

offers, or sales of the Film, Powell tried calling Bowler the entire week and Bowler only answered once quickly to state that the Film was being shown at AFM and they will be wrapping up a sale soon.

74.    When Powell asked Bowler to show him the promotional material for the Film being used at AFM, Bowler refused.

75.    Shortly thereafter, Powell was informed that The Exchange did not even have the Film on its slate for AFM that year and did not show the Film at AFM nor did AFM create any promotional material as Defendants, and each of them, stated or portrayed.

76.    Defendants, and each of them, then continued to make more promises that they will work to sell the Film at the Berlin film festival in February 2023.  But months went by and Defendants still did nothing, which further caused deprecation of the value of the Film in addition to the diversion, theft and conversion of investment money earmarked for the Film by Defendants, and each of them, as alleged herein; and Defendants, and each of them, did not provide updates, information, and remained silent about the Film when asked to respond to inquiries from Mr. Powell.

77.    Then, on March 20, 2023, Powell was informed that Defendants had not paid Tunnel Post (a VFX company) the balance due of $53,000 and that Defendants were unable to pay that amount but offered to repay that amount on the back end through the CAMA, which would injure Plaintiff's financial interest and position.

78.    The next day, on March 21, 2023, Powell was informed that Defendants had a union contract with Tunnel Post to cover all post-production for the Film including sound but breached that agreement and were fined by the union $10,000 for contracting the sound engineering in a non-union transaction and were also required to pay the union contract with Tunnel Post with a then-balance due of $34,000.

79.    Powell attempted to mitigate the losses by offering to pay $15,000 toward the remaining balance but Defendants did not respond, and instead, upon information and belief, Defendants asked The Exchange to pay and recoup that amount from the

CAMA, which would still injure Plaintiff's financial interest and position.

80. By May 17, 2023, Gridiron made "Demand To Comply, Turn Over Operational And Command Control Of Production And/Or Post-Productions And For Tender Of All Accounts And For An Accounting" to Defendants.   (Hereinafter "Demand Letter").

81. After failing to respond to Powell's inquiries and requests for so long, on June 6, 2023, Bret Saxon, for Defendants, and each of them, disregarded the Demand Letter and sent an email to Powell at 3:39 pm stating:

> Latavius - I hope all is well. There are two pressing Matter on HM and I wanted to get your input:
>
> — as the sales agency communicated to you, the Lionsgate offer for domestic is at 500k. The Exchange recommends we take it. It will be pulled shortly. Last time you emailed them about it, you wanted to hold off. It seems it's decision time - we take it or lose the offer.
>
> — as discussed, the Exchange is ready to pay the ~35k to Tunnel to finalize and deliver the film. You emailed them to not pay it. The film is sitting unfinished. Has your position changed? We need to do something to get the film delivered or we won't be able to sell any territories.
>
> Looking forward to your thoughts.
>
> Thanks,
>
> bret

82. At no time prior had any of the Defendants advised Powell or Gridiron of a $500,000 offer from Loinsgate for domestic sales nor was that amount reasonable since the Film had still not been completed, nor had any Defendants sought approval

or authority from Plaintiff or its predecessor or principals for any of the unilateral changes and depreciation of the Film during production or in post-production.

83.   As of the filing of this Complaint, the Film is and has been left incomplete by Defendants, an each of them, as a result of the misconduct, fraud, and intentional conduct or violations of law as alleged herein.

### **FIRST CAUSE OF ACTION**

[Deceit/Fraud as against all Defendants]

84.   Plaintiff hereby reincorporates each and every allegation in this complaint as if fully set forth without duplication or repetition.

85.   As alleged above, Defendants fraudulently induced, or conspired or aided and abetted amongst themselves to fraudulently induce, Plaintiff to invest $5,050,000 into the production of Hard Matter.  Defendants further then strung Plaintiff along in order to loot the Film's production funds to benefit themselves at the expense of Plaintiff.

86.   The misrepresentations alleged above were false and Defendants, and each of them, knew they were false at the time they were made or Defendants, and each of them, otherwise made the misrepresentations recklessly and without regard to their truth.

87.   Defendants, and each of them, intended for Plaintiff to rely on the misrepresentations.

88.   Plaintiff reasonably relied on Defendants' misrepresentations.

89.   Had Plaintiff known the misrepresentations of Defendants, and each of them, were false, Plaintiff would have acted differently.

90.   Plaintiff's reliance on the misrepresentations of Defendants, and each of them, was a proximate cause and substantial factor in causing Plaintiff's harm.

91.   As a direct and proximate cause of the misrepresentations of Defendants, and each of them, Plaintiff has been harmed in an amount to be proven at trial, but not less than $5,050,000.

**SECOND CAUSE OF ACTION**

[Suppression of Facts against all Defendants]

92.   Plaintiff hereby reincorporates each and every allegation in this complaint as if fully set forth without duplication or repetition.

93.   As alleged above, Defendants intentionally failed, or conspired or aided and abetted amongst themselves to fail to disclose, or otherwise disclosed only some facts to make the disclosure deceptive, to Plaintiff in order to induce Plaintiff to invest in $5,050,000 into the production of Hard Matter, including without limit, in the pre-production financing, pre-production planning and marketing, post-production planning and marketing, and/or the Moral Turpitude Disbarment or prior trial court ruling against Bret Saxon at any time.

94.   Plaintiff was unaware of the concealed facts alleged above.

95.   Defendants intended to deceive Plaintiff by concealing the facts alleged above.

96.   Had Plaintiff been aware of the concealed facts alleged above, it would not have invested $5,050,000 into the production of Hard Matter.

97.   As a direct and proximate cause of Defendants concealing the facts alleged above, Plaintiff has been harmed in an amount to be proven at trial, but not less than $5,050,000.

**THIRD CAUSE OF ACTION**

[Violation of Penal Code § 496 as against all Defendants]

98.   Plaintiff hereby reincorporates each and every allegation in this complaint as if fully set forth without duplication or repetition.

99.   Pursuant to Penal Code § 496, it is unlawful for any person to conceal, sell, withhold, or aid in concealing, selling, or withholding any property from its owner, knowing the property to be stolen or wrongfully obtained.

100.  Any person that violates Penal Code § 496 is liable for three times the amount of actual damages, costs of suit, and reasonable attorney's fees.   Siry

Investment, L.P. v. Farkhondehpour, 13 Cal.5th 333, 347-348 (Cal. Sup., 2022).

101.  By the conduct of Defendants alleged above and herein, Defendants have violated Penal Code § 496.

102.  As a direct and proximate cause of the wrongful conduct of Defendants, Plaintiff has been harmed in an amount to be proven at trial.

## **FOURTH CAUSE OF ACTION**

### [Breach of Contract as against Defendant WC]

103.  Plaintiff hereby reincorporates each and every allegation in this complaint as if fully set forth without duplication or repetition.

104.  As alleged above, Price Productions and WC are parties to the written First Contingent Agreement.

105.  As alleged above, pursuant to the Revised Contingent Agreement, Price Productions assigned its interest to the Revised Contingent Agreement to Plaintiff.

106.  Plaintiff has performed all conditions, covenants, and promises required by it on its part to be performed in accordance with the terms and conditions of the First Contingent Agreement and Revised Contingent Agreement, except those obligations that Plaintiff was prevent or excused from performing.

107.  WC has breached the First Contingent Agreement and Revised Contingent Agreement by, among other things:

    a.    Defendants, and each of them, taking and converting (stealing) for themselves the $2.5MM in money Plaintiff paid to "lock up" Mel Gibson for the Film, as more fully alleged hereinabove, in ¶¶ 32-36 and 38, for example;

    b.    Failing to complete Hard Matter;

    c    Refused to allow Plaintiff to audit the costs and expenses of Hard Matter, and failing to provide ongoing accurate cost reports during the production of Hard Matter; and

    d.    Making key creative, artistic, and business decisions relating to the development, production, distribution, and other exploitation

26

**COMPLAINT**

decisions for Hard Matter without Plaintiff's knowledge or consent.

108.  Each, some, or all of the above breaches by WC were a substantial factor in causing injury to Plaintiff, and none of these breaches were excused.

109.  As a direct and proximate cause WC's breaches of the First Contingent Agreement and Revised Contingent Agreement, Plaintiff has been harmed in an amount to be proven at trial, but not less than $5,050,000.

## FIFTH CAUSE OF ACTION

[Count I]

[Conversion as Against the Wonderfilm Defendants]

110.  Plaintiff hereby reincorporates each and every allegation in this complaint as if fully set forth without duplication or repetition.

111. As alleged above, the Wonderfilm Defendants facilitated, aided and abetted, took, and wrongfully retained $5,050,000 of Plaintiff's funds.

112. By retaining and refusing to return Plaintiff's property, the Wonderfilm Defendants have knowingly, intentionally, and substantially interfered with Plaintiff's property.

113. Plaintiff has not consented to the Wonderfilm Defendants retaining Plaintiff's property.

114. By the Wonderfilm Defendants retaining and refusing to return Plaintiff's property, Plaintiff has been harmed.

115. As a direct and proximate cause of the wrongful conduct of the Wonderfilm Defendants, Plaintiff has been harmed in an amount to be proven at trial, but not less than $5,050,000.

## FIFTH CAUSE OF ACTION

[Count II]

[Conversion as Against Defendants Amy Saxon, WF Group, and WFHM]

116.  Plaintiff hereby reincorporates each and every allegation in this complaint

as if fully set forth without duplication or repetition.

117.  As alleged above, Amy Saxon, WF Group, and WFHM facilitated, aided and abetted, took, and wrongfully retained $500,000 of Plaintiff's funds.

118.  By retaining and refusing to return Plaintiff's property, Amy Saxon and WFHM have knowingly, intentionally, and substantially interfered with Plaintiff's property.

119.  Plaintiff has not consented to Amy Saxon, WFG, and WFHM retaining Plaintiff's property.

120.  By Amy Saxon, WFG, and WFHM retaining and refusing to return Plaintiff's property, Plaintiff has been harmed.

121.  As a direct and proximate cause of the wrongful conduct of Amy Saxon and WFHM, Plaintiff has been harmed in an amount to be proven at trial, but not less than $500,000.

## FIFTH CAUSE OF ACTION

[Count III]

[Conversion as Against Defendants Podolska and Lucky Owl]

122.  Plaintiff hereby reincorporates each and every allegation in this complaint as if fully set forth without duplication or repetition.

123.  As alleged above, Podolska and Lucky Owl facilitated, aided and abetted, took, and wrongfully retained $450,000 of Plaintiff's funds.

124.  By retaining and refusing to return Plaintiff's property, Podolska and Lucky Owl have knowingly, intentionally, and substantially interfered with Plaintiff's property.

125.  Plaintiff has not consented to Podolska and Lucky Owl retaining Plaintiff's property.

126.  By Podolska and Lucky Owl retaining and refusing to return Plaintiff's property, Plaintiff has been harmed.

127.  As a direct and proximate cause of the wrongful conduct of Podolska and

Lucky Owl, Plaintiff has been harmed in an amount to be proven at trial, but not less than $450,000.

## FIFTH CAUSE OF ACTION

### [Count IV]

### [Conversion as Against Defendants Davis and Epic Journey]

128. Plaintiff hereby reincorporates each and every allegation in this complaint as if fully set forth without duplication or repetition.

129. As alleged above, Davis and Epic Journey facilitated, aided and abetted, took, and wrongfully retained $450,000 of Plaintiff's funds.

130. By retaining and refusing to return Plaintiff's property, Davis and Epic Journey have knowingly, intentionally, and substantially interfered with Plaintiff's property.

131. Plaintiff has not consented to Davis and Epic Journey retaining Plaintiff's property.

132. By Davis and Epic Journey retaining and refusing to return Plaintiff's property, Plaintiff has been harmed.

133. As a direct and proximate cause of the wrongful conduct of Davis and Epic Journey, Plaintiff has been harmed in an amount to be proven at trial, but not less than $450,000.

