THE LAW OFFICES OF JOHN A. SCHLAFF
John A. Schlaff, State Bar No. 135748
2355 Westwood Boulevard, No. 424
Los Angeles, California 90064
Telephone No. 1-310-474-2627
Telecopy No. 1-310-362-8883
Email john.schlaff@gmail.com

Counsel for Defendants and Counter-Claimants BRET MERRITT
SAXON, JEFF BOWLER, AMY SAXON and WONDERFILM LLC
AND FOR DEFENDANTS RICHARD DAVIS, RICHARD
SALVATORE,, NINA PODOLSKA, WONDER  CAPITAL LLC;
WF HARD MATTER, LLC, LUCKY OWL FILMS INC.,
WF GROUP, LLC

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

GRIDIRON PRODUCTIONS LLC, a )
Georgia Limited Liability Company, )
)
Plaintiff, )
)
vs. )
)
BRET MERRITT SAXON, etc., et )
al. , )
)
Defendants. )
———————————————— )
)
BRET MERRIT SAXON, AMY )
SAXON and JEFFREY BOWLER, )
)
v. )
)
GRIDIRON PRODUCTIONS, )
LATAVIUS POWELL, an )
individual, JUSTIN PRICE, an )
individual, PRICE PRODUCTIONS, )
a business organization of unknown )
form, POWEL & PRICE )
PRODUCTIONS, LLC, a business )
organization of unknown form. )
)
———————————————— )

CASE NO. 2:23-cv-07574-TJH-JPR

*Assigned to the Hon. Terry J. Hatter, Jr.*

**ANSWER AND COUNTER CLAIMS FOR FRAUD, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, DEFAMATION, UNJUST ENRICHMENT / CONSTRUCTIVE TRUST AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

1. Defendants BRET MERRICK SAXON JEFF BOWLER aka JEFFREY

PRINTED ON RECYCLED PAPER

BOWLER, AMY SAXON, NINA PODOLSKA,RICHARD DAVIS, RICHARD SALVATORE, WONDERFILM LLC, WONDER CAPITAL LLC, WF HARD MATTER, LLC, WF GROUP, LLC, LUCKY OWL FILMS INC., EPIC JOURNEY PRODUCTIONS, LLC and PICKLE WAGON HOLDINGS INC (the "Answering Defendants") respond as follows to the Complaint filed against them.

2.  Except where otherwise specifically stated herein, each allegation of the Complaint is denied by the Answering Defendants.

3.  The Answering Defendants admit that approximately $1,800,000 in state tax rebates have been committed to the Film by the State of Mississippi but have not yet been paid by Mississippi.  The Answering Defendants otherwise deny the allegations of Paragraph 1 of the Complaint.

4.  The Answering Defendants admit the allegations of Paragraph 2 of the Complaint for the purposes of this action only.

5.  The Answering Defendants admit the allegations of Paragraph 3 of the Complaint for the purposes of this action only.

6.  The Answering Defendants lack sufficient information to admit or deny the accuracy of some of the allegations of Paragraph 4 of the Complaint, while others of those allegations are materially false.  The Answering Defendants deny the entirety of the allegations of Paragraph 4 of the Complaint on that basis except that Answering Defendants admit for purposes of this action only that Exhibit 1 is a true and correct copy of the Hard Matter Short Form Finance Agreement dated September 23, 2021.

7.  The Answering Defendants observe that some or all of the allegations in Paragraphs 5, 42, 99 and 100 of the Complaint constitute legal conclusions to which no response is required as a matter of law, and, with respect to Paragraph 5 are also irrelevent and scurrilous.  Both Paragraph 5 and 42 purport to summarize documents which speak for themselves.

8.  Answering Defendants admit that that Exhibits "2" and "3" to the Complaint are

PRINTED ON RECYCLED PAPER

**ANSWER AND COUNTER-COMPLAINT**

true and correct copies of prior court proceedings.

9. The Answering Defendants admit that Jeffrey Bowler is a resident of California who did and does business in the State of California, and otherwise deny the allegations of Paragraph 6 of the Complaint.

10. The Answering Defendants admit that Jeffrey Bowler is the owner of Wonderfilm, WC, WF Hardmatter LLC, and otherwise deny the allegations of Paragraph 7 of the Complaint.

11. The Answering Defendants admit that Amy Saxon owns the WF Group, and otherwise deny the allegations of Paragraph 8 of the Complaint.

12. The Answering Defendants admit that Ms. Podolska has an ownership interest in Lucky Owl, and otherwise deny the allegations of Paragraph 9 of the Complaint.

