THE LAW OFFICES OF JOHN A. SCHLAFF
John A. Schlaff, State Bar No. 135748
2355 Westwood Boulevard, No. 424
Los Angeles, California 90064
Telephone No. 1-310-474-2627
Telecopy No. 1-310-362-8883
Email john.schlaff@gmail.com

Counsel for (1) Counter-Claimants and defendants BRET
MERRITT SAXON, JEFF BOWLER, AMY SAXON,
WONDERFILM LLC and WONDER CAPITAL, and
for (2) Defendants RICHARD "STIEN" DAVIS;
RICHARD SALVATORE, NINA PODOLSKA;
WF HARD MATTER, LLC; LUCKY OWL FILMS INC.;
WF GROUP, LLC

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

GRIDIRON PRODUCTIONS LLC, a )
Georgia Limited Liability Company, )
)
    Plaintiff, )
)
    vs. )
)
BRET MERRITT SAXON, etc., et )
al. , )
)
    Defendants. )
_____ )
)
BRET MERRIT SAXON, AMY )
SAXON and JEFFREY BOWLER, )
)
    v. )
)
GRIDIRON PRODUCTIONS, )
LATAVIUS POWELL, an )
individual, JUSTIN PRICE, an )
individual, PRICE PRODUCTIONS, )
a business organization of unknown )
form, POWEL & PRICE )
PRODUCTIONS, LLC, a business )
organization of unknown form. )
)
_____ )

CASE NO. 2:23-cv-07574-TJH-JPR

*Assigned to the Hon. Terry J. Hatter, Jr.*

**FOURTH AMENDED COUNTER-CLAIMS FOR EXTORTION, PROMISSORY FRAUD, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, DEFAMATION, UNJUST ENRICHMENT / CONSTRUCTIVE TRUST AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

1   1.  The Counter-Claimants in this matter BRET MERRICK SAXON, JEFFREY

2   BOWLER, WONDERFILM LLC ("WF"), WONDER CAPITAL LLC ("WC") and

3   AMY SAXON reassert their answer to the Operative Complaint and incorporate such

4   answer by this reference as though set forth in full therein.

5                        **FIRST AMENDED COUNTERCLAIMS**

6   2.  Some or all of the following paragraphs are alleged on information and belief:

7   3, 4, 5, 6, 7, 8, 14, 15, 16, 23, 25, 31, 32, 45, 46, 47, 48, 50, 51, 52, 54, 57, 63, 64 and

8   66.

9   **The Parties and Other Important Persons**.

10  3.  Counter-Defendant Gridiron Productions ("GRIDIRON") is the Plaintiff in this

11  matter and purports to have standing to sue. In fact, it doesn't have such standing.

12  GRIDIRON is an alter-ego of Latavius Powell ("POWELL") and Powell and Price

13  Productions ("PPP"), the latter of which is domiciled in the State of California.

14  4.  POWELL has a long history of engaging in sharp, fraudulent and illegal

15  practices through various alter-egos primarily in the State of Georgia where

16  POWELL recruits NFL players as investors / clients, many of whom have criminal

17  records.  He has been under investigation by the State of Georgia, the SEC and the

18  Georgia equivalent of same for mishandling player funds and charging excessive

19  fees.

20  5.  Because GRIDIRON and POWELL are alter egos of each other, and because at

21  all times relevant to the complaint herein, POWELL was the principal of GRIDIRON,

22  they are sometimes collectively referred to herein below as "GRIDIRON /

23  POWELL".

24  6.  At all times relevant to this suit, JUSTIN PRICE ("PRICE") was acting as the

25  employee, agent and co-conspirator of GRIDIRON and its alter-egos POWELL and

26  PPP.

27  7.  Counter-Defendants ROES 1 through 50 are non-residents of California legally

28

responsible for the damages suffered by the Counter-Claimants. The true names and capacities of defendants ROES 1 through 50 are currently unknown to Counter-Claimants who, therefore, sue these defendants under these fictitious names. Counter-Claimants will amend their Complaint appropriately if and when they learn of these Counter-Defendants' true names and capacities.

8. Each and all of the Counter-Defendants in this action along with the other persons specifically named in this Counterclaim was a co-conspirator, agent, employee and/or alter-ego of the other Counter-Defendants in engaging in the acts and omissions at issue in this Complaint.

**Counter-Claimants**

9. Counter-Claimant Bret Saxon is a resident of California.

10. Counter-Claimant Amy Saxon is a resident of California.

11. Counter-Claimant Jeffrey Bowler is a resident of California.

12. Counter-Claimants WF and WC are California Corporations.

13. Counter-Claimants Bret Saxon, Jeffery Bowler, WF and WC are collectively referred to as "Counter-Claimants."

## COMMON ALLEGATIONS

14. Defendants/Counterclaimants Bret Saxon and Emmy-winning producer Jeffrey Bowler previously worked together as successful independent producers through a company called Wonderfilm, LLC ("Wonderfilm"). They have won numerous awards over the years for their productions and produced, among others, the critically acclaimed films ** and the emmy winning **. Over a period of years, Bowler had mentored an aspiring, inexperienced director named Justin Price, who sought help making his film "Hard Matter." Price ultimately partnered with Latavius Powell, a Georgia businessman managing NFL player investments. Although Bowler and Saxon did not know it at the time, Powell had been put on a watch list by the NFL

1  and had gotten into trouble with Georgia and the SEC for dishonesty in connection

2  with his handling of player funds.  Exhibit "1".

3     15.  PRICE wanted to engage WC and WF to produce the film. Ultimately, WC

4  and POWELL and PRICE entered into an agreement to jointly pursue the making of,

5  and the profiting from a film called  "Hard Matter" which was memorialized in a

6  contract (the "Contract"), a copy of which is attached to Plaintiff's Operative

7  Complaint in this matter at Dckt 58-1.  Counter-Claimants would later learn that

8  Powell had a pattern and practice of misleading his business partners (the "Unfair

9  Business Practices") and habitually breaking deals when it was to his perceived

10  advantage to do so.   On information and belief, at the time POWELL and PRICE

11  executed the Contract, POWELL had every intention of breaching the Contract to the

12  extent that it might later become inconvenient to honor it.   Cross-Complainant's are

13  also informed and believe that POWELL / GRIDIRON intended to breach their

14  agreements with Counter-Claimants to the fullest extent possible to place all risk

15  associated with the project on Counter-Claimants and to secure for themselves

16  remuneration to which they were not entitled and to secure for PRICE industry credits

17  that would not otherwise be available to him (the "Fraudulent Scheme").   POWELL,

18  GRIDIRON and PRICE all concealed their true purposes in entering into agreements

19  with Counter-Claimants knowing that Counter-Claimants would never agree to do

20  business with GRIDIRON if the true facts were revealed.

21     16.  Powell and Price's company, Powell and Price Productions ("PPP") and

22  Wonderfilm entered into a contract in September of 2021 which is attached as Exhibit

23  "1" to the Plaintiff's operative complaint in this matter.  Dckt 58-1 (the "Agreement").

24  A few months later, PPP would assign its rights to Plaintiff Gridiron Production LLC

25  ("Gridiron" and "Plaintiff"), which Responding Defendants are informed is an alter-

26  ego of Powell and, at Powell's insistence, a second, backdated version of the contract

27  was executed replacing PPP with Gridiron as the party contracting with Wonderfilm.