## FIFTH CAUSE OF ACTION

### [Count V]

### [Conversion as Against Defendant Salvatore and March on Productions]

134. Plaintiff hereby reincorporates each and every allegation in this complaint as if fully set forth without duplication or repetition.

135. As alleged above, Salvatore and March on Productions facilitated, aided and abetted, took, and wrongfully retained $200,000 of Plaintiff's funds.

136. By retaining and refusing to return Plaintiff's property, Salvatore and March on Productions have knowingly, intentionally, and substantially interfered

29

with Plaintiff's property.

137. Plaintiff has not consented to Salvatore and March on Productions retaining Plaintiff's property.

138. By Salvatore and March on Productions retaining and refusing to return Plaintiff's property, Plaintiff has been harmed.

139. As a direct and proximate cause of the wrongful conduct of Salvatore and March on Productions, Plaintiff has been harmed in an amount to be proven at trial, but not less than $200,000.

## SIXTH CAUSE OF ACTION

[Restitution, Money Lent, or Received as against all Defendants]

140. Plaintiff hereby reincorporates each and every allegation in this complaint as if fully set forth without duplication or repetition.

141. Defendants are indebted to Plaintiff in the sum of $5,050,000.

142. As alleged above, the $5,050,000 received by Defendants from Plaintiff was intended to be used to produce Hard Matter.

143. As alleged above, Defendants did not use the $5,050,000 to produce Hard Matter, and instead used the funds to enrichment themselves at the expense of the Film and Plaintiff.

144. Defendants have refused to return the $5,050,000 to Plaintiff despite demand.

145. As a direct and proximate cause of the wrongful conduct of Defendants, Plaintiff has been harmed in an amount to be proven at trial, but not less than $5,050,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment awarding it the following relief against Defendants:

1.     Damages in an amount to be determined at trial, but no less than
         $5,050,000;

2.      For Loss of Use of the $5,050,000 October 2021;

3.      For Civil Penalties as permitted by law or statute, including Cal. Penal Code § 496 (c);

4.      For restitution;

5.      For Attorneys' Fees as permitted by contract, law or statute, including Cal. Penal Code § 496(c);

6.      For interest at the maximum legal rate;

7.      For costs of suit incurred herein; and

8.      For such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: September 12, 2023          LAW OFFICE OF JOSEPH M. KAR, PC


By: */s/ Joseph M. Kar*
     Joseph M. Kar

BLANK ROME LLP
Gregory M. Bordo
Craig N. Haring

Attorneys for Plaintiff
GRIDIRON PRODUCTIONS, LLC

**COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a jury trial on issues so triable.

Respectfully submitted,

Dated: September 12, 2023        LAW OFFICE OF JOSEPH M. KAR, PC


By: <u>*/s/ Joseph M. Kar*</u>
    Joseph M. Kar

BLANK ROME LLP
Gregory M. Bordo
Craig N. Haring

Attorneys for Plaintiff
GRIDIRON PRODUCTIONS, LLC

32

**COMPLAINT**

# EXHIBIT 1



**WONDERFILM**

September 23, 2021

Powell and Price Productions
1910 Thomas Ave
Cheyenne, WY 82001

Re:    "Hard Matter"

Dear Latavius and Justin:

This letter confirms the terms of the agreement between Wonder Capital, llc (referred to as "Company") and your production company, Powell and Price Productions  ("Financier") with respect to the proposed production, distribution and exploitation of a feature film entitled "Hard Matter" ("Picture"). Company and Financier are referred herein individually as "Party" and collectively as "Parties."

WHEREAS, The Parties intend to produce the Picture in the Fall of 2021 with principal photography commencing on or about November 15 2021. And, WHEREAS, The Parties intend to deliver the Picture in the Summer of 2022.

WHEREAS, Financier agrees to provide production financing for the Picture in the amount of U.S. $5,050,000 (Five-Million-Fifty-Thousand Dollars) ("Outside Financing"), which represents a portion of the full budget, currently set at $7,300,000.

WHEREAS, Company intends to make good faith efforts to obtain additional Outside Financing through the Louisiana state tax incentive program as well as from additional financiers to complete the budget, Financier understands that Company may use the Outside Financing to begin development, preproduction and production at any time while still working to secure the full budget.

WHEREAS, Company permanently, and for so long as Company is acting in any capacity on the Picture, attaches Justin Price as the director of the Picture.

Additionally, Company permanently, and for so long as Company is acting in any capacity on the Picture, attaches Powell and Price Productions as a credited co-production entity.

In consideration of the mutual promises contained herein the sufficiency of which is hereby agreed and acknowledged, the parties agree as follows:

1. In the event Financier actually provides the Financing on or before September 30, 2021, Financier shall be entitled to the following from 100% of any and all revenues actually received by Company, its parents, subsidiaries or affiliates, or any entity on its behalf, from the exploitation of the Picture (including any exploitable rights therein or elements thereof), worldwide, in any and all markets and any and all media now known or hereafter devised, from all sources:

   a. Recoupment of the Financing.  Such recoupment shall be out of first revenues in, and pari passu relative to any other financier, if any, until Financier has recouped 115% of his contribution.  In addition, Financier shall be entitled to such recoupment after Company has paid the following sums, if applicable, and Producer shall be entitled to maintain a reasonable reserve to cover anticipated amounts due under sub-paragraphs (i) and (ii) below:
       (i)  payments due to unions or guilds having jurisdiction over the Picture for residuals (including any music re-use or new use fees) in connection with the Picture, but only to the extent not paid by the distributor(s) of the Picture;
       (ii) any actual, direct, out-of-pocket costs and expenses of auditing, administering and collecting moneys paid and/or owing to Company from distributors and/or other licensees of the Picture and of paying taxes and other administrative expenses of Company;
       (iii)  the fee and expenses payable to any third-party sales representative or sales agent and distribution attorney for the Picture; and,
       (iv) third party accounts payable or executory obligations of Company which are directly in connection with the production, delivery, sales, marketing, promotion and publicity of the Picture (e.g., for banking or creation of delivery items prior to complete delivery of the Picture to all distributors, and for storage of Picture elements); provided, however, if that if amounts payable under this paragraph 1(a)(iv) would cause the budget of the Picture to exceed $8,500,000, then Company shall obtain Financier's approval of such expenses, failing which such expenses may not be recouped against sums payable to Financier under this agreement.

   b. Following recoupment of the amounts specified in Paragraph 1a above, Financier shall receive an additional five percent (5%) of his contribution ("Financier Deferral").

   c. Following recoupment of the amounts specified in paragraph 1a and 1b above and payment of any and all deferred compensation to persons rendering services or granting rights in connection with the Picture, Financier shall receive

a pari passu portion with all other financiers, if any, of contingent compensation in an amount equal to 50% ("Investor's Share Contingent Compensation") of any and all revenues generated from any further exploitation of the Picture in perpetuity throughout the universe in all media known or developed in the future.

D. Powell and Price Productions will receive a production company credit no later than third billing during the opening title sequence of the Picture. Justin Price, Latavius Powell, and Franziska Schissler will receive producer credits on the Picture. Any Additional credits will be agreed upon mutually between the Parties, and may not be unreasonably withheld.

e. Financier shall have the first opportunity to participate as a financier on any sequels, remakes or other programs derived from the Picture.

2. Financier shall be entitled to have its certified public accountant examine, audit and copy, at Financier's sole cost and expense, those parts of the Company's books and records which relate to the Picture during reasonable business hours at such place where said books and records are regularly maintained. Such examinations shall be made upon not less than ten (10) days prior notice, and shall not be held more frequently than once each calendar year. Additionally, Financier shall be provided with an ongoing cost report during the production of the Picture.

3. Parties agree that for a transaction of this nature more formal documents may be required to affect the ultimate purpose of this Agreement and do hereby agree to incorporate the terms and conditions of this letter Agreement into said documents, if any.  Parties agree to negotiate in good faith terms and conditions not contained herein using the standards and customs of the theatrical motion picture industry for such negotiations.  Unless and until such further documents are executed, if ever, this Agreement shall bind and inure to the benefit of the Parties, their successors and assigns.

4. Parties shall mutually agree to all key creative, artistic and business decisions relating to the development, production (final key cast and crew) , distribution and other exploitation of the Picture.

5. This Agreement is governed by the laws of the State of California.

6. The Parties represent and warrant and agree that each has the right to enter into this Agreement and neither is subject to any obligation or disability which will or might prevent one of the Parties from keeping and performing the covenants and conditions herein.

7. This Agreement contains the full and complete understanding between the Parties and supersedes all prior agreements and understandings whether written or oral and cannot be modified except by a written instrument signed by both

Parties.  Each Party acknowledges that neither Party, nor their agents nor representatives made any representation or promise not expressly contained in this Agreement.

8.  In the event of any dispute hereunder, Financier's remedy shall be limited to an action at law for money damages, and in no event shall Financier have the right to seek injunctive or other equitable relief.

If the foregoing comports with your understanding of our Agreement, please countersign below.

Sincerely,
Wonder Capital, llc

_____
Authorized Signatory

AGREED AND ACCEPTED:

_____
Justin Price

Powell and Price Production, LLC

# EXHIBIT 2

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court Electronically
FILED on 09/22/2021 by Anita Elmer, Deputy Clerk

(State Bar Court No. 17-O-01259)

S270015

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

In re BRET MERRICK SAXON on Discipline

The court orders that Bret Merrick Saxon (Respondent), State Bar Number 205100, is disbarred from the practice of law in California and that Respondent's name is stricken from the roll of attorneys.

Respondent must make restitution to Yarbrough Production Company, LLC and/or Jon Yarbrough, or such other recipient as may be designated by the Office of Probation or the State Bar Court, in the amount of $1,464,651.75 plus 10 percent interest per year from October 21, 2009 (or reimburse the Client Security Fund, to the extent of any payment from the Fund to such payee, in accordance with Business and Professions Code section 6140.5). Reimbursement to the Fund is enforceable as a money judgment and may be collected by the State Bar through any means permitted by law.

Respondent must comply with California Rules of Court, rule 9.20, and perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 calendar days, respectively, after the effective date of this order.

Costs are awarded to the State Bar in accordance with Business and Professions Code section 6086.10 and are enforceable both as provided in Business and Professions Code section 6140.7 and as a money judgment, and may be collected by the State Bar through any means permitted by law.

Jorge Navarrete, Clerk of the Supreme Court
of the State of California, do hereby certify that the
proceeding is a true copy of an order of this Court as
shown by the records of my office.
Witness my hand and the seal of the Court this
___ day of SEP 2 2 2021 20 ___
          Month
By: _____
          Deputy

CANTIL-SAKAUYE
*Chief Justice*

# EXHIBIT 3

**FILED** E.A.

5/26/2021

**Public Matter**

**STATE BAR COURT**
**CLERK'S OFFICE**
**LOS ANGELES**

**STATE BAR COURT OF CALIFORNIA**

**HEARING DEPARTMENT - LOS ANGELES**

| | | |
|---|---|---|
| In the Matter of | ) | Case No. 17-O-01259-YDR |
| | ) | |
| BRET MERRICK SAXON, | ) | DECISION AND ORDER OF |
| | ) | INVOLUNTARY INACTIVE |
| State Bar No. 205100. | ) | ENROLLMENT |
| | ) | |

## Introduction

In this disciplinary proceeding Bret Merrick Saxon (Respondent) is charged with a single count of misconduct for the alleged misappropriation of $1.5 million of entrusted funds from an investor in a movie Respondent was going to produce. The court finds, by clear and convincing evidence, that Respondent is culpable for the intentional and dishonest misappropriation of the investor's funds, an act of moral turpitude. Moreover, in light of the serious nature and extent of Respondent's misconduct, as well as the substantial aggravating and limited mitigating circumstances, the court recommends that Respondent be disbarred.