13. The Answering Defendants admit that (1) Mr. Davis has done business with Mr. Bowler in the past; (2) Mr. Davis is a resident of the State of Illinois and has an ownership interest in Defendant Epic Journey.  Answering Defendants otherwise deny the allegations of Paragraph 10 of the Complaint.

14. The Answering Defendants admit that Mr. Salvatore (1) has done business with Messrs. Saxon and Bowler in the past; (2) is a resident of California and (3) has an ownership interest in Defendant March on Production.  Answering Defendants otherwise deny the allegations of Paragraph 11 of the Complaint.

15. The Answering Defendants admit that Defendant Wonderfilm LLC is a California limited liability company that did and does business in California and his domiciled here; Defendants otherwise deny the allegations of Paragraph 12 of the Complaint.

16. The Answering Defendants admit that  Defendant Wonder Capital LLC is a Delaware limited liability company that did and does business in California and that none of its members are citizens of the State of Georgia and otherwise deny the allegations of Paragraph 13 of the Complaint.

PRINTED ON RECYCLED PAPER

17.  The Answering Defendants admit that Defendant WF Hard Matter LLC is a Louisiana limited liability company.  The Answering Defendants otherwise deny the allegations of Paragraph 14 of the Complaint.

18.  The Answering Defendants admit that all members of WF Group LLC are residents, citizens of, and domiciled in the State of California and otherwise deny the allegations of Paragraph 14 of the Complaint.

19.  The Answering Defendants admit that Defendant Lucky Owl Films Inc. is a California corporation that did and does business in California in which Ms. Podolska has an ownership interest, and otherwise deny the allegations of Paragraph 16 of the Complaint.

20.  The Answering Defendants admit that Epic Journey Productions LLC is a movie production company, and otherwise deny the allegations of Paragraph 17 of the Complaint.

21.  The Answering Defendants admit that Pickle Wagon Holdings is a California corporation that did and does business in California and is domiciled here, and otherwise deny the allegations of Paragraph 18 of the Complaint.

22.  The Answering Defendants admit that March on Productions Inc. is a California corporation domiciled in California that did and does business in California, and otherwise deny the allegations of Paragraph 19 of the Complaint.

23.  The Answering Defendants lack sufficient information to admit or deny the accuracy of some of the allegations of Paragraph 20 of the Complaint, while others of those allegations are materially false.  The Answering Defendants deny the entirety of the allegations of Paragraph 20 of the Complaint on that basis.

24.  The Answering Defendants admit that Powell travelled to Los Angeles and met with Bret Saxon in his home.  The Answering Defendants have not checked IMDB's website and lack information to confirm or deny what is on that website (which is irrelevant in any case) and so deny same for purposes of this answer.

PRINTED ON RECYCLED PAPER

4

Otherwise, the Answering Defendants deny the allegations of Paragraph 22 of the Complaint.

25.  The Answering Defendants admit that Bret Saxon was disbarred in or about May 26, 2021, and otherwise deny the allegations of Paragraph 23 of the Complaint.

26.  The Answering Defendants deny the allegations of Paragarph 24 of the Complaint in their entirety.

27.  The Answering Defendants deny the allegations of Paragarph 25 of the Complaint in their entirety.

28.  The Answering Defendants deny the allegations of Paragarph 26 of the Complaint in their entirety.

29.  The Answering Defendants admit that Mel Gibson was not available to immediately star in Hard Matter due to other commitments -- a fact well known to the Plaintiff and his agents.  The Answering Defendants otherwise deny the allegations of Paragarph 27 of the Complaint in their entirety.

30.  The Answering Defendants admit that while the attempt to negotiate with Mr. Gibson was ongoing, sales productions were prepared based on the possibility that Mr. Gibson would join the cast -- a standard practice in making sales production reports. The Answering Defendants otherwise deny the allegations of Paragraph 28 of the Complaint.

31.  The Answering Defendants admit that the Supreme Court issued an order regarding Mr. Saxon.  The order speaks for itself, is attached to the Complaint and is inaccurately described by the Plaintiffs.  The Answering Defendants otherwise deny the allegations of Paragraph 29 of the Complaint.

32.  The Answering Defendants admit that Price executed the Hard Matter Short Form Contingent Finance Agreement (but on behalf of an entity different from "Price Productions").  The document speaks for itself.  The Answering Defendants otherwise deny the allegations of Paragraph 30 of the Complaint.