28

4

Dckt 58-5.  Powell would ultimately cause a number of NFL players to invest approximately $5,500,000 in the film to meet his obligation under the Agreement. Most of that money was invested in or around February of 2022, and no moneys were invested until October 12, 2021 according to Plaintiff's own account.  Exhibit "2".

17.  While the parties had discussed the possibility that Mel Gibson might be a good fit for one of the roles in the movie, Gibson's involvement was not promised, nor was it mentioned in the Agreement.  Indeed, at paragraph  7, both the Agreements attached to Plaintiff's complaint specifically stated:

> This Agreement contains the full and complete understanding between the Parties and supersedes all prior agreements and understandings whether written or oral and cannot be modified except by a written instrument signed by both  Parties.  Each Party acknowledges that neither Party, nor their agents nor representatives made any representation or promise not expressly contained in this Agreement.

Dckst 58-1 and 58-5.

18.  Gibson ultimately did not participate in the film which proceeded, instead, with other notable actors in starring roles including Harvey Keitel.  At Powell and Price's insistence, Price directed and cast his girlfriend as the female lead in the film. It quickly became apparent that neither of them were competent to take on those roles.  Indeed, from very early on, it became painfully clear to every one involved in the making of the FILM that PRICE wasn't ready to direct a movie at the level of the "Hard Matter".  On the initial shoot, the crew -- including an Oscar winning DP, as well as a well-known Line Producer and Production Designer -- all quit saying PRICE was too difficult and incompetent for them to continue working with him.  In the wake of this exodus of personnel, Saxon and Bowler both spoke with PRICE and POWELL and expressed their concerns.   GRIDIRON / POWELL insisted on PRICE remaining in charge, but both promised that PRICE would be more collaborative in the future and take advice from the seasoned department heads.  That promise was not kept and Counter-Claimants are informed and believe that GRIDIRON and its agents / alter-egos POWELL and PRICE had no intention of keeping such promise at

5

the time the promise was made.  Counter-Claimants, however, believed and relied on GRIDIRON / POWELL and PRICE to their detriment.

19.  A very similar issue arose as a result of PRICE and POWELL insisting that PRICE's girlfriend be the lead in the film.  PRICE and POWELL insisted that (1) she was a 'great actress', (2) she'd been working for months on the many action sequences in the film and had the stunts and had the choreography down pat and (3) there wasn't time to bring in a proper name actress to learn all the stunts. When it came to production, the stunt coordinator WC hired (who had coordinated stunts for multiple Marvel movies), said she was terrible, didn't know how to throw a punch and knew zero choreography. As a result, WC had to cut out the majority of the action fight sequences from the film -- which, had they been properly, executed would have been a major part of the film's box office appeal.

20.  Messrs. Bowler and Saxon sat down with PRICE and POWELL and asked to be allowed to replace her on multiple occasions.  They were always told "no". Along the way, Mr. Saxon and Mr. Bowler reluctantly advised GRIDIRON / POWELL that PRICE needed to be replaced as well.  GRIDIRON / POWELL refused to follow their advice.

21.  In short, the film was handicapped by GRIDIRON / POWELL's bad choices and misrepresentations from the outset.

22.  Mr. Saxon and Mr. Bowler were able to cast the film well despite their director and lead actresses being ill equipped to execute their jobs.  Messrs. Saxon and Bowler had to talk actors out of walking off the set, and  had to manage the crew in a closer fashion in any other movie either had been a part of.  POWELL and PRICE refused to consider any criticism of PRICE's limitations as a director, or PRICE's girlfriend's limitations as an actress.

23.  After the film had been shot, and only approximately $30,000 post-production work remained, POWELL viewed the film in its then current condition and realized

that the film was unlikely to be a commercial success because of PRICE and his girlfriend's failings. True to his plan and past practices, POWELL demanded his money back, among others.

24. In telephonic negotiations with Mr. Saxon which took place in or about May of 2023, POWELL indicated that he was concerned that his NFL player / investors, many of whom had a history of violent crimes, would engage in physical violence against POWELL if he did not shift the blame to Mr. Saxon and Mr. Bowler (in which case, Mr. Saxon and Mr. Bowler could expect to experience physical violence). Among others, Mr. Powell told Mr. Saxon "my investors are not business people like you and me. They will take this to the streets. You need to Google them and see the crimes they've been charged with. It will not be good for you if you don't refund the money invested" (or words to that effect). POWELL repeated these threats and comments to others involved in the project including Nat McCormick of the Exchange in the hopes of increasing pressure on WC to buckle under to his threats. These and other similar comments are hereinafter referred to as the "Threats of Physical Violence."

25. When his Threats of Physical Violence did not have the effect that POWELL hoped they would have, POWELL tried a different tack. POWELL told SAXON that he had long ago had had Messrs. SAXON and BOWLER investigated and knew that Mr. Saxon had previously received bad press and almost had his careers ruined as a result thereof. POWELL told Mr. Saxon that he intended to construct a lawsuit for the purposes of undoing the thirteen years of work Mr. Saxon had put in to get past that period of challenge to his career and to also kill the ability of Bowler and WC and WF to continue to successfully do business. He told Mr. Saxon that he was going to allege in the lawsuit that Mr. Saxon had promised him that Mel Gibson would star in "Hard Matter" and had thereby (and in other ways) defrauded him into investing in the movie. When Mr. Saxon pointed out that those assertions were false,

POWELL said, "I don't care whether they are true or false.  If I'm going down, I'm taking you with me", or words to that effect.  POWELL reiterated that the lawsuit would be crafted in a way to ensure it was picked up by the press and to destroy the business SAXON had rebuilt.  Counterclaimants are informed and believe that POWELL's intent in threatening to ruin Mr. Saxon's career (the "Press Threats") was to force SAXON, BOWLER, WC and WF to make monetary concessions to POWELL.

26.  POWELL's threats were credible.  Thirteen years before, Mr. Saxon made a film in which a wealthy business man invested.  That businessman and Mr. Saxon came to be in conflict (the "Main 2011 Case") over the film and a protracted set of litigations emerged in its wake -- including a number of opportunist, meritless copycat litigations (the "Other Cases") -- which exhausted Mr. Saxon's ability to pay for legal fees. This ultimately resulted in a judgment against Mr. Saxon in an adversary proceeding in the bankruptcy court in which the Court found that Mr. Saxon had committed "defalcation" by putting the business man's funds in the wrong one of several accounts held to support the production of the movie.   This, in turn, led to State Bar proceedings against Mr. Saxon (who was a licensed attorney who had never practiced law) which ultimately resulted in Mr. Saxon being recommended for disbarment in the State Bar Court (after the bar case against him had been dismissed three times).   The Main 2011 Case and the Other Cases are collectively referred to as the "2011 Cluster Cases".[1]

27.  Apart from legal proceedings arising out of the 2011 Cluster Cases, Mr. Saxon has not been sued since (except for the present frivolous filings by the GRIDIRON / POWELL, and a countersuit which was brought in response to a lawsuit brought by

---

[1]  Due to the length and intensity of all of these litigations, Mr. Saxon did not have the funds to appeal either the Bankruptcy Court judgment or the State Bar Court finding, and Mr. Saxon lost his legal license.  While Mr. Saxon made mistakes in his relationship with the Plaintiff in the Main 2011 Case, he also continues to believe that at least in certain respects, the latter two Court rulings were in error.