## Significant Procedural History

The Office of the Chief Trial Counsel of the State Bar of California (OCTC) initiated this proceeding by filing a Notice of Disciplinary Charges (NDC) on December 19, 2018. On January 30, 2019, Respondent filed a motion to dismiss on the grounds that the proceeding was barred by rule 5.21 of the Rules of Procedure of the State Bar[1] because the alleged violation took

---

[1] Unless otherwise indicated, all references to "rule(s)" are to the Rules of Procedure of the State Bar.

place more than five years prior to the filing of the original NDC.[2]  OCTC opposed the motion.[3]  On April 3, this court granted the motion and issued an order dismissing the case without prejudice, as OCTC had failed to proffer evidence in support of its contentions regarding applicable tolling provisions.

OCTC filed an Amended Notice of Disciplinary Charges (ANDC) on May 30, 2019, which included more facts about the relationship between the complaining witness, Jon Yarbrough (Yarbrough), and Respondent, including information about the civil remedies sought in other court proceedings.  Respondent filed a second motion to dismiss on the same grounds as before.  OCTC similarly opposed this motion.  Ultimately, on July 31, this court granted Respondent's motion to dismiss with prejudice, finding that the five-year time limit elapsed despite the other court proceedings and Respondent's conduct was not a continuing violation.  OCTC appealed.

The Review Department, by Opinion and Order filed June 26, 2020, found that the ANDC related back to the original NDC, which was filed within the five-year limit.  The Review Department based its calculation of the limitations period "from the date of the filing of the original NDC, which was December 19, 2018" to "the 2014 completion of the escrow arrangement alleged in the ANDC" – finding that Respondent's breach of his fiduciary duty to hold Yarbrough's funds in trust was a continuing violation and ended when the purpose of the escrow arrangement was fulfilled.[4]  As such, this matter was remanded back to the Hearing Department for further proceedings consistent with the Opinion and Order.

---

[2] Respondent also filed an answer to the NDC on February 13, 2019.

[3] OCTC argued that the limitations period should be tolled by the periods that the complainant sought civil remedies against Respondent and during Respondent's continued breach of his fiduciary duties.

[4] Although not dispositive to its ultimate conclusion, the Review Department found that the limitations period was also tolled during the pendency of the civil proceedings in Tennessee

This court thereafter held a status conference on August 24, 2020, and set pre-trial and trial dates.

On October 1, 2020, Respondent filed a third motion to dismiss on the same grounds as before, but raising the issue of whether a settlement agreement entered into by Yarbrough and Respondent extinguished Respondent's fiduciary duties in 2010 rather than in 2014 as the Review Department had found.[5]  OCTC opposed the motion as it would require presentation of evidence, i.e., the settlement agreement, and a determination on the merits as to the legal effect, if any, of the settlement agreement.  On December 2, this court denied Respondent's motion finding that the settlement agreement upon which he relied was not part of the ANDC and Respondent failed to establish that it was appropriate for judicial notice.

On December 8, 2020, the parties filed a stipulation as to facts and admission of documents (Stipulation).  On that same date, based upon OCTC's second supplemental pretrial statement reflecting its intent to call an expert witness regarding the legal effect of the settlement agreement, the court issued an order for the parties to submit a summary of any expert testimony each party intended to offer by December 18.  OCTC submitted proposed expert testimony.  Respondent opposed OCTC's proposed expert testimony and requested that it be excluded.

On January 11, 2021, the court issued an order excluding the proposed expert testimony proffered by OCTC, as the proposed testimony would constitute impermissible expert testimony regarding legal conclusions, specifically contract interpretation.  In this order, the court also declined Respondent's request to bifurcate the proceedings by first addressing the issues relating to the settlement agreement separate from the culpability portion of the proceedings.

_____

based on the same acts or circumstances as the alleged violation.  However, the subsequent sister-state judgment by California and bankruptcy proceedings were "derivative" of the civil proceedings in Tennessee and therefore did not toll the limitations period.

[5] The Review Department was not made aware of any settlement agreement and did not consider it in their analysis of the fiduciary relationship between Yarbrough and Respondent.

Trial was conducted January 12-14, January 21, and February 9, 2021.[6]

After the close of evidence, on February 24, 2021, Respondent filed a fourth motion to dismiss the proceedings on the same grounds as his October 1, 2020 motion to dismiss. OCTC filed an opposition to the motion on March 1, 2021.[7]

OCTC, represented by Supervising Attorney Anand Kumar and Deputy Trial Counsel Sujith Divakaran, filed its closing argument brief on March 2, 2021. Respondent, represented by Ronald Richards, Esq., filed a closing brief the next day. The matter was submitted for decision on March 2, 2021.

## Jurisdiction

Respondent was admitted to the practice of law in California on December 6, 1999, and has been licensed to practice law at all times since that date.

## Findings of Fact and Conclusions of Law

The following findings of fact are based on the Stipulation filed by the parties and the documentary and testimonial evidence admitted at trial.

**Facts**

At all relevant times, Respondent was either sole shareholder, owner, chairman of the board, managing member, and/or president of IMG Film, Incorporated (IMG), Set in Space, Inc. (Set in Space), Saxon Holding Company dba The Marketing Partners (TMP), and Conduit Media, Inc. (Conduit Media). There is no meaningful distinction between Respondent and his

---

[6] Due to the Covid-19 pandemic, this trial took place on the Zoom platform pursuant to California Rules of Court, Emergency Rule 3, adopted by the Judicial Council and effective April 6, 2020 through the date of this decision. Each witness (other than Respondent) confirmed that they had refrained from accessing the trial prior to appearing to testify.

[7] For the reasons discussed *post,* under "Conclusions of Law," the court herein denies Respondent's motion.

respective entities for the purposes of these proceedings.  At all relevant times, investor

Yarbrough was a managing member of Yarbrough Production Company, LLC (YPC).

Original October 6, 2009 Financing Agreement

On or about October 6, 2009, Respondent, through his ownership and/or control of Set

in Space and IMG, entered into an agreement with YPC (Financing Agreement), whereby YPC

would invest $1.5 million and IMG would invest $3.5 million (Combined Financing) to fund Set

in Space's production of a motion picture project tentatively entitled "Fandango" (Picture).

Respondent was effectively functioning as both an investor, through IMG, and escrow

holder/producer, through Set in Space, per the terms of the Financing Agreement.

Regarding the receipt and handling of investor funds, section 1(b)(ii) of the Financing

Agreement provided:

> **All Financing advances shall be advanced directly to Bank of America, ABA # [9593], and Account # [9789] (the "Picture Account"), or such other bank account approved by Investors.** The Picture Account shall be a segregated account and may only be used to receive Financing advances and sums solely to fund production costs of the Picture in accordance with this [Financing] Agreement, and Producer may not withdraw or otherwise use such monies for any other purpose.  Any funds advanced to the Picture Account by an Investor shall be held in trust for such Investor until 100% of the Combined Financing has been received into the Picture Account.  **Producer shall not be entitled to utilize *any* of the Combined Financing until 100% of the Combined Financing has actually been received into the Picture Account.** Within ten (10) days after the date of this Agreement, Producer shall provide each Investor with evidence of receipt of 100% of the Combined financing into the Picture Account ("Funding Evidence"), which shall be in a form and substance satisfactory to each Investor, in each Investor's sole discretion.  If any Investor has not received Funding Evidence within ten (10) days after the date of this Agreement, then Producer shall return all funded portions of the Combined Financing to the relevant Investors.

(Exh. 6, pp. 1-2, emphasis added.)  Once received, Respondent was expected to utilize the

Combined Financing "to fund 100% of the production costs, including, without limitation,

customary delivery costs, in accordance with the Approved Budget," which was attached as an exhibit.  (Exh. 6, p. 1.)

Section 16 of the Financing Agreement, entitled "Merger" provided that the Financing Agreement set forth the entire agreement between the parties with respect to the Picture and may be amended or otherwise modified "only by writing signed by each party."  (Exh. 6, p. 9.)

Concurrently with the Financing Agreement, Respondent signed a Guaranty, on behalf of IMG and as an individual, personally guaranteeing "the performance of all obligations of Producer under the [Financing] Agreement."  (Exh. 6, p. 12.)

Enclosed with the Financing Agreement was an Information Certificate, dated October 7, 2009, the accuracy and truth of which was confirmed by Respondent at the time the parties entered into the Financing Agreement.  Respondent specifically represented in the Information Certificate that all material information, data, and facts regarding Set in Space and IMG, the $1.5 million investment, the Picture, and the principals involved in the production had been disclosed to YPC.  However, Respondent did not disclose all material information to YPC.

For example, Respondent failed to disclose costs had already been incurred for supposed pre-production activities, or the fact that he intended to use YPC's funds to reimburse these costs.  Further, Respondent failed to disclose to YPC that neither he nor Set in Space nor IMG actually owned the rights to the Picture at the time the parties entered into the Financing Agreement.  Rather, he had only been granted an option to purchase the rights to the screenplay for Fandango on or about October 27, 2009, after the Financing Agreement, and the copyright was not in fact assigned to Set in Space until on or about February 27, 2010.  Finally, and perhaps most significantly, neither the name Conduit Media nor Conduit Media, Inc.'s Bank of America account, ending in 9746 (Conduit Media BOA Account) was listed anywhere on the Information Certificate.  However, Conduit Media's Union Bank account, account ending in

5100 (Conduit Media UB Account) was listed on the Information Certificate as a production account supposedly belonging to Set in Space.

### YPC's Funds Wired to the Picture Account

On October 21, 2009, YPC wired $1.5 million into the Picture Account.  Prior to YPC's $1.5 million deposit, the Picture Account had a beginning balance of $836.66.  At no time did Respondent deposit $3.5 million into the Picture Account.

*Respondent's Transfer of YPC's $1.5 Million Funds*

On October 21, 2009, the same day that it was received, Respondent transferred the entire $1.5 million deposited by YPC from the Picture Account to an account controlled by Respondent, the Conduit Media BOA Account.  Prior to this deposit of funds, the Conduit Media BOA Account had a balance of $0.

*Respondent's Bank Withdrawals from the Conduit Media BOA Account*

Less than 10 days after Respondent transferred $1.5 million into the Conduit Media BOA Account, Respondent made unauthorized and undisclosed transfers, withdrawals, and check issuances totaling $1,277,000 from the Conduit Media BOA Account.  YPC had not agreed to the distribution of the $1,277,000 in transactions which are set out below, none of which have been established to have been for production costs.

On October 21, 2009, Respondent made three withdrawals from the Conduit Media BOA Account, totaling $559,000, which included transfers to TMP's Bank of America account, account ending 9719 (TMP Account), and the Conduit Media UB Account.[8]  On October 22, Respondent made two more withdrawals from the Conduit Media BOA Account, totaling

---

[8] On October 21, 2009, Respondent issued a check for $35,000 to IMG Film, Inc.'s Bank of America account, account ending 9722 (IMG Film Account); transferred $124,000 to the TMP Account; and transferred $400,000 to the Conduit Media UB Account.

$208,000, including another transfer to the Conduit Media UB Account.[9]  On October 23, Respondent transferred $400,000 from the Conduit Media BOA Account to the Conduit Media UB Account.  Finally, on October 30, Respondent made two more withdrawals from the Conduit Media BOA Account, totaling $110,000, including another transfer to the TMP account.[10]

*Respondent's Post-October 21, 2009 Withdrawals from the TMP Account*

Prior to October 21, 2009, the beginning balance in the TMP Account was $12,538.73.  On October 21, 2009, the same day that Respondent transferred $124,000 to the TMP Account from the Conduit Media BOA Account, Respondent issued or caused to be issued 15 pre-printed checks from the TMP Account, totaling $32,936.47.[11]

In all, between October 21, 2009, and November 13, 2009, Respondent made over two dozen payments from the TMP Account, totaling over $100,000, to pay for his personal expenses.[12]  Respondent could not explain how these payments were related to production costs and flatly admitted that several were indisputably for personal expenses, e.g., payments to his two ex-wives and his daughter, a charitable donation, and payments for roofing and his car.

---

[9] On October 22, 2009, Respondent withdrew $8,000 in cash and transferred $200,000 to the Conduit Media UB Account.

[10] On October 30, 2009, Respondent transferred $23,000 to the TMP Account and $87,000 to an unknown account.