PRINTED ON RECYCLED PAPER

33.  The Answering Defendants admit that at various times projected budgets for Hard Matter were transmitted to Messrs. Powell and Price and that while it was still possible that Mr. Gibson might agree to appear in the Film including on September 28 2021 which document speaks for itself. The Answering Defendants otherwise deny the allegations of Paragraph 31 of the Complaint.

34.  The Answering Defendants deny the allegations of Paragarph 32 of the Complaint in their entirety.

35.  The Answering Defendants admit that Powell transferred $2,050,000 on or about October 12, 2021, and otherwise deny the allegations of Paragraph 33 of the Complaint.

36.  The Answering Defendants admit that texts were exchanged in and around October 13, 2021, and that an offer was submitted on October 13, 2021, but otherwise deny the allegations of Paragraph 34 of the Complaint.

37.  The Answering Defendants admit that Bret Saxon had encouraging discussions with Mr. Gibson's team at various points and shared that information with Messrs. Powell and Price, as well as the fact that Mel himself had not yet even read the script. Answering Defendants otherwise deny the allegations of Paragraph 35 of the Complaint.

38.  The Answering Defendants admit that they, along with Messr's Powell and Price, had been informed that the soonest Mr. Gibson would be available would be in January of 2022 .  The Answering Defendants have no recollection of any such They otherwise deny the allegations of Paragraph 36 of the Complaint.

39.  The Answering Defendants deny the allegations of Paragarph 37 of the Complaint in their entirety.

40.  The Answering Defendants admit that they entered into various loan out agreements needed to secure the production of the film.  Answering Defendants otherwise deny the allegations of Paragraph 38 of the Complaint.

PRINTED ON RECYCLED PAPER

41.  The Answering Defendants admit that on or about November 21, 2021, Bret Saxon texted Powell that he was negotiating John Travolta to star in the Film but he had passed and was now talking to Nicholas Cage.  In December 2021, may have sent another text to Powell stating that it was likely that Gary Oldman might be involved in the film.  The Answering Defendants otherwise deny the allegations of Paragraph 39 of the Complaint.

42.  The Answering Defendants deny the allegations of Paragarph 40 of the Complaint in their entirety.

43.  The Answering Defendants admit that on October 13, 2021, a Sales Term Sheet was drafted with respect to Hard and otherwise deny the allegations of Paragraph 41 of the Complaint.

44.  The Answering Defendants admit that a true copy of the Sales Term Sheet is attached to the Complaint.  The rest of paragraph 42 consists of legal conclusions.  The document speaks for itself.

45.  The Answering Defendants deny the allegations of Paragarph 43 of the Complaint in their entirety.

46.  The Answering Defendants deny the allegations of Paragraph 44 of the Complaint.

47.  The Answering Defendants admit that they apprised Messrs. Price and Powell that Harvey Keitel, Peter Storemare and Frank Grillo had agreed to star in the Film, and otherwise deny the allegations of Paragraph 45 of the Complaint.

48.  The Answering Defendants deny the allegations of Paragarph 46 of the Complaint in their entirety.

49.  The Answering Defendants deny the allegations of 47.

50.  The Answering Defendants admit that on January 23, 2022 sales forecasts for the Film were transmitted, and further that the estimated initial revenue was between $6,000,000 - $9,000,000 subject to the directors and actors' performance  and

PRINTED ON RECYCLED PAPER

7

otherwise deny the allegations of Paragraph 48 of the Complaint.

51.  The Answering Defendants admit that they, together with Justin Price, signed an agreement in the ordinary course of business, and otherwise deny the allegations of Paragraph 49 of the Complaint.

52.  The Answering Defendants deny the allegations of Paragraph 50 of the Complaint.

53.  The Answering Defendants deny the allegations of Paragarph 51 of the Complaint in their entirety.

54.  The Answering Defendants admit that Production of Hard Matter began on or about March 25, 2022, and otherwise deny the allegations of Paragraph 52 of the Complaint.

55.  The Answering Defendants lack sufficient information to admit or deny the allegations of Paragraph 53 of the Complaint and deny them on that basis.

56.  The Answering Defendants admit that Exhibit 5 is a true and correct copy of the Revised Contingent Abreement of March 28, 2022, and otherwise deny the allegations of Paragraph 54 of the Complaint.

57.  The Answering Defendants deny the allegations of Paragraph 55 of the Complaint.

58.  The Answering Defendants deny the allegations of Paragraph 56 of the Complaint.

59.  The Answering Defendants recall no such conversation and on that basis deny the allegations of Paragraph 55 of the Complaint.