FOURTH AMENDED COUNTER-CLAIMS

Mr. Bowler for a finder's fee in connection with the sale of the Jessica Simpson Brands).   However, Mr. Saxon's (and, to a lesser extent, Mr. Bowler's) business suffered for years as a result of bad press from the 2011 Cluster Cases and an LA Times news story about them which left Mr. Saxon extremely vulnerable to false claims echoing those of the 2011 Cluster Cases.

28.  The Threats of Physical Violence and the Press Threats are hereinafter referred to as the "Extortionate Threats."

29.  At or about the time that POWELL was making the Extortionate Threats, POWELL, Defendant Bos Entertainment AKA the "Exchange", offered to put up the approximately $30,000 to conclude the post-production work on Hardmatter so that at least some recoupment of funds could come from the project.  POWELL insisted that they not do so.

30.  Terrified by POWELL's threats, although POWELL was entitled to no such concession, BRET SAXON, JEFFREY BOWLER, WC and WF offered to refund half of POWELL's investment over time.  POWELL initially accepted this offer, but reneged and demanded more.

31.  When more concessions were not forthcoming, on or about September of 2023, POWELL filed his first complaint in connection with this matter as a pretext to interface with the press and disseminate faleshoods concerning them in order to divert the player/investor's from coming after GRIDIRON / POWELL, Gridiron's complaint knowingly and falsely alleged:

> 24. In the course of the negotiations over the financing and production of Hard Matter, and after execution of a written agreement, Bret Saxon and Bowler made certain untrue and false representations and promises to entice Price Productions and Plaintiff to invest $5,050,000 and transfer intellectual property rights for the Film based on representations that superstar celebrity Mel Gibson would star in the Film.
>
> * * * *
>
> 27. However, unbeknownst to Price Productions and Plaintiff,  Mel Gibson was not available to star in Hard Matter because he already committed to another film entitled "Hot Seat" set to start production on November 1, 2021 in New Mexico; and, upon information and belief, Mel Gibson had either declined to star in Hard Matter or Bret Saxon and Bowler had fabricated their purported

discussions with Mel Gibson to deceive Price Productions into entering into an agreement to produce Hard Matter with Bret Saxon, Bowler, Wonderfilm, WC, WFHM, WF Group, and The Exchange (the "Wonderfilm Defendants").

\* \* \* \*

36.    By **_November 2, 2021_**, still believing that Mel Gibson was signed on to star in Hard Matter, Price Productions submitted sample Hard Matter graphics with Mel Gibson to the Wonderfilm Defendants.  However, as the Wonderfilm Defendants well knew and had never disclosed to Price Productions at that time, Mel Gibson never agreed to star in Hard Matter, and had already started production of the film "Hot Seat" on November 1, 2021 in New Mexico; and, upon information and belief, on November 15, 2021, Mel Gibson also confirmed that he would be directing the fifth "Lethal Weapon" film.

37.    **_By the second week of November 2021_**, after duping Price Productions to invest $5,050,000 in Hard Matter based on the representation that Mel Gibson would star in the Film, and **_mere days before filming was to start on November 15, 2021, Wonderfilm Defendants admitted to Price Productions that Mel Gibson had not agreed to star in the Film_**. They further stated that production would not start until the first quarter of 2022.

Dckt Nos. 1 and repeated at Dckt No. 58; emphasis added.

32.  The foregoing allegations were a pure confabulation and specifically crafted to give Gridiron (and its alter-ego Powell) a basis to defame and destroy Counterclaimants Bret Saxon, Jeffrey Bowler and the companies they were associated with (i.e. WF and WC) in direct and indirect communications with the press.

33.  In fact, the parties' written communications flatly contradicts Plaintiff's story to the point that it is obvious not only that Plaintiff was lying, but that Counter-Defendant knew it was lying in its complaint.  In text messages and in emails starting in late September and continuing through October of 2021 collectively attached as Exhibit "3", Messrs. Saxon and Bowler explicitly and repeatedly informed PPP that Mel Gibson had not yet agreed to participate in the film, and continued to do so at all times before Plaintiff's first investment and well prior to the November date concocted by the Plaintiff.

34.  Thus, on **_September 23, 2021_**, Defendant Bret Saxon, in connection with negotiating the contract with Price and Powell Productions, wrote to Price indicating that no formal offer had gone out to Mel Gibson at that point:  "Justin - great getting together yesterday - lots of progress and we're excited about producing Hard Matter with you. I've attached a finance agreement for $5,050,000.  The balance of the 7.3m

10

budget Wonderfilm will cash flow from the tax credit in Louisiana.  If we can get this agreement wrapped up this week and your money transferred early next week, *__we'll get the pay/play offer into Gibson__* on Wednesday".  Exhibit "3", p. 1.

35.  On *__October 4, 2021__* Bowler wrote to Price and informed him that "Me[l]'s team confirmed the call later. Please make sure your guy [i.e Latavius Powell] sends wire in next few hours.  So we can be confident on the call and offer him the pay tomorrow to say yes."   Price responded that Latavius was at the bank but that "the compliance officer said there are red flags and law suits . . . Yeh compliance officer comes with the players - so they are flagging Brett for lawsuits a lot of them old but this was new info", thus making it clear that Counter-Defendant was on notice about Mr. Saxon's legal difficulties before a dime was invested in HardMatter.   Exhibit "3" at pp 2 and 5-6.

36.  On *__October 12, 2021__*, by Plaintiff's own account, the first of Plaintiff's investors' monies was invested in the film -- more than a week after Powell certainly knew of Saxon's legal issues.  The monies invested were not committed or expended for at least several weeks thereafter.  The following day, in an *__October 13, 2021__* dated text message between Bret Saxon, on the one hand, and Justin Price, on the other hand, Saxon wrote:

> "I've spent a bunch of time this week with Mel's agent . . . He's fully on board and supporting it with Mel. *__Just waiting on Gibson to read__*." (emphasis added.)

Exhibit "3", p. 9 and compare with Exhibit "2".

37.  None of Price or Powell's emails found or produced to date either on October 13, 2021 or later contain any expression of surprise or outrage that Gibson had not even read the script, let alone a demand a return of the monies that had just been wired the previous day.

38.  On *__October 16, 2021__*, Saxon wrote to both Powell and Price and not only informed them that Gibson still had not yet read the script, but also that Gibson's

earliest availability would not be until January of 2022 and that there might be

problems with getting him onboard:

> "Justin – Mel Gibson is interested in playing Sawyer based on the pitch.  He took 2 films since we initially engaged on it and is now shooting until Dec 17.  ***His first avail is Jan 5.  He also wants a week to read and get back to us***.
> Feedback to discuss is Mel is 65 and Franziska is his daughter, who I believe is 23, yea? We'll have to have Mel play younger and her play 30ish. And there's an action sequence at the dock that we'd need to discuss with Gibson about how much he would be up for doing."

Exhibit "3", p 11.

39.  Price responded that same day, with a CC to Powell not only acknowledging

that he had read the message, but also that he knew that it was still not certain that

Gibson would participate:

> "This won't affect the timeline as long as we can cast out a good Kyron ***if Mel agrees to filming January 5, 2022*** (maybe Dylan O'Brien) and we can shoot out the rest of the film and then finish up his scenes at the top of the year. We will be able to grab action and frames to help with sellable elements before we even shoot Mel. Thank you for the update and let's rock it."