[11] The 15 pre-printed checks included checks paid to the following entities and/or persons: Verizon California for $1,838.57; The George Vinall ALS Foundation for $10,000; Time Warner Cable for $204.95; Drury Bros. Roofing for $8,052.55; Blue Cross of California for $4,915; Baron's Orchids, Inc. for $188; Guthy Renker Corporation for $729.78; Harris Stationers, Inc. for $214.88; and Respondent's ex-wife for $1,800.

[12] In addition to the 15 pre-printed checks already noted, these payments included the following: on October 22, 2009, Respondent issued a check to his daughter for $264 and made an electronic payment to his Chase account for $17,057.55; on October 23, Respondent made two electronic transfers to Mb Financial for payment on his Mercedes Benz vehicle in the amounts of $1,778.19 and $4,747.19 and an electronic transfer to Directv for $239.45; on October 30, Respondent issued checks to his other ex-wife for $5,511.31 and his daughter for $252; on November 5, Respondent issued a check to Gelson's Markets for $1,572.69; and on November 6 and November 13, Respondent issued checks to his daughter for $192 and $288, respectively.

<u>YPC Requests Proof of Respondent's Contribution to the Combined Financing</u>

YPC, through Yarbrough and Todd McTavish, Esq., corporate counsel for YPC, made repeated requests for the Funding Evidence, which, as required by the Financing Agreement, should have been provided within 10 days after execution of the Financing Agreement, on or about October 16, 2009.

On January 25, 2010, McTavish responded to an email from Respondent indicating that he had "repeatedly requested the bank statements showing the deposit of the [$3.5 million] from [Respondent] and [Respondent] never provided it." (Exh. 13, p. 5.) McTavish also intimated that Respondent was deferring this request by calling it "time-consuming" and claiming that it interfered with production because Respondent never in fact deposited the $3.5 million. (*Id.*)

Instead of providing proof of his $3.5 million deposit on behalf of IMG, Respondent faxed several bank statements to YPC, including those from the Conduit Media BOA Account demonstrating $1 million in deposits, which actually represented the movement of YPC's money and not any portion of Respondent's $3.5 million contribution to the Combined Financing.

The next day, McTavish emailed Respondent to request contact information for Respondent's accountant because Respondent had told Yarbrough that YPC could obtain the requested documentation directly from Respondent's accountant. Respondent never provided the accountant's contact information. However, Respondent and Yarbrough met on February 6, 2010, and went over the statements that Respondent previously faxed, with Respondent insisting that he had deposited the $3.5 million and confirming the accuracy of the bank statements.

On February 8, 2010, McTavish emailed Respondent again and requested bank statements "sufficient to conclusively prove that the $1.5 million and the $3.5 million deposits were made, as required under the Financing [A]greement" and if Respondent was not able to provide such documentation then Respondent was instructed to refund YPC's $1.5 million

investment.  (Exh. 13, p. 1.)  Respondent neither provided the requested documentation nor refunded YPC's $1.5 million investment.

YPC's Civil Proceedings Against Respondent & October 1, 2010 Settlement Agreement

On February 9, 2010, YPC filed a civil action against Respondent in Tennessee Chancery Court alleging breach of contract, fraud, fraud in the inducement, enforcement of guarantee agreement and breach of trust, entitled *Yarbrough Production Company, LLC v. Bret Saxon, Set in Space, Inc., and IMG Film, Inc.*, case No. 37602 (Tennessee Action).

On or about October 1, 2010, Respondent and YPC entered into a stipulated settlement agreement which required Respondent to pay YPC $2,250,000 on or before October 19, 2010 (Settlement Agreement).  The Settlement Agreement provided that in the event Respondent, IMG, and Set in Space (collectively Defendants), did not make the payment by October 19 at 12:01 a.m., YPC could file a Final Order regarding liability and damages in the amount of $2,250,000 against Defendants.

Section 1.3 of the Settlement Agreement was entitled "Full and Complete Release and Waiver of Rights" which, in relevant part provides:

> **Subject to Defendants' *full and timely performance* of their obligations under this [Settlement] Agreement,** YPC, its heirs… do hereby remise, release… Defendants… from any and all manner of debts, security interests … liabilities, [and] obligations … including, but not limited to, any rights…under the terns [sic] of the Financing Agreement and/or Guaranty.  Further, **upon signing this [Settlement] Agreement *and the payment in section 1.1*,** the Financing Agreement, Guaranty, and any terms contained therein **shall immediately and irrevocable** become null and void and all rights, assets, and benefits acquired thereunder shall be immediately and revoked and/or terminated…The phrase "full and timely" in the first sentence of this section means that performance requires that the full settlement amount be tendered to YPC by wire transfer or certified funds by October 19, 2010, at 12:01 a.m. (pacific time).  Defendants shall not raise any defense or excuse if such funds are not deposited by such time in furtherance of a claim that Defendants timely and fully performed their obligations pursuant to this [Settlement] Agreement.

-10-

(Exh. A, p. 2 (emphasis added).)

Respondent, either individually or as representative of his companies, did not pay YPC $2,250,000, or any portion thereof, on or before October 19, 2010.

Consequently, on October 27, 2010, YPC filed and entered the Final Order in the Tennessee Action, which included liability for breach of contract, fraud, enforcement of the guarantee agreement, and breach of trust in addition to stipulated damages of $2,250,000 against Defendants pursuant to Section 1.1 of the Settlement Agreement (Tennessee Final Order).  The Tennessee Final Order further provided that "Plaintiff and Defendant[s] further agree, and this Court further finds, that the liability and damages herein found are not dischargeable pursuant to 11 U.S.C. § 523(a)(2)."[13]  (Exh. 24, p. 2.)

As a result of the Tennessee Final Order, YPC was able to collect $7,126 from a Sheriff's sale of property owned by Respondent.

<u>YPC's Sister-State Judgment Against Respondent</u>

After the entry of the Tennessee Final Order, Yarbrough retained the Law Offices of Michael Raichelson to represent YPC and pursue a sister-state judgment against Respondent in California.  On April 24, 2013, the Los Angeles County Superior Court entered an Amended Judgment on Sister-State Judgment which provided in relevant part, "[t]hat the Tennessee Final Order is entered as a Sister-State Judgment in the favor of [YPC] and against [Respondent, Set in Space, and IMG] in the amount remaining unpaid on sister-state judgment of $2,242,874.00, filing fee for application of $435.00, accrued interest on sister-state judgment of $405,967.59." (Exh. 14, p. 18.)

---

[13] This court notes, however, that the bankruptcy court ruling on YPC's motion for summary judgment, found that "[t]he Tennessee Court did not have authority to make a finding under § 523(a)(2) because only bankruptcy courts may adjudicate § 523(a)(2) dischargeability issues. [Citation]."  (Exh. 14, p. 41.)

Respondent's Bankruptcy Petition and YPC Adversary Proceeding

On September 5, 2013, Respondent filed for Chapter 7 Bankruptcy in the United States Bankruptcy Court, Central District (Bankruptcy Court), *In re Bret Merrick Saxon*, case No. 2:13-bk-32314-TD.  And, on November 30, 2013, YPC filed an adversary complaint in Bankruptcy Court, *Yarbrough Production Company, LLC. vs. Bret Merrick Saxon,* case No. 2:13-ap-02141-SK, challenging the dischargeability of the stipulated damages to be paid by Respondent as ordered by the Tennessee Final Order.

On May 21, 2015, the Bankruptcy Court granted YPC's Motion for Summary Judgment, only as to YPC's second cause of action, finding that Respondent's obligation to pay the $2,250,000 stipulated judgment was non-dischargeable in bankruptcy court pursuant to 11 U.S.C. section 523, subdivision (a)(4), based on Respondent's defalcation of YPC's investment funds while acting in a fiduciary capacity.  The Bankruptcy Court denied the Motion for Summary Judgment as to the first (fraud under 11 U.S.C. § 523, subd. (a)(2)) and third (willful and malicious injury under 11 U.S.C. § 523, subd. (a)(6)) causes of action and the matter proceeded to trial.

On June 28, 2016, the Bankruptcy Court orally issued and entered a final ruling after trial finding that Respondent's obligation to pay the $2,250,000 judgment was a non-dischargeable debt on several grounds.  Most notably, the court found multiple fraudulent misrepresentations by Respondent in the inducement of the Financing Agreement and found that Respondent intentionally and unlawfully converted YPC's $1.5 million in breach of the Financing Agreement by transferring the money to the Conduit Media BOA Account.  As a result, the

Bankruptcy Court entered a judgment of nondischargeability under 11 U.S.C. section 523, subdivisions (a)(2)(A) [fraud] and (a)(6) [willful and malicious injury].[14]

As a result of the Bankruptcy Court ruling, YPC recovered an additional $28,222.25 from proceeds obtained by the Chapter 7 Bankruptcy Trustee as a result of a settlement related to a separate fraudulent action.

The Picture

Production of the Picture appears to have begun sometime after October 7, 2009, as evidenced by the Information Certificate, which refers to production insurance that Set in Space *will have* "starting in pre-production."  (Exh. 6, p. 30.)  As of October 2012, production had apparently not yet been completed.[15]   The Picture, titled "A Fine Step," was ultimately produced and released in 2014.

**Conclusions of Law**[16]

### Respondent's Motion to Dismiss Based Upon the Rule 5.21 Limitations Period

Rule 5.21(A) provides that there is a five-year time limit on the initiation of disciplinary charges based solely on a complainant's allegations of misconduct.  Here, both parties concede that this disciplinary matter is based solely on complainant (YPC)'s allegations of misconduct.

---

[14] The Bankruptcy Court findings are entitled to great weight and carry a "strong presumption of validity." (*Maltaman v. State Bar* (1987) 43 Cal.3d 924, 947 [civil findings entitled to "strong presumption of validity" if supported by substantial evidence"].)

[15] Although Respondent testified at trial that he had completed production by March or April 2010, the documentary evidence presented belies that fact as there are numerous mentions of production halting in 2010 on account of litigation with another party and remaining unfinished in 2012.  (See, e.g., Exh. 27, p. 2; Exh. 14, p. 67.)  Respondent appears to conflate the end of production with the end of filming.  However, as reflected in the Approved Budget, attached to the Financing Agreement, there were numerous post-filming production tasks and costs.

[16] All unspecified statutory references are to the Business and Professions Code, unless otherwise indicated.

-13-

Thus, the five-year time limit applies.  At issue is when the five-year limit began to run and whether the time limit was sufficiently tolled by any applicable tolling provisions or events.

Rule 5.21(B) specifies that if the alleged violation is a continuing offense then the date of the violation, for the purposes of determining when the five-year limit begins, is the date "the offensive conduct ends."  Moreover, the five-year limit is tolled "while the attorney represents the complainant, the complainant's family member, or the complainant's business or employer." (Rule 5.21(C)(1).)  Importantly, the Review Department found this applicable to the fiduciary relationship between Respondent and YPC.[17]  Based on the information before them, the Review Department further determined that this relationship continued until the purpose for which Respondent was holding YPC's funds was accomplished --- 2014 with the completion of production and release of the film.

Respondent now raises the argument that the fiduciary relationship between the parties was extinguished by the execution of the Settlement Agreement on October 1, 2010, whereby the parties agreed to a "Full and Complete Release and Waiver of Rights."  However, this court is not persuaded that Respondent's fiduciary relationship was extinguished by the execution of the Settlement Agreement for two reasons.

First, the release and waiver of rights was expressly conditioned upon Respondent's full and timely payment of the stipulated damages.  Respondent did not, and still has not, made full, let alone timely, payment of the stipulated damages.  Thus, Respondent's duties and obligations under the Financing Agreement were not terminated as he did not actually fully and timely

---

[17] Specifically, the Review Department found that "[a]ppellate courts have used the word 'represents' to describe the limited agency of an escrow relationship, stating that the agent 'only represents his principal insofar as he carries out the escrow instructions.' (*Hannon v. Western Title Insurance Co.* (1989) 211 Cal.App.3d 1122, 1127; see *Lee v. Escrow Consultants, Inc.* (1989) 210 Cal.App.3d 915, 920–921, citing *Kirby v. Palos Verdes Escrow Co.* (1986) 183 Cal.App.3d 57, 64.)…Thus, neither the Rules of Procedure of the State Bar nor case law requires us to limit the tolling provision in rule 5.21 to attorney-client relationships."