60.  The Answering Defendants admit that Powell and Mr. Saxon had discussions about visual post-production work, and otherwise deny the allegations of Paragraph 55 of the Complaint.

61.  The Answering Defendants admit the allegations of paragraph 59.

PRINTED ON RECYCLED PAPER

62.  The Answering Defendants admit that the sound and visual effects were not done by September 1, 2022, and otherwise deny the allegations of Paragraph 60 of the Complaint.

63.  The Answering Defendants deny the allegations of Paragraph 61 of the Complaint.

64.  The Answering Defendants lack sufficient information to admit or deny the accuracy of some of the allegations of Paragraph 62 of the Complaint, while others of those allegations are materially false.  The Answering Defendants deny the entirety of the allegations of Paragraph 62 of the Complaint on that basis.

65.  The Answering Defendants deny the allegations of Paragarph 63 of the Complaint in their entirety.

66.  The Answering Defendants admit that Bowler stated that AFM was an important venue for selling the film if it was ready, and otherwise deny the allegations of Paragraph 64 of the Complaint.

67.  The Answering Defendants lack sufficient information to admit or deny the accuracy of some of the allegations of Paragraph 65 of the Complaint, while others of those allegations are materially false.  The Answering Defendants deny the entirety of the allegations of Paragraph 65 of the Complaint on that basis.

68.  The Answering Defendants deny the allegations of Paragarph 66 of the Complaint in their entirety.

69.  The Answering Defendants deny the allegations of Paragraph 67 of the Complaint.

70.  The Answering Defendants deny the allegations of Paragarph 68 of the Complaint in their entirety.

71.  The Answering Defendants deny the allegations of Paragraph 69 of the Complaint.

72.  The Answering Defendants deny the allegations of Paragarph 70 of the

PRINTED ON RECYCLED PAPER

Complaint in their entirety.

73.  The Answering Defendants do not recall any such conversation and on that basis deny the allegations of Paragraph 71 of the Complaint.

74.  The Answering Defendants admit that Mr. Bowler wrote to Mr. Powell confirming that The Exchange's sales team would be cutting a promotional trailer of the Film for AFM to show buyers for the sale of the Film, and otherwise deny the allegations of Paragraph 72 of the Complaint.

75.  The Answering Defendants lack sufficient information to admit or deny the accuracy of some of the allegations of Paragraph 73 of the Complaint, while others of those allegations are materially false.  The Answering Defendants deny the entirety of the allegations of Paragraph 73 of the Complaint on that basis except that the Answering Defendants admit that Mr. Bowler answered one of Powell's calls.

76.  The Answering Defendants deny the allegations of Paragraph 74 of the Complaint.

77.  The Answering Defendants lack sufficient information to admit or deny the accuracy of some of the allegations of Paragraph 75 of the Complaint, while others of those allegations are materially false.  The Answering Defendants deny the entirety of the allegations of Paragraph 75 of the Complaint on that basis.

78.  The Answering Defendants deny the allegations of Paragraph 76 of the Complaint.

79.  The Answering Defendants deny the allegations of Paragraph 79.

80.  The Answering Defendants admit that there was a dispute involving the union which resulted in a $10,000 fine , and otherwise deny the allegations of Paragraph 78 of the Complaint.

81.  The Answering Defendants admit that Powell offered to pay $15,000 if several others of the Answering Defendants would also pay.  Answering Defendants otherwise deny the allegations of Paragraph 79 of the Complaint.

PRINTED ON RECYCLED PAPER

10

82.  The Answering Defendants lack sufficient recollection to admit or deny the accuracy of some of the allegations of Paragraph 80 of the Complaint, while others of those allegations are materially false.  The Answering Defendants deny the entirety of the allegations of Paragraph 80 of the Complaint on that basis.

83.  The Answering Defendants admit that an email was sent containing language quoted in Paragraph 81, and otherwise deny the allegations of Paragraph 81 of the Complaint.

84.  The Answering Defendants deny the allegations of Paragraph 82 of the Complaint.

85.  The Answering Defendants deny paragraphs 83-143 in their entirety except to the extent some of those paragraphs incorporate earlier allegations as to which admissions have been made above.

86.  Answering Defendants assert each and all of the following affirmative Defenses:

### FIRST AFFIRMATIVE DEFENSE -- FAILURE TO STATE A CAUSE OF ACTION

87.  The Complaint fails to state a claim upon which relief can be granted against the Answering Defendants.

### SECOND AFFIRMATIVE DEFENSE -- LACK OF STANDING

88.  The Plaintiff lacks standing to bring claims against the Answering Defendants.

### THIRD AFFIRMATIVE DEFENSE -- CONSENT / RATIFICATION / WAIVER / ESTOPPEL

89.  The Plaintiffs have, through their conduct, waived any claims against the Answering Defendants and/or have consented to, ratified or are otherwise estopped from asserting claims against the Answering Defendants.