*Id*.

40.  One week later, in an ***October 23, 2021*** dated text message, Saxon informed

both Powell and Price that Gibson still had not read the script:

> I've got a call Monday afternoon with Mel's agent. They expect him to read it this weekend. . . .

Exhibit "3", p. 9.

41.  Two days later, in an ***October 25, 2021*** dated text message, Saxon again texted

Price indicating that Gibson still had not read the script, and suggested that it might

be time to pick someone else for the role of Sawyer:

> "[S]poke with agent. He thinks we're in good shape, ***but they hadn't reached Mel today***. . . I'll stay on it and let's all talk Wednesday and make a decision if we haven't gotten an answer….but let's hope he attaches by then and we don't have a decision to make!"

*Ibid.*

42.  On ***October 31, 2021***, this time Justin Price wrote to Saxon indicated that he

had a friend in Las Cruces who was with Gibson and who had independently let him

**FOURTH AMENDED COUNTER-CLAIMS**

know that the parties were unlikely to hear from Gibson before ***November 6, 2021*** regarding the Hard Matter film:

> My dude James is running lines with Mel and he's been in Las cruces for a few days without filming so when they wrap on nov 6 I think ***we may hear something***.

Tellingly, neither Powell or Price took issue with any of these revelations in any of the emails and texts cited above and continued to invest money in Hard Matter. Exhibits "5" and "6" at p. 10.

43.  It is patent from these emails and texts, and the deafening silence that followed them, that the Plaintiff was not relying on Mel Gibson being a part of the Hard-Matter project and that Plaintiff's contention that Plaintiff was deceived concerning Saxon's past is false as well.  Plaintiff's confabulation concerning the time-line and what it knew or didn't know prior to investing in Hard-Matter was a flat out knowingly false creation.

44.  Counterclaimants are informed and believe that POWELL and/or his counsel issued press releases regarding this suit to, among others, the Hollywood Reporter and the Los Angeles Times at about that time.

45.  In any event, on or about the first week in November, 2023, at POWELL's urging, POWELL's counsel Joseph Kar would issue a knowingly false statement to the press alleging that he had evidence of Counter-claimants' having promised that Mel Gibson would star in Hardmatter and somehow concealed the true facts concerning his availability.  The Los Angeles Times would report on that day that Mr. Kar told them that Plaintiff had "clear communications" to back up POWELL's false story.

> "We have clear communications that they used Gibson as a lure and that my client didn't know he was unavailable," Kar told The Times."

In fact, neither Mr. Kar nor POWELL had "clear communications" to any such effect and POWELL because the "clear communications" establish the very opposite and Kar knew of the falsity of their statements at the time they made them (the "False

Allegations").  Kar and POWELL's statements to the press disseminating the False Allegations and the false assertion that Kar and POWELL had evidence to support those False Allegations were designed to make good on POWELL's threats to ruin SAXON, BOWLER, WC and WF and were not made in good faith.

46.  At the time that POWELL and Kar did so, they knew from their investigations that SAXON, BOWLER, WC and WF were papering several deals including a $100,000,000 joint venture with a company called Covington Group, Inc. for the production of a set of films which would have resulted in BOWLER, WC and WF making at least $35,000,000 in the first year of the venture.  Counter-defendants intended to destroy this revenue stream and succeeded in doing so.  Shortly after the LA Times published an unflattering article regarding this lawsuit, Covington Group, Inc. and virtually every one else doing business with Counter-Defendants terminated their business relationships with Counter-Claimants BRET SAXON, JEFFREY BOWLER, WC and WF with the result that Counter-Claimants have had next to zero revenues ever since.

## FIRST COUNT -- CIVIL EXTORTION

### (By Counter Claimants BRET SAXON, JEFFREYBOWLER, WC and WF against all Counterdefendants)

47.  Counter-Claimants reallege paragraphs 3-46 as though set forth herein in full.

48.  In making the Extortionate Threats, the Counter-Defendants intended to and did (1) threaten to do an unlawful injury to the person or property of the Counter-Claimants BRET SAXON, JEFFREY BOWLER, WC and WF; (2) to accuse those persons and entities of a crime; (3) to expose, or to impute to them a deformity, disgrace, or crime and did so with the express purpose and effect of causing fear and receiving an economic benefit from same.

49.  As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $35 million.

## SECOND COUNT -- DEFAMATION

### (By Counter-Claimants WF, WC, Bret Saxon, Jeffrey Bowler

### Against All Cross-Defendants)

50.  Counter-Claimants reallege paragraphs 3-46 and 48-49 above as though set forth herein verbatim.

51.  The False Allegations were untrue and Counter-Defendants knew them to be untrue at the time that they made them.

52.  The False Allegations were designed to be ruinous to Counter-Claimants and they were.

53.  As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $35 million dollars.

## THIRD COUNT --BREACH OF CONTRACT

### Counter-Claimants WC Against All Cross-Defendants)

54.  Counter-Claimants reallege 3-46, 48-49 and 51-53 above as though set forth herein verbatim.

55.  As alleged by the Counter-Defendants themselves, Counter-Claimants and Counter-Defendants entered into the contract attached as 58-1 to the Cross-Defedendants' operative Complaint in this matter (the "Contract").  Counterclaimant WC performed its obligations under the Contract.   Counter-Defendants have breached their agreements with the Counter-Claimants embodied in that Contracts and the covenant of good faith and fair dealing associated with those agreements by, among others, failing and refusing to allow post-production on Hard-Matter to be

completed, and by falsely trying to cut-off any possibility of Counterclaimants' recouping their investment in the film.

56. As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $1 million.

## FOURTH COUNT -- BREACH OF FIDUCIARY DUTY

### (By Counter-Claimants WF, WC, Bret Saxon, Bowler and Amy Saxon Against All Cross-Defendants)

57. Counter-Claimants reallege paragraphs 3-46, 48-49, 51-53, 55-56 above as though set forth herein verbatim.

58. The purpose of the contract attached at Dckt No. 58-1 was to facilitate the making of "Hardmatter" and economically profiting thereby. The contract provided for joint control of the project, and for the contribution to the control and fisc of the project to be shared with later investors.   Thus, by and through the contract attached to the Plaintiff's Operative Complaint at Dckt No. 58-1,  the Counter-Claimant WC and Counter-Defendants thus became joint venturers with each other and with other investors in the Hardmatter Project.

59. Among those other investors was Amy Saxon, who invested well in excess of $250,000 into the Hardmatter Project between April of 2022 and September of 2022.

60. Counter-Defendants thus took on fiduciary duties to Counter-Claimants and breached those duties by refusing to let the film be completed.   Under the terms of the Contract, unless and until the film is completed and sold, Counter-Claimants cannot be fully paid or repaid.

61. As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $1 million.

/ / /

## FIFTH COUNT -- INTENTIONAL INTERFERENCE

## WITH ECONOMIC ADVANTAGE

### (By Counter-Claimants Bret Saxon, Jeffrey Bowler, WF and WC

### Against All Cross-Defendants,)

62.   Counter-Claimants reallege paragraphs 3-46, 48-49, 51-53, 55-56, 58-61 above as though set forth herein verbatim.

63.   Counter-Defendants knew of the Covington Group, Inc. joint venture that was in the offing at the time they engaged in the misconduct discussed in this pleading.