-14-

perform his obligations under the Settlement Agreement such that the release and waiver of rights took effect.  Instead, YPC was forced to file a Final Order with the Tennessee court, resulting in a stipulated judgment in favor of YPC and against Respondent, which contained no mention of a stipulated release and waiver of rights.

Second, Respondent cannot take advantage of his own fraud and subsequent agreement to pay resultant penalties in order to rebut the continuation of a fiduciary relationship and his ongoing duties to care and account for entrusted funds.  Respondent does not, nor can he, argue that he was never in a fiduciary relationship with YPC.  Rather, he seeks to avail himself of the consequences of his own fraud "to disclaim the continuation of a fiduciary relationship following his assumption of a hostile attitude towards [YPC]."  (*Stevens v. Marco* (1956) 147 Cal.App.2d 357, 376.)  This does not, as a matter of law, relieve Respondent of his fiduciary duties. Respondent, who was at all times the custodian of YPC's investment funds, continued to utilize YPC's investment funds for his own purposes, and continued to produce the Picture for which YPC's investment funds were originally intended to be used.  Thus, the fiduciary relationship between the parties continued at least until YPC's funds were properly distributed,[18] the purpose for which YPC's funds were to be used was accomplished (i.e., the production of the Picture), or the funds were rightfully returned to YPC.  Respondent failed to establish that any of these three events occurred prior to 2014 and thus the five-year limit did not expire until 2019, at the earliest.

---

[18] Despite admitting that he had no way of distinguishing YPC's funds from his own, Respondent seeks to disavow himself of the fiduciary relationship by also claiming that, since he spent more than $1.5 million in production-related costs by around March 2010, he had spent all of YPC's money by that date and no longer had or could have a duty to hold its funds in trust. This ignores crucial facts – Respondent was not entitled to spend that money as it was required to be held in trust until the entire Combined Financing had been deposited in the Picture Account before being spent on production related costs, and as of February 8, 2010, at the latest, Respondent had a duty to return the money as YPC had requested.

This court further finds that, although the ultimate purpose for which the Financing Agreement was created ceased to exist in 2014, Respondent had duties under the Financing Agreement independent of the production of the Picture because his duties first required him to maintain YPC's funds in trust until the entire Combined Financing had been deposited, an event which never occurred.  Accordingly, Respondent is alleged to have breached his fiduciary duties under the Financing Agreement in a myriad of ways, including by failing to hold the funds in escrow until 100% of the Combined Financing had been received and by failing to return the funds to YPC upon request when the terms with respect to the deposit of the entirety of the Combined Financing were violated, by instead spending YPC's funds (to which he was not entitled) through the release of the film in 2014.  This created a continuing violation beyond the time when Respondent withdrew YPC's money from the escrow account, i.e., the Picture Account.

In fact, since Respondent never returned or ever properly accounted for YPC's entrusted funds, he arguably never terminated the course of conduct upon which the charged violation was based, i.e., Respondent's misappropriation of funds by his breach of fiduciary duty in failing to carry out the instructions of the Financing Agreement.  (See, e.g., *In the Matter of McCarthy* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 364, 377–378 [misconduct based upon breach of fiduciary duty and misappropriation resulted "not only from his initial failure [to maintain the funds], but from his ultimate failure to distribute" them notwithstanding a municipal court judgment and bankruptcy court finding of nondischargeability]; *In the Matter of Dyson* (Review Dept. 1990) 1 Cal. State Bar Ct. Rptr. 280, 286 [attorney had ongoing fiduciary duty to client to hold in trust settlement funds subject to medical liens; attorney's duty to clients lasted until debt paid].)  However, even assuming that the alleged violation terminated when the movie was produced in 2014 and ended Respondent's duties to hold YPC's funds in trust, the NDC, filed December 19, 2018, was nevertheless filed timely within five years of such date.

Separately, OCTC argues that Respondent's concealment of facts about the violation and the Tennessee Action along with criminal and administrative investigations based on the same underlying acts or circumstances also sufficiently tolled the five-year limitations period.[19]  The court need not address each of these reasons for tolling based on the above finding of a continuing violation and ongoing fiduciary relationship between Respondent and YPC lasting until at least 2014.

Based on the foregoing, and for lack of good cause shown, Respondent's motion to dismiss filed on February 24, 2021, is denied as the court finds that OCTC timely filed the NDC on December 19, 2018.  Having found that this proceeding is not barred by the five-year limitations rule and was filed timely, the court now turns to the culpability findings.

### Count One – § 6106 [Moral Turpitude - Misappropriation]

Section 6106 provides, in part, that the commission of any act involving dishonesty, moral turpitude, or corruption constitutes cause for suspension or disbarment, *whether the act is committed in the course of his relations as an attorney or otherwise*.

In Count One, OCTC alleges that Respondent committed an act of moral turpitude through his willful and intentional misappropriation of YPC's $1.5 million in entrusted funds by removing them from the Picture Account and depositing them into other accounts controlled by Respondent, before first depositing his $3.5 million share of the Combined Financing, contrary to the express terms of the Financing Agreement and without the authority to do so.

---

[19] OCTC asserts that the proceedings were tolled for a total of 1,557 days, as follows: 110 days from October 21, 2009, to February 8, 2010, while Respondent concealed the fact that YPC's funds had been removed from the picture account until the filing of the Tennessee Action; 260 days from February 9, 2010, to October 27, 2010, during the pendency of the Tennessee Action; 265 days from May 25, 2011, to February 14, 2012, during the pendency of a Tennessee Department of Commerce and Insurance investigation; and 922 days from July 26, 2012, to February 2, 2015, during the pendency of a United States Attorney's Office criminal investigation.

It is well settled that "the wilful misappropriation of a client's funds involves moral turpitude.  [Citation.]"  (*McKnight v. State Bar* (1991) 53 Cal.3d 1025, 1033-1034.)  "[A]n attorney's failure to use entrusted funds for the purpose for which they were entrusted constitutes misappropriation.  [Citation.]"  (*Baca v. State Bar* (1990) 52 Cal.3d 294, 304.)  And willful misappropriation of entrusted funds amounts to theft, one of the most serious breaches of professional trust that a lawyer can commit.  (*Howard v. State Bar* (1990) 51 Cal.3d 215, 221.)  While moral turpitude generally requires a certain level of intent, guilty knowledge, or willfulness, the law is clear that where an attorney's fiduciary obligations are involved, particularly trust account duties, even a finding of gross negligence will support such a charge.  (*In the Matter of Blum* (Review Dept. 2002) 4 Cal. State Bar Ct. Rptr. 403, 410.)

During all relevant times, YPC was not Respondent's client and Respondent was not acting as YPC's attorney.  Nonetheless, Respondent was a fiduciary to YPC by virtue of his receipt of entrusted funds pursuant to the Financing Agreement and Respondent is held to the duties outlined in the rules and statutes governing attorney conduct in this regard.  (See *Johnstone v. State Bar* (1966) 64 Cal.2d 153, 155-156 [attorney who receives money on behalf of a third party is a fiduciary to such third party and when he "violates his [fiduciary] duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct"]; see also *Crooks v. State Bar* (1970) 3 Cal.3d 346, 355 [attorney acting as escrow agent breached fiduciary duty to third party involved in transaction by distributing funds in violation of escrow agreement].)

Respondent acknowledges that he did not deposit any of his funds into the Picture Account as required by the Financing Agreement and that he transferred the YPC funds out of the Picture Account and into non-segregated accounts over which Respondent had control.  Yet, Respondent contends that, contrary to the language of the Financing Agreement, his transfer of

the YPC funds was done with the verbal approval of various YPC representatives.  Respondent

also argues that his misappropriation was merely "technical" as "[t]he money was not stolen."

(Respondent's Closing Brief, pp. 2-3.)  However, the court finds these arguments unavailing.

As to his first claim, Respondent's contention, hinging solely on his own testimony, is

not credible.  (*In the Matter of Oheb* (Review Dept. 2006) 4 Cal. State Bar Ct. Rptr. 920, 935, fn.

13 [attorney's unexplained failure to substantiate testimony with evidence expected to be

produced is strong indication testimony not credible].)  Respondent could not identify the YPC

representatives that gave such approval, when this alleged approval took place, the specific

nature of the alleged approval, nor any documentation of the alleged approval.  The terms of the

Financing Agreement were clear and did not provide for modification via oral agreement.

Specifically, the terms required that Respondent deposit his $3.5 million share of the Combined

Financing into the Picture Account and provide proof of such deposit within 10 days of the

execution of the Financing Agreement.  In addition to the proof of the $3.5 million deposit, the

Financing Agreement required such deposit to take place before Respondent could "withdraw or

otherwise use such monies for any other purpose."  (Exh. 6, p. 2.)  Respondent never provided

proof of his deposit because he admittedly never deposited the $3.5 million into the Picture

Account.  Yet, he withdrew and began using YPC's funds nonetheless.  Apart from his self-

serving testimony, Respondent could not point to any evidence of YPC's approval of terms

modifying the Financing Agreement as he claimed.

Even if the transfer of funds to the Conduit Media BOA Account had been approved,

Respondent stipulated that his subsequent transfers, withdrawals, and/or check issuances,

totaling $1,277,000 of the $1.5 million in YPC's funds which were then being held in the

Conduit Media BOA Account, were *unauthorized and undisclosed*.  The witness testimony and

documentary evidence received at trial confirmed that YPC was not aware of and did not agree

to this subsequent spending of said funds (either for personal or other expenses, including pre-production expenses).

As to his second claim, Respondent's misappropriation was anything but "technical." Respondent essentially admits to "robbing Peter to pay Paul," i.e., using YPC's funds to pay his personal and other expenses initially but claiming that he ultimately spent at least $1.5 million towards the purpose intended, which was to produce the film. Even assuming he did in fact later spend $1.5 million, representing YPC's investment, on the production of the film, this is not merely a "technical" misappropriation but rather a willful and intentional misappropriation. (*In the Matter of Song* (Review Dept. 2013) 5 Cal. State Bar Ct. Rptr. 273, 278 [as a fiduciary, an attorney may not use client funds as "merely temporary loans" without obtaining client consent].) Respondent was not permitted to withdraw said funds for any purpose except for agreed-upon production expenses. Moreover, he was required to hold the entirety of YPC's $1.5 million funds in trust until he deposited his $3.5 million share of the Combined Financing, which he never deposited, and thereafter required to maintain the funds in the segregated account until appropriately expended, which Respondent did not do. While not his client, Respondent owed a duty to YPC nevertheless and was "rightly expected to exercise extraordinary care and fidelity in dealing with money" belonging to YPC. (*Howard v. State Bar, supra,* 51 Cal.3d at p. 221.) This would include maintaining accurate records of and appropriately accounting for the entrusted funds.

The mere fact that Respondent's balance in the Picture Account fell below the amount he was required to hold on behalf of YPC raises an inference of misappropriation. (*Giovanazzi v. State Bar* (1980) 28 Cal.3d 465, 474 [inference of misappropriation if attorney's trust account balance drops below amount attorney should maintain for client].) Thus, Respondent must show that no misappropriation occurred and that he was entitled to use the YPC funds as he did,

-20-

including proof that he used them for their intended purpose and in accordance with the Financing Agreement.  (*In the Matter of Sklar* (Review Dept. 1993) 2 Cal. State Bar Ct. Rptr. 602, 618.)  To that end, Respondent failed to produce evidence to demonstrate what portion, if any, of YPC's $1.5 million investment was used to produce the film.  Moreover, even if he had ultimately used $1.5 million to produce the film, he was not entitled to use YPC's funds to do so per the terms of the Financing Agreement, which required that Respondent refund YPC's investment upon Respondent's his failure to demonstrate proof of his own deposit.  Respondent's misuse of YPC's funds most certainly constitutes an intentional misappropriation of funds and demonstrates his lack of appreciation for his duties as a fiduciary.