### FOURTH AFFIRMATIVE DEFENSE -- FAILURE TO NAME AND JOIN NECESSARY PARTIES

90.  The causes of action in Plaintiff's Complaint are barred, in whole or in part, in accordance with Federal Rules of Civil Procedure, Rule 12(b)(7) insofar as Plaintiff

11

has failed to join necessary and indispensable parties.

## FIFTH AFFIRMATIVE DEFENSE -- STATUTE OF LIMITATIONS / LACHES

91.  The causes of action in Plaintiff's Complaint are time-barred under applicable statutes of limitations and the doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE -- UNCLEAN HANDS

92.   The causes of action in Plaintiff's Complaint are barred by Plaintiff's unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE -- OFFSET

93.  The Answering Defendants are entitled to Offset amounts owed to them by the Plaintiff on account of the Plaintiff's torts and breaches of contract.

## EIGHTH AFFIRMATIVE DEFENSE -- FAILURE TO MITIGATE

94.   The causes of action in Plaintiff's Complaint are barred because Plaintiff and its principal have failed to mitigate their damages.

WHEREFORE, the Answering Defendants ask:

1. That Plaintiff take nothing by way of the Complaint;

2. That Plaintiff be dismissed with costs of suit;

3. And for such other and further relief as the Court may deem just.

## COUNTERCLAIMS

95.  Some or all of the following paragraphs are alleged on information and belief: 96, 97, 98, 112, 123 and 124.

**Counter-Defendants**.

96.  Counter-Defendant Latavius Powell ("POWELL") is a resident of Georgia. He is the principal of Gridiron Productions and was a principal of Powell and Price Productions, both of which entities are his alter-egos.

97.  Counter-Defendant Justin Price ("PRICE") is a resident of California.  He was a principal of Powell and Price Productions and, to the extent any such entity in fact exists, was a principal of Price Productions, both of which entities are his alter-egos.

PRINTED ON RECYCLED PAPER

98.  Counter-Defendant Powell and Price Productions ("PPP") is the entity who contracted with Counter-Claimants and which took on fiduciary duties to them.  It is an alter-ego of POWELL and PRICE.

99.  Counter-Defendant Price Productions is an entity which Plaintiff claims exists and is a business of unknown form.

100.  Counter-Defendant Gridiron Productions ("GRIDIRON") is the Plaintiff in this matter and purports to have standing to sue in this matter. In fact, it doesn't have such standing.  Counter-Defendants POWELL, PRICE, PPP and GRIDIRON are hereinafter referred to as the "POWELL COUNTER-DEFENDANTS".

101.  Counter-Defendants DOES 1 through 50 are legally responsible for the damages suffered by the Counter-Claimants.  The true names and capacities of defendants DOES 1 through 50 are currently unknown to Counter-Claimants who, therefore, sue these defendants under these fictitious names.  Counter-Claimants will amend their Complaint appropriately if and when they learn of these Counter-Defendants' true names and capacities.

102.  Each and all of the Counter-Defendants in this action was a co-conspirator, agent, employee and/or alter-ego of the other Counter-Defendants in engaging in the acts and omissions at issue in this Complaint.

**Counter-Claimants**

103.    Counter-Claimant Bret Saxon is a resident of California.

104.    Counter-Claimant Amy Saxon is a resident of California.

105.    Counter-Claimant Jeffrey Bowler is a resident of California.

106.    Counter-Claimant WF is a California Corporation.

## COMMON ALLEGATIONS

107.  Counter-Claimant Bret Saxon is a resident of the State of California. For years, Mr. Saxon had successful marketing and movie production businesses.

PRINTED ON RECYCLED PAPER

108.  At various times, Mr. Saxon and Mr. Bowler worked together on multiple films.  The vast majority of those films were economically successful.