64.   Counter-Defendants set out to destroy that deal and all other working deals in which the Counter-Claimants Bret Saxon, Jeffrey Bowler, WC and WF were involved and they succeeded.

65.   As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $35 million.

## SIXTH CAUSE OF ACTION -- PROMISSORY FRAUD

### (By Counterclaimants Bret Saxon, Jeffrey Bowler, WF and WC against

### all Counter-Defendants)

66.   Counter-Claimants reallege paragraphs 3-46, 48-49, 51-53, 55-56, 58-61 and 62-65 as though set forth herein verbatim.

67.   As a result of the Counter-Defendants actions, Counter-Claimants have been injured in a collective amount which is currently unknown, but which exceeds $1 million.

/ / /

/ / /

/ / /

/ / /

17

## SEVENTH COUNT -- UNFAIR BUSINESS PRACTICES

### (By All Counter-Claimants Against All Cross-Defendants,

### Including Third Party Defendants)

68.  Counter-Claimants reallege paragraphs 3-46, 48-49, 51-53, 55-56, 58-61, 62-65 and 66-67 above as though set forth herein verbatim.

69.  The conduct of GRIDIRON / POWELL has resulted in monetary damages to Cross-Complainants and their acts described in this Cross-Complaint constitute unfair business practices in violation of the provisions of the California Unfair Business Practices Act.

WHEREFORE, Counter-Claimants pray for:

1.    On all causes of action, compensatory damages in an amount no less than $35 million;

2.    On the First, Second, Fourth and Sixth causes of action, exemplary damages;

3.    On the Seventh Cause of Action, for an injunction requiring disgorgement and preventing GRIDIRON / POWELL from doing business in California; and

4.    On all causes of action cost of suit and such other relief as the Court may deem proper.


Date:  August 26, 2025                    THE LAW OFFICES OF JOHN A. SCHLAFF

                                                              / S /

                                                   By _____

                                                        John A. Schlaff,
                                                   Counsel for Defendants and Counter-Claimants
                                                   BRET MERRITT SAXON, JEFF BOWLER,
                                                   AMY SAXON AND WONDERFILM LLC,
                                                   AND FOR DEFENDANTS RICHARD
                                                   DAVIS, RICHARD SALVATORE., NINA
                                                   PODOLSKA, WONDER  CAPITAL LLC; WF
                                                   HARD MATTER, LLC, LUCKY OWL FILMS
                                                   INC., WF GROUP, LLC

DEMAND FOR JURY TRIAL ON ALL COUNTS SO TRIABLE

18

# EXHIBIT "1"

5/1/25, 2:55 PM    Chase Carlson on X: The NFLPA has issued an alert relating to investment advisor Latavius Powell after the State of Georgia allege…

Case 2:23-cv-07574-TJH-JPR    Document 141    Filed 08/26/25    Page 20 of 51    Page ID #:3824



**Post**



Chase Carlson ✔
@ChaseACarlson

Follow

The NFLPA has issued an alert relating to investment advisor Latavius
Powell after the State of Georgia alleged he misrepresented assets
managed/number of clients and charged an "unreasonable fee for
investment management services in light of services offered."



This **ALERT** is being provided for informational purposes for our members. If you have any questions
relative to this matter you are requested to contact the NFLPA Security Department at 202-756-9102 or by
email at tim.christine@nflpa.com.

The NFLPA Security Department recently received requests to conduct background investigations for the business
CSG Wealth Management and its owner Latavius Powell. Mr. Powell is not registered with The NFLPA Financial
Advisors Program.

Latavius Powell is the CEO of CSG Wealth Management, Sports Advisory Group. This business operates in
Atlanta, Georgia. Powell is a registered Investment Adviser in the State of Georgia, insurance broker, and real
estate broker. Powell appears on social media sites on which there are photos of him with NFL players and him at
NFL facilities.

Inquiries with the United States Security and Exchange Commission (SEC) and the Financial Industry Regulatory
Authority (FINRA) were conducted. Both the SEC and FINRA reported "Disclosure Events" against Powell and his
firm CSC Wealth Management by the State of Georgia Commissioner of Securities, recorded on July 02, 2018.

The SEC reported the following:

*"THE STATE OF GEORGIA SECURITIES COMMISSIONER ALLEGED THAT CSG WEALTH MANAGEMENT, LLC
AND LATAVIUS POWELL FAILED TO MAINTAIN AN ACCURATE ADV PART 1A AND 2A; COULD NOT
PRODUCE ALL STATE REQUESTED BOOKS AND RECORDS; FAILED TO ESTABLISH, MAINTAIN, AND
ENFORCE WRITTEN POLICIES AND PROCEDURES TO COMPLY WITH APPLICABLE REGULATIONS; DID
NOT INSPECT EACH OFFICE LOCATION AT LEAST ANNUALLY; DID NOT FURNISH EACH ADVISORY CLIENT
AND PROSPECT A COPY OF THE FIRM'S BROCHURE; MAINTAINED CUSTODY OF CLIENT ASSETS IN
PROVIDING BILL PAYMENT SERVICES WHILE FAILING TO NOTIFY THE STATE OF GEORGIA OF THIS FACT
AND COMPLYING WITH CUSTODY REQUIREMENTS; DID NOT FULFILL THEIR FIDUCIARY DUTY; PROVIDED
LOANS TO A CLIENT; MISREPRESENTED TO CLIENTS AND POTENTIAL CLIENTS THE NATURE OF
ADVISORY SERVICES OFFERED, ASSETS MANAGED, AND NUMBER OF CLIENTS SERVICED; AND
CHARGED AN UNREASONABLE FEE FOR INVESTMENT MANAGEMENT SERVICES IN LIGHT OF SERVICES
OFFERED."*

State of Georgia Commissioner of Securities Consent Order, July 02, 2018

SEC Disclosure

FINRA Disclosure

**Don't miss what's happening**

People on X are the first to know.

Log in

**Sign up**

5/1/25, 2:55 PM
Case 2:23-cv-07574-TJH-JPR    Document 141    Filed 00/26/25    Page 21 of 51    Page ID #:3825
Chase Carlson on X: The NFLPA has launched an effort, leading to investment advisor Octavius Powell allen the Slate Brokerga allege...