Most suggestive of his intent was that Respondent's actions, in misappropriating the $1.5 million of YPC's investment funds, were surrounded by deceit.  Respondent misrepresented material facts in the inducement of YPC to enter into the Financing Agreement, including, but not limited to, failing to inform YPC that he intended to use YPC's funds, at least in part, to cover debts already incurred, including Respondent's personal debts.  This uncontradicted evidence demonstrated that Respondent accepted YPC's funds under false pretenses and his intent was confirmed by his immediate use of YPC's funds to cover personal expenses through the issuance of no less than 15 pre-printed checks the very same day that he received YPC's funds.  Respondent concealed his actions and lied to YPC when directly confronted about failing to provide proof of the deposit of his $3.5 million share of the Combined Financing.  To this day, Respondent has refused to account for the usage of YPC's funds and admitted that he could not draw a distinction between his funds and YPC's funds.

Thus, by intentionally and dishonestly misappropriating YPC's $1.5 million in entrusted funds, Respondent is culpable of committing an act of moral turpitude in violation of section 6106, as alleged in count one – a conclusion further supported by the subsequent acts of deceit

by answering YPC's inquiries with lies and evasion, coupled with Respondent's utter failure to account for the usage of those funds.  (See *Edwards v. State Bar* (1990) 52 Cal.3d 28, 38.)

## Aggravation and Mitigation

### Aggravation[20]

The State Bar bears the burden of proving aggravating circumstances by clear and convincing evidence.  (Std. 1.5.)  The court finds the following factors in aggravation.[21]

### Multiple Acts/Pattern of Misconduct (Std. 1.5(b).)

Standard 1.5(b) provides that aggravating circumstances include "multiple acts of wrongdoing."  Multiple acts of misconduct as aggravation are not limited to the counts pleaded. (*In the Matter of Valinoti* (Review Dept.2002) 4 Cal. State Bar Ct. Rptr. 498, 555.)  Here, Respondent was charged with and found culpable of a single count of moral turpitude by the intentional and dishonest misappropriation of YPC's $1.5 million in entrusted funds. Nevertheless, the court finds that Respondent's multiple misrepresentations in the fraudulent inducement of YPC's $1.5 million dollar investment, his immediate transfer of the funds to an unauthorized account and misappropriation through dozens of unauthorized transfers and withdrawals, his subsequent multiple misrepresentations, his concealment of his actions, and his continued improper use of the funds through the release of the Picture four years later constitute

---

[20] All references to standards are to the Rules of Procedure of the State Bar, title IV, Standards for Attorney Sanctions for Professional Misconduct.

[21] OCTC also argues for aggravation for Respondent's bad faith and lack of candor demonstrated through his dishonest conduct and lack of credibility (Stds. 1.5(d) and (l)) and refusal or inability to account for entrusted funds (Std. 1.5(i)).  However, the underlying facts related to Respondent's bad faith, dishonesty, and refusal to account for entrusted funds were considered in determining culpability so this will not be considered as an independent aggravating factor.  (See *In the Matter of Sampson* (Review Dept. 1994) 3 Cal. State Bar Ct. Rptr. 119, 132-133 [error to consider same conduct in finding moral turpitude for aggravation].) Additionally, Respondent's lack of credibility in his testimony is not sufficient to constitute aggravation for bad faith or lack of candor.  (See *In the Matter of Wolff* (Review Dept. 2006) 5 Cal. State Bar Ct. Rptr. 1, 11.)

multiple acts of misconduct meriting substantial weight in aggravation.  (See *In the Matter of Kueker* (Review Dept.1991) 1 Cal. State Bar Ct. Rptr. 583, 594 [multiple acts in aggravation for one count of moral turpitude where attorney made 11 misrepresentations over two years]; *Song, supra*, 5 Cal. State Bar Ct. Rptr. at p. 279 [significant aggravation for single count of moral turpitude for misappropriating funds through 65 improper CTA withdrawals.)

**Significant Harm (Std. 1.5(j).)**

Respondent's misconduct caused significant financial harm to Yarbrough/YPC and placed unnecessary burdens on the administration of justice.  In addition to the obvious inability to utilize their funds due to Respondent's continuing failure to return YPC's entrusted funds more than a decade later, Yarbrough/YPC was harmed by incurring the additional expense of hiring several law firms to represent YPC in efforts to recover the entrusted funds in three separate court actions – the Tennessee Action, the sister-state judgment action in California, and the Bankruptcy Court adversary proceeding – and related enforcement measures involving numerous law enforcement and administrative agencies.  (See *In the Matter of Casey* (Review Dept. 2008) 5 Cal. State Bar Ct. Rptr. 117, 126 [significant harm where client hired new attorney, incurred attorney fees, and suffered for three years due to attorney's misconduct].)  Moreover, due to Respondent's failure to account for the entrusted funds and his deceptive and evasive responses with respect to the status of the funds, YPC had to hire a forensic accountant to determine what even happened to the funds.  Significantly, despite having specifically agreed to the nondischargeability of the debt in the stipulated judgment, Respondent prolonged the legal battle over the misappropriated funds and filed for bankruptcy in an effort to have his $2.25 million debt owed to YPC discharged nonetheless.

Overall, the significant harm that Respondent caused Yarbrough/YPC and the profession warrants substantial consideration in aggravation.  (*Chang v. State Bar* (1989) 49 Cal.3d 114,

128 [misappropriation harms not only the client but it also "endangers the confidence of the public at large in the legal profession."].)

**Indifference (Std. 1.5(k).)**

The court also finds that Respondent demonstrated indifference through his lack of remorse for his actions.  He showed little insight or recognition of his wrongdoing, which causes concern that he will repeat his misdeeds.  Despite entering into the Stipulation, which largely established his culpability for the misconduct alleged, Respondent characterizes his actions as minor mistakes or merely technical violations.  (*In the Matter of Spaith* (Review Dept. 1996) 3 Cal. State Bar Ct. Rptr. 511, 519 [justifying use of CTA funds for office expenses based on intent to repay raises "concern as to whether respondent has recognized the extent of his wrongdoing"]; *In the Matter of Wolff* (Review Dept. 2005) 5 Cal. State Bar Ct. Rptr. 1, 14 [indifference found where the attorney continued to deny culpability despite her stipulation establishing her misconduct as charged]; *In the Matter of Casey, supra,* 5 Cal. State Bar Ct. Rptr. at pp. 126-127 [respondent's assertion that his conduct was a minor ethical problem showed indifference and failure to appreciate the wrongfulness of his misconduct].)

Additionally, though Respondent has maintained that his movement of YPC's funds into separate accounts was not improper as it was authorized by several unidentified YPC representatives, it was part of a strategic decision to avoid certain fees, and all of YPC's money ultimately went to production of the Picture, there is no credible evidence to support this version of events.  (*Wolff, supra,* 5 Cal. State Bar Ct. Rptr. at p. 14 [attorney who fails to accept responsibility for actions and seeks to shift responsibility to others demonstrates indifference and lack of remorse].)  Despite two civil court judgments and a bankruptcy court finding of nondischargeability based in part upon findings of fraud, Respondent refuses to acknowledge his fraudulent misconduct and continues to peddle unsupported excuses for his behavior.

While the law does not require Respondent to be falsely penitent, it "does require that [he] accept responsibility for his acts and come to grips with his culpability.  [Citation.]"  (*In the Matter of Katz* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 502, 511.)  Accordingly, the court finds clear and convincing evidence of Respondent's indifference and gives this substantial weight as it is suggestive of his inability to rehabilitate.

### Failure to Make Restitution (Std. 1.5(m).)

The only funds recouped by YPC were those obtained by YPC's enforcement actions and even that was only a small fraction of the $1.5 million investment.  Moreover, the payments were not made directly or even voluntarily by Respondent, but rather the funds represented monies recovered by the bankruptcy trustee ($28,222.25) and funds resulting from a forced Sheriff's sale ($7,126).  Respondent has yet to pay YPC the $1.5 million plus interest has accrued since October 2009.  Respondent's argument that no restitution is required because YPC's funds were in fact used to produce the movie is unavailing.  Setting aside the fact that Respondent failed to establish that YPC's funds were used to produce the movie, Respondent was not entitled to use these funds for the production of the movie as he was required to return these funds as early as October 2009 and no later than YPC's formal request in February 2010, according to the terms of the Financing Agreement, on account of his failure to deposit his portion of the Combined Financing.  Respondent's failure to make restitution is a substantial aggravating factor.

**Mitigation**

Respondent bears the burden of proving mitigating circumstances by clear and convincing evidence.  (Std. 1.6.)  The court finds the following factors in mitigation, each of which is entitled to only moderate weight.[22]

---

[22] Although, Respondent did not cite to any mitigating circumstances beyond his lack of prior discipline, OCTC did address the potential claim for mitigating circumstances on the basis of excessive delay.  (Std. 1.6(i).)  Although the delay in the filing of the State Bar disciplinary

**No Prior Record of Discipline (Std. 1.6(a).)**

Respondent was a licensed attorney for almost 10 years before he committed misconduct. However, he worked primarily in a non-attorney capacity as a movie producer and has not claimed to have practiced law during any of those years.  As his counsel conceded, Respondent is a movie producer who happens to have a license to practice law.[23]  As such, the weight, if any, to give to this period of licensure without prior discipline is significantly diminished.  (*In the Matter of Blum* (Review Dept. 1994) 3 Cal. State Bar Ct. Rptr. 170, 177 [appropriate to depreciate years of practice by time not spent practicing law].)  Similarly, Respondent's ten years of licensure since, without subsequent misconduct, also carries limited weight, if any, because he was not a practicing attorney during this time and his misconduct constitutes an ongoing violation of his fiduciary duties.  Further, Respondent's misconduct is very serious and demonstrates an ongoing lack of appreciation for the rules governing attorneys.  Accordingly, although Respondent was licensed to practice for 10 years prior to committing misconduct in this matter, the court affords him moderate weight in mitigation given that he has not been a practicing attorney during that time, such that this court can properly find his conduct to be so aberrational.[24]  (Cf. *Hawes v. State Bar* (1990) 51 Cal.3d 587, 596 [significant weight in

proceedings was excessive, Respondent failed to demonstrate a sufficient showing of specific, legally cognizable prejudice.  (*Blair v. State Bar* (1989) 49 Cal.3d 762, 774.)  Respondent was able to present his defense and produced over 1,300 pages of production-related documents so his vague assertions that other relevant records were lost is not persuasive.  Moreover, the documents that Respondent claimed he was unable to preserve, Picture expenses, would not have established that he held YPC's funds in trust and dutifully executed the terms of the Financing Agreement.  (See *In re Respondent K*, (1993). 2 Cal. State Bar Ct. Rptr. 335, 361-362.)  Thus, the court does not find mitigation under standard 1.6(i).

[23] It is also significant to this court that Respondent repeatedly claimed his ignorance of the precise terms of many of the relevant legal documents as a defense to any finding of intent in the Bankruptcy Court proceedings, claiming that he did not have a lawyer to look over the contracts and was unfamiliar with some of the basic legal terms, such as "fraud."

[24] Notably, Respondent did not offer any character evidence to support an inference that this conduct was indeed aberrational.

mitigation where the attorney was *actively engaged* in the practice of law for over ten years of practice before first act of misconduct].)

### Cooperation with the State Bar (Std. 1.6(e).)

Respondent entered into a partial stipulation as to facts and admission of documents, many of which were easily provable facts. While not stipulating to culpability, Respondent's cooperation conserved court time and resources as many of the stipulated facts evidenced Respondent's culpability for the misconduct alleged in count one. Accordingly, although not entitled to great weight, Respondent's cooperation with OCTC warrants moderate consideration in mitigation. (See *In the Matter of Lenard* (Review Dept. 2013) 5 Cal. State Bar Ct. Rptr. 250, 260 [reduced mitigating credit given where attorney stipulates to facts and admission of documents but does not stipulate to culpability].)