109.  Approximately 13 years ago, Mr. Saxon made a film in which a wealthy business man invested.  That businessman and Mr. Saxon came to be in conflict (the "Main 2011 Case") over the film and a protracted set of litigations emerged in its wake -- including a number of opportunist meritless copycat litigations (the "Other Cases") -- which exhausted Mr. Saxon's ability to pay for legal fees. This ultimately resulted in a judgment against Mr. Saxon in an adversary proceeding in the bankruptcy court in which the Court found that Mr. Saxon had committed "defalcation" by putting Mr. Yarborough's funds in the wrong one of several accounts held to support the production of the movie.   This, in turn, led to State Bar proceedings against Mr. Saxon (who was a licensed attorney who had never practiced law) which ultimately resulted in Mr. Saxon being recommended for disbarment in the State Bar Court (after the bar case against him had been dismissed three times). The Main 2011 Case and the Other Cases are collectively referred to as the "2011 Cluster Cases".

110.  Due to the length and intensity of all of these litigations, Mr. Saxon did not have the funds to appeal either the Bankruptcy Court judgment or the State Bar Court finding, and Mr. Saxon lost his legal license.  While Mr. Saxon made mistakes in his relationship with the Plaintiff in the Main 2011 Case, he also continues to believe that at least in certain respects, the latter two Court rulings were in error.

111.  Apart from legal proceedings arising out of the 2011, Mr. Saxon has not been sued since (except for the present frivolous filings by the POWELL COUNTER-DEFENDANTS, and a countersuit which was brought in response to a lawsuit brought by Mr. Bowler for a finder's fee in connection with the sale of the Jessica Simpson Brands).   However, Mr. Saxon's (and, to a lesser extent, Mr. Bowler's) business suffered for years as a result of bad press from the 2011 Cluster Cases which

PRINTED ON RECYCLED PAPER

left Mr. Saxon extremely vulnerable to false claims echoing those of the 2011 Cluster Cases.  As discussed below, POWELL would ultimately try to take advantage of Mr. Saxon's vulnerability with regard to the 2011 Cluster Cases to extort the Counter-Claimants to provide POWELL with funds to which he was not entitled.

112.  Several years ago, Mr. Bowler met PRICE who, at that time, was living in his car but wanted to be a director.  PRICE was industrious enough to get Mr. Bowler on the phone to ask for career advice -- which Mr. Bowler decided to give.  Over the years, Mr. Bowler took PRICE's calls and tried to point him in the right direction professionally. Years later, PRICE came in to meet with Messrs. Saxon and Bowler and to pitch a script he wrote and intended to direct for a movie called "Hard Matter".  PRICE said that his partner -- Georgia businessman POWELL -- would finance the film.

113.  PRICE wanted to hire WF to produce the film. Ultimately WF agreed, and POWELL put up $5 million towards the $7.3 million budget.   As Counter-Claimants would later learn, POWELL ran a fund investing NFL player's funds.  Although Mr. Bowler and Mr. Saxon did not know it at the time, they are now informed that POWELL had been put on a watch list by the NFL and has gotten into trouble with the Georgia State version of the SEC for mishandling player funds.

114.  Very early on, it became painfully clear to every one involved in the making of the FILM that POWELL's partner PRICE wasn't ready to direct a movie at the level of the "Hard Matter".  On the initial shoot, the crew  -- an Oscar winning DP, a well-known Line Producer and Production Designer -- all quit saying PRICE was too difficult and incompetent for them to continue working with him.  In the wake of this exodus of personnel, Saxon and Bowler both spoke with PRICE and POWELL and expressed their concerns.   Powell insisted on PRICE remaining in charge, but both promised that PRICE would be more collaborative in the future and take advice from the seasoned department heads.  That promise was not kept.

PRINTED ON RECYCLED PAPER

ANSWER AND COUNTER-COMPLAINT

115.  A very similar issue arose as a result of PRICE and POWELL insisting that PRICE's girlfriend be the lead in the film.  PRICE and POWELL insisted that (1) she was a 'great actress', (2) she'd been working for months on the many action sequences in the film and had the stunts and had the choreography down pat and (3) there wasn't time to bring in a proper name actress to learn all the stunts. When it came to production, the stunt coordinator Mr. Saxon and Mr. Bowler hired, who does Marvel movies, said she was terrible, didn't know how to throw a punch and knew zero choreography. As a result, Messrs. Saxon and Bowler had to cut out the majority of the action fight sequences from the film -- which had they been properly executed would have been a major part of the film's box office appeal.

116.  Messrs. Bowler and Saxon sat down with PRICE and POWELL and asked to be allowed to replace her on multiple occasions.  They were always told "no". Along the way, Mr. Saxon and Mr. Bowler reluctantly advised POWELL that PRICE needed to be replaced as well.  POWELL refused to follow their advice.