X

⚙

12:43 PM · May 12, 2020

💬 4          🔁 10          ♡ 27          🔖 1          ⬆

**Don't miss what's happening**
People on X are the first to know.

Log in          **Sign up**

# EXHIBIT "2"

On Nov 4, 2022, at 11:48 AM, Jeffrey Bowler <jeff@thewonderfilm.com> wrote:

Could you do this by Monday? Don't send anything to Latavius. Just to me and Bret.  Thx love.
Jeffrey Bowler
Partner

Wonderfilm
923 Cole Ave Suite
Los Angeles, CA 90038
M. (310) 500-6610

Begin forwarded message:

> **From:** BMS <bret@thewonderfilm.com>
> **Date:** November 4, 2022 at 11:39:51 AM PDT
> **To:** lataviuspowell@csgwealth.com, Jeffrey Bowler <jeff@thewonderfilm.com>
> **Subject: Re: Updated Hard Matter Funding Acknowledgement**
>
> Jeff – can you ask accounting to pull details on all the below so I can update the letter? Letter is attached for reference.
>
> bret
>
> ---
>
> **From:** "lataviuspowell@csgwealth.com" <lataviuspowell@csgwealth.com>
> **Date:** Wednesday, November 2, 2022 at 8:41 PM
> **To:** BMS <bret@thewonderfilm.com>, Jeffrey Bowler <jeff@thewonderfilm.com>
> **Subject:** Updated Hard Matter Funding Acknowledgement
>
> Bret,
>
> Can you please send the updated funding acknowledgements to show all funds deposited by myself and clients for the film hard matter.  I have attached the acknowledgement you sent as of 1/24/22.  Please change c/o CSG Wealth Management to c/o Gridiron Productions - 430 Schriever Ct., Mcdonough, GA 30252.
>
> For recollection:
>
> Shaq Mason wired $2,000,000 on 10/12/2021 (wells fargo)
>
> Henry Ruggs III wired $500,000 on 10/13/2021 (wells fargo)
>
> Richard James Jr. wired $250,000 on 2/7/2022 (wells fargo)
>
> Oshane Ximines  wired $250,000 on 2/7/2022 (wells fargo)
>
> Kenneth Williams Jr. wired $750,000 on 2/8/2022 (wells fargo)
>
> Lael Collins wired $500,000 on 2/16/2022 (wells fargo)
>
> Latavius Powell wired $450,000 on 2/7/2022 (wells fargo)
>
> Latavius Powell wired $50,000 on 2/7/2022 (delta community bank)

Latavius Powell $75,000 contributed on 2/9/2022 via compesation withheld.  (paid 175k instead of 250k bc jeff said funds were needed right away)

Latavius Powell wired $175,000 on 2/17/2022 (wells fargo)

Latavius Powell wired $25,000 on 2/23/2022 (Bank of America)

Latavius Powell wired $25,000 on 2/25/2022 (Bank of America)


Total Invested $5,050,000


--
Latavius T. Powell
President and CEO
CSG Wealth Management - Sports Advisory Group
3455 Peachtree Rd. NE, ste. 500
Atlanta, GA 30326
(404) 645-2006
www.csgwealth.com

<Hard Matter Funding Acknowledgment 1.24.22.pdf>

---

**12 attachments**

📄 **500K Collins.pdf**
59K

📄 **Transfer to Latavius 175K.pdf**
48K

📄 **2mln Shaq.pdf**
59K

📄 **25K Latavius 2 25.pdf**
46K

📄 **25K Latavius 2 23.pdf**
46K

📄 **175K Latavius.pdf**
48K

📄 **50K Latavius.pdf**
47K

📄 **450K Latavius.pdf**
48K

📄 **750K Kenneth.pdf**
47K

**250K Oshane.pdf**
48K

**250K Richard.pdf**
47K

**500K Henry.pdf**
47K



Online Banking

---

**Business Adv Fundamentals - 8805: Account Activity Transaction Details**

---

|  |  |
|---:|---|
| **Post date:** | 02/16/2022 |
| **Amount:** | 500,000.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 220216 TIME:1412 ET TRN:2022021600380684 SEQ:2022021600125362/414723 ORIG:LA'EL COLLINS ID:944822110 SND BK:WELLS FARGO BANK NA ID:0407 PMT DET:24212332 SPOKE WITH ADVIS OR LATAVIUS. HE CON TACTED CLIENT AT THE PHONE NUM |
| **Merchant name:** | LA'EL COLLINS |
| **Merchant information:** |  |
| **Transaction** | Income: Deposits |

4

Chat

Share Your Feedback

DEF0068759

 **Bank of America**

*Online Banking*

---

## Business Adv Fundamentals - 8805: Account Activity Transaction Details

---

| | |
|---:|:---|
| **Post date:** | 02/09/2022 |
| **Amount:** | -175,000.00 |
| **Type:** | Withdrawal |
| **Description:** | WIRE TYPE:WIRE OUT DATE:220209 TIME:0447 ET TRN:2022020900080042 SERVICE REF:002835 BNF:LATAVIUS POWELL ID:6009851715 BNF BK:WELLS FAR GO BANK, N.A. ID:121000248 PMT DET:374709596 EP HA RD MATTER |
| **Merchant name:** | LATAVIUS POWELL |
| **Merchant information:** | |
| **Transaction** | Uncategorized: Uncategorized |

Share Your Feedback

DEF0068760



# Online Banking

## Business Adv Fundamentals - 8805: Account Activity Transaction Details

| | |
|---|---|
| **Post date:** | 10/12/2021 |
| **Amount:** | 2,000,000.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 211012 TIME:1529 ET TRN:2021101200735229 SEQ:2021101200239684/788886 ORIG:SHAQUILLE MASON ID:941117484 SND BK:WELLS FAR GO BANK NA ID:0407 PMT DET:23380682 |
| **Merchant name:** | SHAQUILLE MASON |
| **Merchant information:** | |
| **Transaction category:** | Income: Deposits |

2

Chat

Share Your Feedback

DEF0068761



**Online Banking**

---

**Business Adv Fundamentals - 8805: Account Activity Transaction Details**

---

|  |  |
|---:|:---|
| **Post date:** | 02/25/2022 |
| **Amount:** | 25,000.00 |
| **Type:** | Transfer |
| **Description:** | Online Banking Transfer Conf# x91huugwa; POWELL, LATAVIUS |
| **Merchant name:** | POWELL, LATAVIUS |
| **Merchant information:** | |
| **Transaction** | Income: Other Income |

Share Your Feedback

DEF0068762

    Online Banking

---

**Business Adv Fundamentals – 8805: Account Activity Transaction Details**

---

|  |  |
|---:|---|
| **Post date:** | 02/23/2022 |
| **Amount:** | 25,000.00 |
| **Type:** | Transfer |
| **Description:** | Online Banking Transfer Conf# s9vInwa0m; POWELL, LATAVIUS |
| **Merchant name:** | POWELL, LATAVIUS |
| **Merchant information:** | |
| **Transaction:** | Income: Other Income |

Share Your Feedback

DEF0068763



Online Banking

---

**Business Adv Fundamentals - 8805: Account Activity Transaction Details**

---

|  |  |
|---:|:---|
| **Post date:** | 02/17/2022 |
| **Amount:** | 175,000.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 220217 TIME:1549 ET TRN:2022021700427074 SEQ:2022021700157007/455229 ORIG:LATAVIUS T POWELL ID:000006009851715 SND BK:W ELLS FARGO BANK NA ID:0407 PMT DET:004180704853274 0PRIVATE INVESTMENT |
| **Merchant name:** | LATAVIUS T POWELL |
| **Merchant information:** | |
| **Transaction** | Income: Deposits |

Share Your Feedback

DEF0068764

Bank of America | Online Banking | Accounts | Account Details | Account Activity
3/14/22, 3:25 PM



**Bank of America**

# Online Banking

---

**Business Adv Fundamentals - 8805: Account Activity Transaction Details**

---

| | |
|---:|:---|
| **Post date:** | 02/07/2022 |
| **Amount:** | 50,000.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 220207 TIME:1557 ET TRN:2022020700480207 SEQ:20220380077700/000139 ORIG:LATAVIUS TREMAYNE POWELL ID:1190107630010 SND BK:DELTA COMMUNITY CREDIT UNION ID:261071315 |
| **Merchant name:** | LATAVIUS TREMAYNE POWELL |
| **Merchant information:** | |
| **Transaction** | Income: Other Income |