### <u>Discussion</u>

The purpose of State Bar disciplinary proceedings is not to punish the attorney, but to protect the public, the courts, and the legal profession; to maintain the highest possible professional standards for attorneys, and to preserve public confidence in the legal profession. (*Chadwick v. State Bar* (1989) 49 Cal.3d 103, 111; *Cooper v. State Bar* (1987) 43 Cal.3d 1016, 1025.)

In view of the misconduct, OCTC urges the court to disbar Respondent from the legal profession. Respondent, on the other hand, contends that, because his misconduct was aberrational and "merely a technical misappropriation," the appropriate level of discipline should be a public reproval. Respondent's argument is incredulous.

In determining the appropriate level of discipline, the court looks first to the standards for guidance. (*Drociak v. State Bar* (1991) 52 Cal.3d 1085, 1090; *In the Matter of Koehler* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 615, 628.) The court then looks to the decisional law.

(*Snyder v. State Bar* (1990) 49 Cal.3d 1302, 1310-1311; *In the Matter of Taylor* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 563, 580.)

The Supreme Court gives the standards "great weight" and will reject a recommendation consistent with the standards only where the court entertains "grave doubts" as to its propriety. (*In re Silverton* (2005) 36 Cal.4th 81, 91-92; *In re Naney* (1990) 51 Cal.3d 186, 190.)  Although the standards are not mandatory, a compelling, well-defined reason must be provided for any deviation from them.  (*Bates v. State Bar* (1990) 51 Cal.3d 1056, 1061, fn. 2; *Aronin v. State Bar* (1990) 52 Cal.3d 276, 291.)  Upon balancing the mitigating and aggravating circumstances, it is appropriate to recommend a lesser sanction than otherwise specified in the applicable standard in cases of minor misconduct, where there is little or no injury to the client, the public, the legal system, or the profession, and where the record demonstrates that the lawyer is willing and has the ability to conform to ethical responsibilities in the future.  (Std. 1.7(c).)

Standard 2.1(a) applies to Respondent's misconduct in this matter.  Standard 2.1(a) provides for a presumed sanction of disbarment for an intentional or dishonest misappropriation of entrusted funds unless the amount misappropriated is insignificantly small or unless the most compelling mitigating circumstances clearly predominate, in which case actual suspension is appropriate.  Here, the misappropriated amount, $1.5 million, is undoubtedly *not* insignificantly small.  (*Lawhorn v. State Bar* (1987) 43 Cal.3d 1357, 1361, 1368 [$1,355.75 held to be significant amount].)  Further, Respondent's mitigation is neither compelling, nor predominant over his serious misconduct and aggravation.  Thus, the exceptions outlined in Standard 2.1(a) do not apply and disbarment is the presumed sanction.

Respondent's misconduct in this matter was not minor and the record does not demonstrate his willingness or ability to conform to his ethical responsibilities in the future. Rather, Respondent's serious, intentional and deceitful misconduct caused significant harm.

Furthermore, Respondent's misconduct is significantly aggravated by his demonstrated indifference, failure to make restitution, and multiple acts of misconduct while only somewhat mitigated by his cooperation by entering into a partial stipulation as to facts and his lack of any prior record of discipline, albeit not as an actively practicing attorney.  Most importantly, Respondent's dishonest conduct coupled with his indifference gives this court little confidence that his behavior is unlikely to reoccur.

Honesty is the fundamental rule of ethics, "without which the profession is worse than valueless in the place it holds in the administration of justice.' [Citations.]"  (*Rhodes v. State Bar* (1989) 49 Cal.3d 50, 60.)  The Supreme Court has regularly and consistently disciplined attorneys for dishonesty.  (*Sevin v. State Bar* (1973) 8 Cal.3d 641, 645-646 [misappropriation and fabricated loan agreement]; *Marquette v. State Bar* (1988) 44 Cal.3d 253, 263 [insufficiently funded checks].)  Further, cases involving deceit and misappropriation have been known to warrant disbarment, even in the absence of a prior record of discipline.  (*Kelly v. State Bar* (1988) 45 Cal.3d 649 [disbarment for $20,000 misappropriation, moral turpitude, dishonesty, and improper communication with adverse party despite no aggravation and finding mitigation for no prior record of discipline]; *Spaith*, *supra*, 3 Cal. State Bar Ct. Rptr. 511 [disbarment for $40,000 misappropriation and intentionally misleading client despite mitigation for emotional problems, repayment of money, 15 years of discipline-free practice, strong character evidence, candor and cooperation with State Bar].)

As to the appropriate level discipline, this court finds some guidance in *Song, supra*, 5 Cal. State Bar Ct. Rptr. 273, and *Chang v. State Bar, supra,* 49 Cal.3d 114.  In *Song*, the attorney misappropriated $112,293 over three years for his personal use.  He was found culpable of failing to maintain client funds in trust and misappropriation.  The attorney was credited with four factors in mitigation including good character, twelve years of discipline-free practice, his

cooperation by entering into a stipulation of facts that established his culpability, and his commitment to community service/pro bono work.  In aggravation, the attorney committed multiple acts of misconduct and lacked remorse.  Concluding that the attorney's substantial mitigation was not compelling considering his serious misconduct and aggravating factors, the Review Department recommended disbarment.

Similar to the attorney in *Song*, Respondent misappropriated a substantial sum of money over an extended period, having failed to refund the money to this day.  Although Respondent was not found culpable of a misrepresentation, his actions were surrounded by deceit as the evidence demonstrated that he fraudulently induced YPC to enter into the Financing Agreement in the first place and presented YPC with misleading bank records in an attempt to cover up his actions.  While Respondent has presented some mitigation, like the mitigation in *Song*, it is not sufficiently compelling to justify a level of discipline short of disbarment, especially in light of the serious misconduct and substantial factors in aggravation.

Likewise, in *Chang*, the attorney was found culpable, in a single client matter, of misappropriating $7,900 in client funds, failing to provide an accounting, and making misrepresentations to his client and the State Bar.  In mitigation, the attorney had no prior record of discipline in eight years of practice prior to the misconduct.  In aggravation, the attorney never acknowledged the impropriety of his conduct.  The Supreme Court ordered the attorney be disbarred, noting that his lack of remorse or candor, serious misconduct, and failure to pay restitution gave reason to doubt whether he could conform his conduct to ethical standards.  Like in *Chang*, Respondent has committed serious misconduct, failed to pay restitution, and lacks insight into his behavior, raising the concern that he will be unable to appropriately conform his conduct in the future.

Therefore, having considered the nature and extent of the misconduct, the aggravating and mitigating circumstances, as well as the case law, the court finds that Respondent's disbarment is necessary to preserve public confidence in the legal profession and to protect the public, the courts, and the legal community.

## Recommendations

It is recommended that Bret Merrick Saxon, State Bar Number 205100, be disbarred from the practice of law in California and that his name be stricken from the roll of attorneys.

**Restitution**

It is further recommended that Bret Merrick Saxon make restitution in the amount of $1,464,651.75[25] plus 10 percent interest per year from October 21, 2009, to Yarbrough Production Company, LLC and/or Jon Yarbrough or such other recipient as may be designated by the Office of Probation or the State Bar Court (or reimburse the Client Security Fund, to the extent of any payment from the Fund to such payee, in accordance with Business and Professions Code section 6140.5). Reimbursement to the Fund is enforceable as a money judgment and may be collected by the State Bar through any means permitted by law.

**California Rules of Court, Rule 9.20**

It is further recommended that Bret Merrick Saxon be ordered to comply with the requirements of California Rules of Court, rule 9.20, and to perform the acts specified in subdivisions (a) and (c) of that rule within 30 and 40 days, respectively, after the effective date of the Supreme Court order imposing discipline in this matter.[26]

---

[25] This amount represents the $1.5 million investment wired into the Picture Account by YPC on October 21, 2009, less the $7,126 recovered in the Sherriff's sale and $28,222.25 recovered from the bankruptcy trustee.

[26] For purposes of compliance with rule 9.20(a), the operative date for identification of "clients being represented in pending matters" and others to be notified is the filing date of the Supreme Court order, not any later "effective" date of the order. (*Athearn v. State Bar* (1982) 32 Cal.3d 38, 45.) Further, Bret Merrick Saxon is required to file a rule 9.20(c) affidavit even if

**Costs**

It is further recommended that costs be awarded to the State Bar in accordance with

Business and Professions Code section 6086.10, and are enforceable both as provided in

Business and Professions Code section 6140.7 and as a money judgment, and may be collected

by the State Bar through any means permitted by law.  Unless the time for payment of discipline

costs is extended pursuant to subdivision (c) of section 6086.10, costs assessed against an

attorney who is actually suspended or disbarred must be paid as a condition of reinstatement or

return to active status.[27]

<u>**Order of Involuntary Inactive Enrollment**</u>

Bret Merrick Saxon is ordered transferred to involuntary inactive status pursuant to

Business and Professions Code section 6007, subdivision (c)(4).  His inactive enrollment will be

effective three calendar days after this order is served and will terminate upon the effective date

of the Supreme Court's order imposing discipline herein, or as provided for by rule 5.111(D)(2)

of the State Bar Rules of Procedure or as otherwise ordered by the Supreme Court pursuant to its

plenary jurisdiction.


Dated:  May 26, 2021

Yvette D. Roland
_____
YVETTE D. ROLAND
Judge of the State Bar Court

---

he has no clients to notify on the date the Supreme Court filed its order in this proceeding.
(*Powers v. State Bar* (1988) 44 Cal.3d 337, 341.)  In addition to being punished as a crime or
contempt, an attorney's failure to comply with rule 9.20 is, inter alia, cause for disbarment,
suspension, revocation of any pending disciplinary probation, and denial of an application for
reinstatement after disbarment.  (Cal. Rules of Court, rule 9.20(d).)

[27] Monetary sanctions do not apply here as the proceedings commenced before April 1,
2020.  (See Rule 5.137(H), as revised on March 1, 2021.)

**CERTIFICATE OF ELECTRONIC SERVICE**

(Rules Proc. of State Bar, rule 5.27.1.)

I, the undersigned, certify that I am a Court Specialist of the State Bar Court.  I am over the age of eighteen and not a party to the within proceeding.  Pursuant to standard court practice, on May 26, 2021, I transmitted a true copy of the following document(s):

**DECISION AND ORDER OF INVOLUNTARY INACTIVE ENROLLMENT**

by electronic service to RONALD N. RICHARDS at the following electronic service address as defined in rule 5.4(29) and as provided in rule 5.26.1 of the Rules of Procedure of the State Bar:

ron@ronaldrichards.com

by electronic service to SUJITH DIVAKARAN at the following electronic service address as defined in rule 5.4(29) and as provided in rule 5.26.1 of the Rules of Procedure of the State Bar:

Sujith.Divakaran@calbar.ca.gov

The above document(s) was/were served electronically.  My electronic service address is ctroomB@statebarcourt.ca.gov  and my business address is 845 South Figueroa Street, Los Angeles, CA 90017

I declare, under penalty of perjury under the laws of the State of California, that the information above is true and correct.

Date: May 26, 2021

*Elizabeth Alvarez*

Elizabeth Alvarez
Court Specialist
State Bar Court

# EXHIBIT 4

*the*
Exchange.

October 13, 2021                                                            (the "Effective Date")

Wonder Capital LLC                                                          ("Producer" or "your")

**Re: Sales Term Sheet / "HARD MATTER"**

BOS Entertainment d/b/a The Exchange ("TE") and Producer hereby enter into this binding Sales Term Sheet with respect to the picture currently entitled "HARD MATTER" (the "Picture").

Producer hereby represents and warrants that it owns and controls all rights of every kind and nature in and to the Picture sufficient to allow TE to render its services to producer, sell, license and distribute the rights hereunder for the duration of the Term. If a breach of this representation and warranty occurs, TE may, in its sole discretion, cancel this Term Sheet, in which case, Producer shall pay to TE twenty-five thousand US dollars (US $25,000) as well as other outstanding amounts that are owed to TE (including but not limited to Sales Fee for the Domestic Territory and the International Territory, Sales Expenses, Marketing Expenses). The above shall not be a limitation to TE's remedies at law and equity.