117.  In short, the film was handicapped by POWELL' bad choices from the outset.

118.  Mr. Saxon and Mr. Bowler were able to cast the film well despite their director and lead actresses being ill equipped to execute their jobs.  Messrs. Saxon and Bowler had to talk actors out of walking off the set, and  had to manage the crew in a closer fashion in any other movie either had been a part of.  POWELL and PRICE refused to consider any criticism of PRICE's limitations as a director, or PRICE's girlfriend's limitations as an actress.  POWELL also refused to allow the film to be completed.  In short, it is the errors of POWELL and PRICE which ultimately caused the film to fail to make it to release on time, and further required Counter-Claimant Amy Saxon to loan more than $275,000 toward the completion of the Film's production, which loan has yet to be repaid.

119.  POWELL and PRICE's allegations that the Counter-Defendants have pocketed secret profits, thus, is not only not true -- it is the very opposite of truth.

PRINTED ON RECYCLED PAPER

120. There are no such profits because POWELL and PRICE prevented them from arising by their intransigence -- and while the Film was able to inspire an offer from Lionsgate for domestic distribution and many foreign sales, the total looked like it would cap out at $2-2.5m.  This was a direct result of (1) PRICE's incompetence and the inadequacies of his chosen female lead and (2) POWELL's deliberately blocking the ability of the Counter-Claimants to finish the film.

121.  Prior to filing his frivolous lawsuit, POWELL indicated that he was concerned as to how his players would react to the money they had invested with POWELL having been spent on such a mediocre film.  Not to put too fine a point on it, he indicated that he was afraid that they might become physically violent with him (and indirectly threatened violence to Mr. Saxon as well).  He indicated that he was prepared to say anything to get his money back out of a film that his own decisions had sabotaged.   He told Mr. Saxon that if he was going down, he was going to take Mr. Saxon and Mr. Bowler with him by destroying them by falsely resurrecting old claims of fraud.  True to his threat, his complaint is, virtually in its entirety, demonstrably false.

122.  For example, POWELL claims Mr. Saxon and Mr. Bowler promised that Mel Gibson would star in the film, but the emails and text messages among Messrs. Bowler and Saxon, on the one hand, and POWELL on the other hand, show that there was constant, accurate communication with Messrs. POWELL and PRICE concerning Messrs. Saxon and Bowler's calls with Gibson's agents which revealed the fact that while Mr. Gibson's team was enthusiastic about the project,  Mr. Gibson had not read the script and was not "onboard" at all.   POWELL contends that Mr. Saxon and Mr. Bowler concealed from him the fact that Mr. Gibson was busy on other projects, but the text messages show that PRICE AND POWELL were told specifically about Mr. Gibson's work conflicts. POWELL contends that he was lied to about Mr. Saxon's past litigation history, but the text messages show that he was both

PRINTED ON RECYCLED PAPER

well aware of that history and even asked Mr. Saxon to stay away from certain meetings with other investors because he was concerned that Mr. Saxon's past might impede the success of the film.  While POWELL said in his lawsuit that he didn't get paid any money, the fact is that POWELL was the highest paid producer on the film, and the wire confirmations, the bank statements, the film accounting, emails and texts all prove it -- which is probably one of the principal reasons why POWELL was particularly worried about his players blaming him for the film's lack of success.

123.  POWELL has repeated the foregoing lies, on behalf of himself, and for Gridiron, has made scurrilous accusations against the Counter-Defendants to the press either directly or indirectly through his lawyer.  POWELL knew these accusations to be false at the time he made them, and they were made to carry out his threat to ruin Counter-Claimants Bret Saxon, Jeffrey Bowler and WC.  POWELL's have resulted in multiple articles being published, including in the Los Angeles Times, which have defamed the Counter-Claimants and resulted in the cancellation of more than $150 million worth of contracts which would have been expected to yield in excess of $15,000,000 in profit to the Counter-Claimants.

124.    To the extent that POWELL believes any of the lies he has told about the Counter-Claimants, it is because his partner PRICE deliberately misled him.

### FIRST CAUSE OF ACTION -- FRAUD
**(By All Counter-Claimants Against All Counter-defendants)**

125.    Counter-Claimants reallege each of the foregoing allegations above as though set forth herein verbatim.

126.    As a result of the wrongful acts described above, Counter-Defendants have committed fraud against the Counter-Claimants in that they knowingly made false statements in the hope that others would rely on those false statements, upon which others, in fact, did rely (including the Counter-Claimants themselve) all with the intent of causing loss to the Counter-Claimants.