Share Your Feedback

DEF0068765


Bank of America

Online Banking

---

**Business Adv Fundamentals - 8805: Account Activity Transaction Details**

---

| | |
|---:|:---|
| **Post date:** | 02/07/2022 |
| **Amount:** | 450,000.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 220207 TIME:1341 ET TRN:2022020700423570 SEQ:2022020700121653/451673 ORIG:LATAVIUS T POWELL ID:000006009851715 SND BK:W ELLS FARGO BANK NA ID:0407 PMT DET:006695803849517 9INVESTMENT WIR/90046 |
| **Merchant name:** | LATAVIUS T POWELL |
| **Merchant information:** | |
| **Transaction** | Income: Deposits |

Share Your Feedback

DEF0068766



**Bank of America**                                                                        Online Banking

---

**Business Adv Fundamentals - 8805: Account Activity Transaction Details**

---

| | |
|---:|:---|
| **Post date:** | 02/07/2022 |
| **Amount:** | 450,000.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 220207 TIME:1341 ET TRN:2022020700423570 SEQ:2022020700121653/451673 ORIG:LATAVIUS T POWELL ID:000006009851715 SND BK:W ELLS FARGO BANK NA ID:0407 PMT DET:006695803849517 9INVESTMENT WIR/90046 |
| **Merchant name:** | LATAVIUS T POWELL |
| **Merchant information:** | |
| **Transaction** | Income: Deposits |

Share Your Feedback

DEF0068767

Bank of America | Online Banking | Accounts | Account Details | Account Activity                                                    3/4/22, 3:24 PM

  **Bank of America**                                                          **Online Banking**

---

**Business Adv Fundamentals - 8805: Account Activity Transaction Details**

---

**Post date:** 02/08/2022

**Amount:** 750,000.00

**Type:** Credit

**Description:** WIRE TYPE:WIRE IN DATE: 220208
TIME:1428 ET TRN:2022020800377151
SEQ:2022020800119203/409392
ORIG:KENNETH LAMAR WILLIAMS
ID:941117583 SND BK:WE LLS FARGO BANK
NA ID:0407 PMT DET:24169151

**Merchant name:** KENNETH LAMAR WILLIAMS

**Merchant information:**

**Transaction** Income: Deposits

Share Your Feedback

DEF0068768

**Bank of America**                                                    **Online Banking**

## Business Adv Fundamentals - 8805: Account Activity Transaction Details

| | |
|---:|:---|
| **Post date:** | 02/08/2022 |
| **Amount:** | 750,000.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 220208 TIME:1428 ET TRN:2022020800377151 SEQ:2022020800119203/409392 ORIG:KENNETH LAMAR WILLIAMS ID:941117583 SND BK:WE LLS FARGO BANK NA ID:0407 PMT DET:24169151 |
| **Merchant name:** | KENNETH LAMAR WILLIAMS |
| **Merchant information:** | |
| **Transaction category:** | Income: Deposits |

Share Your Feedback

DEF0068769

 **Bank of America**             Online Banking

---

**Business Adv Fundamentals - 8805: Account Activity Transaction Details**

---

| | |
|---:|:---|
| **Post date:** | 02/07/2022 |
| **Amount:** | 250,000.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 220207 TIME:1658 ET TRN:2022020700504623 SEQ:2022020700180970/494483 ORIG:OSHANE LLOYD XIMINES ID:942675460 SND BK:WELL S FARGO BANK NA ID:0407 PMT DET:24164891 |
| **Merchant name:** | OSHANE LLOYD XIMINES |
| **Merchant information:** | |
| **Transaction** | Income: Deposits |

Share Your Feedback

DEF0068770



Online Banking

---

**Business Adv Fundamentals - 8805: Account Activity Transaction Details**

---

|  |  |
|---|---|
| **Post date:** | 02/07/2022 |
| **Amount:** | 250,000.00 |
| **Type:** | Credit |
| **Description:** | WIRE TYPE:WIRE IN DATE: 220207 TIME:1658 ET TRN:2022020700504623 SEQ:2022020700180970/494483 ORIG:OSHANE LLOYD XIMINES ID:942675460 SND BK:WELL S FARGO BANK NA ID:0407 PMT DET:24164891 |
| **Merchant name:** | OSHANE LLOYD XIMINES |
| **Merchant information:** | |
| **Transaction** | Income: Deposits |

Share Your Feedback

DEF0068771

EXHIBIT "3"

**Subject**: Hard Matter
**From**: BMS <bret@thewonderfilm.com>
**To**: Justin Price <justinhollywood@gmail.com>
**Cc**: Jeffrey Bowler <jeff@thewonderfilm.com>
**Date Sent**: Thursday, September 23, 2021 10:39:42 AM GMT-07:00
**Date Received**: Thursday, September 23, 2021 10:39:43 AM GMT-07:00
**Attachments**: Hard Matter Finance Agreement - Short Form.doc,Hard Matter Finance Agreement Long Form.docx

Justin – great getting together yesterday – lots of progress and we're excited about producing Hard Matter with you. I've attached a finance agreement for $5,050,000. The balance of the 7.3m budget Wonderfilm will cash flow from the tax credit in Louisiana. If we can get this agreement wrapped up this week and your money transferred early next week, we'll get the pay/play offer into Gibson on Wednesday.

We drafted 2 agreements – a short form which is fine for now, and a long form if you or your team prefer the additional terms and detail. We don't need both, just giving you options. We listed Latavius as the party through his CSG management entity. If the contract party needs to change, feel free to redline.

The production account wiring info is below.

Thanks,
Bret


Wiring Information:

Wonder Capital, llc REDACTED 4079

Wire Instructions:

Account Name: Wonder Capital, llc

Account Number: REDACTED 8805

Routing Number: 026009593

Swift: BOFAUS3N

Bank of America
7800 W. Sunset Blvd.
Los Angeles, CA 90046



DEF0069037



frank. Men's team just confirmed the call later. Please make sure Your guy sends wire in next few hours. So we can be confident on the call and offer him the pay tomorrow to say yes.

Check in now 🙏

Cool. Let me know.

Oct 4, 2021 at 11:20 AM

Heading to bed in an hour. Waking up at 2am. Please confirm wire before I go to bed

DEF0069038



11:27    5G

‹ 92    Justin ›

wire before I go to bed if you can.

O need to cancel it before I go to sleep if he can't come through. I don't want to wake up at 2am to cancel. Lol

I'm on his ass haha he has told me everything is fine - I'm like bro u at the longest BOA wire line or what

Right! Exactly. Lol.

About to catch a body in Georgia -

iMessage

DEF0069039



**Justin**

Oct 4, 2021 at 12:41 PM

Heading to bed in 30. I'll cancel the meeting. Clearly he's not coming through. When you find out what happened between Friday and today, let me know. I wish people would keep their word more. I always do. I shouldn't have set the call up based on his word only. I'll cancel it, and I'll just tell them we're not ready.

Hey Jeff he is at bank - everything was cool

DEF0069040



**Justin**

the compliance officer said there are red flags and law suits - he just gave me a call - give me 15

Ok. I'll stay up. Let me know.