**TERRITORY:** The Domestic Territory and the International Territory. The "Domestic Territory" shall mean (a) the United States and its territories and possessions; and (b) Canada and its territories and possessions. The "International Territory" shall mean the world excluding the Domestic Territory.

**TERM**: Twenty (20) years from the Effective Date and the delivery of the Picture. Plus, TE may enter into distribution agreements that extend for an additional five (5) years (i.e. 25 years total).

**SALES FEE FOR THE DOMESTIC TERRITORY:** TE shall receive ten percent (10%) of all revenue ("Gross Receipts") generated in the Domestic Territory

**SALES FEE FOR THE INTERNATIONAL TERRITORY:** TE shall receive fifteen percent (15%) of Gross Receipts generated in the International Territory.

**SALES EXPENSES:** The Sales Expenses shall be equal to one hundred thirty-five thousand US dollars (US $135,000) (a one-time charge non-accountable during the Term). Eighty-five thousand US dollars (US $85,000) of the Sales Expenses shall be paid on execution of this Sales Term Sheet. The remaining fifty thousand US dollars (US $50,000) of the Sales Expenses shall be payable out of the budget of the Picture.

**MARKETING EXPENSES:** The Marketing Expenses shall be fully recoupable based upon actual, verifiable, out-of-pocket expenses and capped at fifty thousand US dollars (US $50,000).

**FINANCING FEE:** Subject to TE bringing and/or sourcing financing outside of any presales and tax credit (the "Financing Commitment") which is to be approved by Producer, TE shall receive a financing fee, an amount to be negotiated in good faith with the Producer, which shall be payable out of the budget, in full, upon commencement of principal photography of the Picture.

**BACKEND COMPENSATION:** Subject to TE bringing and/or sourcing the Financing Commitment, TE shall receive a backend compensation in an amount to be negotiated in good faith with the Producer, which shall be paid pro rata pari passu with any and all other financiers associated with the Picture.

**CREDITS:** TE (or its designee) shall be entitled to an animated logo in front of the Picture on screen and a static logo on all paid ads, billing blocks, etc. worldwide. TE (or its designee) shall also be accorded an "in association with" credit on screen and on all paid ads, billing blocks, etc. worldwide. TE shall be entitled to three (3)



Executive Producer credits (shared card) on screen in the main title, and in paid ads positioned at Producers' discretion worldwide. Subject to bringing and/or sourcing the Financing Commitment, TE shall be entitled to additional credits, which shall be negotiated in good faith with the Producer.

**DELIVERY:** The delivery schedule of materials will be negotiated in good faith between the parties. Delivery materials shall be delivered at Producer's cost.

**SUBSEQUENT PRODUCTIONS:** TE shall have the right to participate in all sequels / prequels / remakes / stage plays / television productions / animation productions / subsequent productions of any kind in the same manner as is outlined in this term sheet, which will include any theatrical / VOD / straight to DVD / TV / Internet or other unknown or specified medium.

**BUDGET:** The all in budget shall include, without limitation, all applicable guild (e.g., WGA, SAG, DGA, teamsters, IATSE, as applicable) residual deposits, a minimum contingency as determined by the applicable bond company, bond fee, foreign and domestic delivery materials, allowances for legal fees to close financing, and our fifty thousand US dollars (US $50,000) Sales Expenses charge as described above. TE shall have meaningful consultation on the budget of the Picture.

**THE WATERFALL:** for the Picture in the Territory shall be as follows:

First, collection agency fees, expenses (if approved and necessary) and guild residuals;
Second, to TE for the Sales Fee for the Domestic Territory and the International Territory;
Third, to TE to recoup Marketing Expenses; and
Thereafter, 100% to the profit sharing pool where TE shall receive its Backend Compensation, if applicable.

**SALES AGENCY AGREEMENT:** A fully executed and binding sales agency agreement with an international sales estimates and delivery schedule to be negotiated in good faith by the parties.

**COLLECTION AGENT:** It is intended that a collection account ("Collection Account") for the Picture will be set up with a third-party collection agent approved by TE and Producer to collect all Gross Receipts for the Picture, and both TE and Producer shall be a party to the agreement regarding said Collection Account. Fintage Collection Account Management B.V. and Freeway Entertainment Group B.V. are pre-approved.

**CONDITIONS PRECEDENT:** TE's obligations herein are subject to satisfaction of the following "Conditions Precedent," in TE's sole discretion:

**Actors:** Approval of actors in the principal roles of "Sawyer", "Kyron", "Elera", "Daxon", "Lukas", and "Eion", and any replacement thereof. TE hereby approves Mel Gibson in the role of "Sawyer".

**Screenplay:** Approval of the screenplay. TE hereby approves the screenplay written by Justin Price submitted to TE on October 13, 2021.

**Director:** Approval of the director, and any replacement thereof. TE hereby approves Justin Price.

**Chain of Title:** Approval of the chain of title for the Picture.

**E&O Insurance:** Approval of the Errors & Omissions insurance for the Picture.

**Start of Principal Photography:** Approval of the start date of principal photography for the Picture.



All disputes arising out of or relating to this Sales Term Sheet will be resolved by binding arbitration under the IFTA Rules of International Arbitration in effect at the time the notice of arbitration is filed. The prevailing party in any arbitration or other legal proceeding brought pursuant hereto shall be entitled to recover all of its attorneys' fees and expenses actually incurred.

This Sales Term Sheet shall expire on November 5, 2021 at 6PM Pacific Time Pacific Time if TE does not receive an indication of your interest.

If the above terms, conditions and understandings are acceptable to you, please indicate your acceptance and agreement by signing below.

**AGREED AND ACCEPTED:**
**("Producer")**
Wonder Capital LLC

By:  Jeff Bowler

**AGREED AND ACCEPTED:**
**("TE")**
BOS Entertainment d/b/a The Exchange

Brian O'Shea

# EXHIBIT 5



**WONDERFILM**

September 23, 2021

Latavius Powell
Gridiron Productions LLC
430 Schriever Ct.
Mcdonough, GA 30252

Re:     "Hard Matter"

Dear Latavius:

This letter confirms the terms of the agreement between Wonder Capital, llc (referred to as "Company") and Gridiron Productions LLC ("Financier") with respect to the proposed production, distribution and exploitation of a feature film entitled "Hard Matter" ("Picture").  Company and Financier are referred herein individually as "Party" and collectively as "Parties."

WHEREAS, Company intends to produce the Picture in the Spring of 2022 with principal photography commencing on or about March 1, 2022. And, WHEREAS, Company intends to deliver the Picture in the third Quarter of 2022.

WHEREAS, Financier agrees to provide production financing for the Picture in the amount of U.S. $5,050,000 (Five-Million-Fifty-Thousand Dollars) ("Outside Financing"), which represents a portion of the full budget, currently set at $7,300,000.

WHEREAS, Company intends to make good faith efforts to obtain additional Outside Financing through the Louisiana state tax incentive program as well as from additional financiers to complete the budget, Financier understands that Company may use the Outside Financing to begin development, preproduction and production at any time while still working to secure the full budget.

WHEREAS, Company permanently, and for so long as Company is acting in any capacity on the Picture, attaches Justin Price as the director of the Picture.

Additionally, Company permanently, and for so long as Company is acting in any capacity on the Picture, attaches Powell and Price Productions as a credited co-production entity.

In consideration of the mutual promises contained herein the sufficiency of which is hereby agreed and acknowledged, the parties agree as follows:

1. In the event Financier actually provides the Financing on or before March 1, 2022 Financier shall be entitled to the following from 100% of any and all revenues actually received by Company, its parents, subsidiaries or affiliates, or any entity on its behalf, from the exploitation of the Picture (including any exploitable rights therein or elements thereof), worldwide, in any and all markets and any and all media now known or hereafter devised, from all sources:

     a. Recoupment of the Financing.  Such recoupment shall be out of first revenues in, and pari passu relative to any other financier, if any, until Financier has recouped 120% of his contribution.  In addition, Financier shall be entitled to such recoupment after Company has paid the following sums, if applicable, and Producer shall be entitled to maintain a reasonable reserve to cover anticipated amounts due under sub-paragraphs (i) and (ii) below:

     (i)  payments due to unions or guilds having jurisdiction over the Picture for residuals (including any music re-use or new use fees) in connection with the Picture, but only to the extent not paid by the distributor(s) of the Picture;

     (ii) any actual, direct, out-of-pocket costs and expenses of auditing, administering and collecting moneys paid and/or owing to Company from distributors and/or other licensees of the Picture and of paying taxes and other administrative expenses of Company;

     (iii)  the fee and expenses payable to any third-party sales representative or sales agent and distribution attorney for the Picture; and,

     (iv) third party accounts payable or executory obligations of Company which are directly in connection with the production, delivery, sales, marketing, promotion and publicity of the Picture (e.g., for banking or creation of delivery items prior to complete delivery of the Picture to all distributors, and for storage of Picture elements); provided, however, if that if amounts payable under this paragraph 1(a)(iv) would cause the budget of the Picture to exceed $8,500,000, then Company shall obtain Financier's approval of such expenses, failing which such expenses may not be recouped against sums payable to Financier under this agreement.

     b. Following recoupment of the amounts specified in paragraph 1a above and payment of any and all deferred compensation to persons rendering services or granting rights in connection with the Picture, Financier shall receive a pari passu portion with all other financiers, if any, of contingent compensation in an amount equal to 50% ("Investor's Share Contingent Compensation") of any and all revenues generated from any further exploitation of the Picture in perpetuity throughout the universe in all media known or developed in the future.

d. Financier shall receive a credit as an Executive Producer in the main titles of the final release print of the Picture. The size and placement of said credit is left solely to Company's discretion. Additional credits upon mutual agreement of the Parties, not to be unreasonably withheld.

e. Financier shall have the first opportunity to participate as a financier on any sequels, remakes or other programs derived from the Picture.

2. Financier shall be entitled to have its certified public accountant examine, audit and copy, at Financier's sole cost and expense, those parts of the Company's books and records which relate to the Picture during reasonable business hours at such place where said books and records are regularly maintained. Such examinations shall be made upon not less than ten (10) days prior notice, and shall not be held more frequently than once each calendar year. Additionally, Financier shall be provided with an ongoing cost report during the production of the Picture.

3. Parties agree that for a transaction of this nature more formal documents may be required to affect the ultimate purpose of this Agreement and do hereby agree to incorporate the terms and conditions of this letter Agreement into said documents, if any.  Parties agree to negotiate in good faith terms and conditions not contained herein using the standards and customs of the theatrical motion picture industry for such negotiations.  Unless and until such further documents are executed, if ever, this Agreement shall bind and inure to the benefit of the Parties, their successors and assigns.

4. Except as otherwise expressly provided herein, all creative, artistic and business decisions relating to the development, production, distribution and other exploitation of the Picture shall remain in Company's sole discretion.

5. This Agreement is governed by the laws of the State of California.

6. The Parties represent and warrant and agree that each has the right to enter into this Agreement and neither is subject to any obligation or disability which will or might prevent one of the Parties from keeping and performing the covenants and conditions herein.

7. This Agreement contains the full and complete understanding between the Parties and supersedes all prior agreements and understandings whether written or oral and cannot be modified except by a written instrument signed by both Parties.  Each Party acknowledges that neither Party, nor their agents nor representatives made any representation or promise not expressly contained in this Agreement.

8.  In the event of any dispute hereunder, Financier's remedy shall be limited to an action at law for money damages, and in no event shall Financier have the right to seek injunctive or other equitable relief.

If the foregoing comports with your understanding of our Agreement, please countersign below.

Sincerely,
Wonder Capital, llc

_____
Authorized Signatory

AGREED AND ACCEPTED:

_____
Latavius Powell
Gridiron Productions, LLC