PRINTED ON RECYCLED PAPER

127.     As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $15 million.

## SECOND CAUSE OF ACTION --BREACH OF CONTRACT
### (By Counter-Claimants WC, Bret Saxon and Bowler against All Counter-Defendants)

128.     Counter-Claimants reallege each of the foregoing allegations above as though set forth herein verbatim.

129.     Counter-Defendants have breached their agreements with the Counter-Claimants as alleged above and the covenant of good faith and fair dealing associated with those agreements.

130.     As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $1 million.

## THIRD CAUSE OF ACTION -- BREACH OF FIDUCIARY DUTY
### (By Counter-Claimants WC, Bret Saxon and Bowler against All Counter-Defendants)

131.     Counter-Claimants reallege each of the foregoing allegations above as though set forth herein verbatim.

132.     By and through their agreements with the Counter-Claimants, Counter-Defendants became joint venturers with the Counter-Claimants and thus took on fiduciary duties to them.  Counter-Defendants breached those duties.

133.     As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $15 million.

## FOURTH CAUSE OF ACTION -- DEFAMATION
### (By Counter-Claimants WC, Bret Saxon and Bowler against All Counter-Defendants)

134.     Counter-Claimants reallege each of the foregoing allegations above as though set forth herein verbatim.

PRINTED ON RECYCLED PAPER

135.     As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $15 million.

### FIFTH CAUSE OF ACTION -- UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST
**(By Counter-Claimant Amy Saxon Against All Counter-Defendants)**

136.     Counter-Claimants reallege each of the foregoing allegations above as though set forth herein verbatim.

137.     As alleged above, Counter-Claimant Amy Saxon loaned over $276,000 to allow for the Film to be completed which has unjustly enriched the Counter-Defendants and has created a constructive trust.

### SIXTH CAUSE OF ACTION -- INTENTIONAL INTERFERENCE WITH ECONOMIC ADVANTAGE
**(By Counter-Claimants Bret Saxon and Bowler against All Counter-Defendants)**

138.     Counter-Claimants reallege each of the foregoing allegations above as though set forth herein verbatim.

139.     As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $15 million.

WHEREFORE, Counter-Claimants pray for:

1.   On all causes of action, compensatory damages in an amount no less than $15 million;

2.   On the First, Third, Fourth and Sixth causes of action, exemplary damages;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

PRINTED ON RECYCLED PAPER

3.   On all causes of action cost of suit and such other relief as the Court may deem proper.

Date:  November 13, 2023          THE LAW OFFICES OF JOHN A. SCHLAFF


/ S /


By _____

John A. Schlaff,
Counsel for Defendants and Counter-Claimants
BRET MERRITT SAXON, JEFF BOWLER,
AMY SAXON AND WONDERFILM LLC,
AND FOR DEFENDANTS RICHARD
DAVIS, RICHARD SALVATORE,, NINA
PODOLSKA, WONDER  CAPITAL LLC; WF
HARD MATTER, LLC, LUCKY OWL FILMS
INC., WF GROUP, LLC

PRINTED ON RECYCLED PAPER

21

**PROOF OF SERVICE BY ELECTRONIC SERVICE**

STATE OF CALIFORNIA, LOS ANGELES

   I, John A. Schlaff, am employed in the county of Los Angeles, State of California; I am over the age of 18 years and not a party to the within action; my business address is The Law Offices of John A. Schlaff, 2355 Westwood Boulevard, No. 424, Los Angeles, California 90064.

   On November 14, 2023, I  electronically served the foregoing **"ANSWER AND COUNTERCLAIMS FOR FRAUD, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, DEFAMATION, UNJUST ENRICHMENT / CONSTRUC-TIVE TRUST AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE"** on the interested party or parties by serving through the Pacer system the following parties:

Joseph M. Kar, Esq.
LAW OFFICE OF JOSEPH M. KAR, LLC
15250 Ventura Blvd., Suite PH-1220
Sherman Oaks, CA 91403
jkar@civillegal.com

VELKEI LAW P.A.
Steven A. Velkei, Esq.
Christopher G. Wilson
6430 Sunset Blvd, Suite 702
Los Angeles, CA 90028
svelkei@velkeilaw.com
cwilson@velkeilaw.com

BLANK ROME LLP
Gregory M. Bordo, Esq.
Craig N. Haring, Esq.
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
craig.haring@blankrome.com
greg.bordo@blankrome.com

/ /  State          I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

/x/  Federal       I declare (certify, verify or state) under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this court at whose direction the service was made.

Executed on November 14, 2023

/ S /

_____

John A. Schlaff

PRINTED ON RECYCLED PAPER