Yeh compliance officer comes with the players - so they are flagging Brett for lawsuits a lot of them old but this was new info - so I have to call the room ty

Also, bret doesn't own wonder capital LLC. I own 100% of it, he has

iMessage

DEF0069041



own 100% of it, he has no access to anything. So they're not giving him the money

🙏

Heading to bed.  Text me in middle of night. It's ok. It's on silent. So I know what's going on.  On a flight back to LA at 8am

Ok

Oct 5, 2021 at 11:15 AM

Can we push 30 min? Customs is taking

DEF0069042

I sent it yesterday morning. I'll resend now.

Resent.

Got it ty

Sep 30, 2021 at 1:11 PM

Just tried you. Jeff and I are on a layover for another hour.

Oct 5, 2021 at 6:47 AM

Just saw you called. WiFi on the plane, but can't answer a call. We land in about 3 hours. We're on our flight back from Rome. We can call you on our layover in Chicago.

Awesome see u then –

We land at 11.45am central. Then clear customs, but we'll call as soon as we clear.



Oct 13, 2021 at 9:50 AM

Hey Justin – did you write the script in Finsl Draft? If yea, can you email me the Final Draft version? We need it to input into Mivie Magic to break it down for locations and budgeting.

Yes I ll send now

Sorry – at airport and I see typos. Final Draft, Movie Magic.

Awesome, thanks.

Sent

DEF0015959

Oct 20, 2021 at 10:22 AM

Thanks Justin. Totally agree. I've spent a bunch of time this week with Mel's agent because I had another one of his clients on a film we finished Monday. He's fully on board and supporting it with Mel. Just waiting on Gibson to read.

U da man! Ty and we know it takes time so all good – still breaking stuff down and sending good energy! Congrats on Brasco? And have a great week

You too!

Oct 23, 2021 at 2:53 PM



I love your voice notes! I appreciate the energy!!! I've got a call Monday afternoon with Mel's agent. They expect him to read it this weekend. I think we're looking good.

Amazing!!  Yes!!!!

Oct 25, 2021 at 3:15 PM

Sent

Your turnaround times are amazing. Pleasure to work with you.

 ty and u rock! I'm here for any adjustements

Oct 25, 2021 at 6:57 PM

Yea, spoke with agent. He thinks we're in good shape, but they  hadn't reached Mel today.

Sweet – ok so another week u think?

Maybe, but hopefully sooner.

Ty for the update 😊 fingers crossed

Understand. Let's stay on it and let's all talk Wednesday and make a decision if we haven't gotten an answer….but let's hope he attaches by then and we don't have a decision to make!

Hell yeh! I'm sure he will and even on Wednesday we won't be moving on – just seeing what you guys think is best and I'm here to listen

Perfect.

Oct 27, 2021 at 9:57 AM

Yea, in Shreveport. Had to come down to put down stakes for the studio. M. Night is in the whole place on a 20m production ending early December. 2 other films have said they want the stages in January. If we wanted the stages and production facilities we needed to show our faces and give them comfort. Also scouting to see what works in town. So far so good. I'll call on Mel this afternoon and then call you and we can strategize.

Haha…no, I like it! Good vibrations!

Oct 31, 2021 at 7:20 PM



My dude James is running lines with Mel and he's been in Las cruces for a few days without filming so when they wrap on nov 6 I think we may hear something .. I mean if he does 'hot seat' I knowwwwwweew be will love hard matter - let's go! And happy Halloween by

DEF0015961

wonderfilm Mail - Gibson - Sawyer

 Gmail

BMS <bret@thewonderfilm.com>

---

## Gibson - Sawyer

7 messages

---

**BMS** <bret@thewonderfilm.com>                                        Sat, Oct 16, 2021 at 11:33 AM
To: Justin Price <justinhollywood@gmail.com>, Jeffrey Bowler <jeff@thewonderfilm.com>
Cc: "lataviuspowell@csgwealth.com" <lataviuspowell@csgwealth.com>

Justin – Mel Gibson is interested in playing Sawyer based on the pitch. He took 2 films since we initially engaged on it and is now shooting until Dec 17. His first avail is Jan 5. He also wants a week to read and get back to us.

Feedback to discuss is Mel is 65 and Franziska is his daughter, who I believe is 23, yea? We'll have to have Mel play younger and her play 30ish.  And there's an action sequence at the dock that we'd need to discuss with Gibson about how much he would be up for doing.

bret

---

**Justin Price** <justinhollywood@gmail.com>                           Sat, Oct 16, 2021 at 12:12 PM
To: BMS <bret@thewonderfilm.com>
Cc: Jeffrey Bowler <jeff@thewonderfilm.com>, "lataviuspowell@csgwealth.com" <lataviuspowell@csgwealth.com>

No problem on the age switch and as far as the fight scene I can re-write the fight sequence to a stand off and gun shot slight tussle knife so we don't have to have elaborate stunts on it. This won't affect the timeline as long as we can cast out a good Kyron if Mel agrees to filming January 5, 2022 (maybe Dylan O'Brien) and we can shoot out the rest of the film and then finish up his scenes at the top of the year. We will be able to grab action and frames to help with sellable elements before we even shoot Mel. Thank you for the update and let's rock it.

[Quoted text hidden]

---

**Jeffrey Bowler** <jeff@thewonderfilm.com>                            Sat, Oct 16, 2021 at 12:37 PM
To: Justin Price <justinhollywood@gmail.com>
Cc: BMS <bret@thewonderfilm.com>, lataviuspowell@csgwealth.com

The only problem is that it will cost a lot of money to shoot before Xmas. Hold stages and crew. Send actors and keys home then travel everyone back again.  We need consecutive weeks of production.

It's almost November.  We need good prep and still need to cast.  It will take another few weeks in my professional opinion to cast another big name besides Mel.  Like Dylan.  It just always does.

Jeffrey Bowler
Partner

Wonderfilm

## PROOF OF SERVICE BY ELECTRONIC SERVICE

STATE OF CALIFORNIA, LOS ANGELES

I, John A. Schlaff, am employed in the county of Los Angeles, State of California; I am over the age of 18 years and not a party to the within action; my business address is The Law Offices of John A. Schlaff, 2355 Westwood Boulevard, No. 424, Los Angeles, California 90064.

On August 25, 2025, I electronically served the foregoing **"FOURTH AMENDED COUNTER-CLAIMS FOR EXTORTION, PROMISSORY FRAUD, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, DEFAMATION, UNJUST ENRICHMENT / CONSTRUCTIVE TRUST AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE"** on the interested party or parties by serving through the Pacer system the following parties:

Joseph M. Kar, Esq.
LAW OFFICE OF JOSEPH M. KAR, LLC
15250 Ventura Blvd., Suite PH-1220
Sherman Oaks, CA 91403
jkar@civillegal.com

BLANK ROME LLP
Gregory M. Bordo, Esq.
Craig N. Haring, Esq.
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
craig.haring@blankrome.com
greg.bordo@blankrome.com
greg.bordo@blankrome.com

Carolyn Beck, Esq.
Eisner, LLP
433 N. Camden Drive
4th Floor
Beverly Hills, CA 90210
Email: cbeck@eisnerlaw.com

/ /  State   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

/x/  Federal   I declare (certify, verify or state) under penalty of perjury that the foregoing is true and correct, and that I am employed at the office of a member of the bar of this court at whose direction the service was made.

Executed on August 25, 2025

/ S /
_____
John A. Schlaff

19